**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| D. A., A.A., and Lucinda del Carmen Padilla-Gonzales, | ) ) ) | Case No. 20-cv-3082 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED AS TO |
| v. | ) ) | THOSE CLAIMS SO TRIABLE |
| The United States of America, Heartland Alliance for Human Needs and Human Rights, and Heartland Human Care Services, Inc., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs D.A. and A.A. and their mother, Lucinda Padilla-Gonzales, by their attorneys, bring this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and against Heartland Alliance for Human Needs and Human Rights and Heartland Human Care Services under the Rehabilitation Act, 29 U.S.C. § 794, 42 U.S.C. § 12102(1) and under state law, stating as follows:

### INTRODUCTION

1.      This action seeks damages for the mistreatment of siblings D.A. and A.A. and their mother, Lucinda Padilla-Gonzales, while they were in the custody of the United States government and its contractors.

2.      D.A. and A.A. fled Honduras for the United States with Lucinda in May 2018 to seek safety and asylum from political violence that had been directed against the family in Honduras. D.A. and A.A.'s father, Luis Ardón-Castellanos, and their older brother, L.A., had already fled Honduras the month before.

1

3.      When D.A., and A.A. arrived in the United States with Lucinda, however, federal employees, without warning or explanation, separated the family, holding them in separate detention facilities and keeping them separated for more than a month.

4.      Out of a desire to deliberately inflict cruelty upon a Latino family from Central America, federal agents dragged 14-year old D.A. and 5-year old A.A. away from their mother, crying and screaming, and shipped them off to a shelter far away.

5.      Federal agents did not reunite D.A. and A.A. with their father either, who was already in the United States. Instead, federal agents deliberately moved, detained, and isolated the children in Chicago, Illinois, hundreds of miles away from either of their parents, for more than a month.

6.      Separating D.A. and A.A. from their parents inflicted immense trauma on the children and Lucinda. The government intended this cruelty on D.A. and A.A. in order to coerce Lucinda to give up their rights, including her and her children's asylum claims, and leave the United States.

7.      While the children were detained, for no reason whatsoever other than cruelty, Defendants prevented the children from having a single phone call with their mother, depriving the traumatized children and their mother the opportunity to even hear the other's voices; to know the other was okay; or even alive.

8.      Once D.A. and A.A. arrived in Chicago, the government's contractor, Defendants Heartland Alliance for Human Needs and Human Rights and its subsidiary Heartland Human Care Services, Inc. (collectively "Heartland"), failed to accommodate the siblings' symptoms of post-traumatic stress; subjected the traumatized children to a regimented existence in which they were denied basic features of childhood; deprived the siblings of all privacy; and even separated

the two children from each other, for example prohibiting then five-year-old A.A. from hugging his older sister.  This failure to accommodate the children's evident disability further exacerbated their emotional trauma.

9.       The United States also recklessly disregarded Lucinda's physical safety and health during her detention.  Government agents confiscated crutches that a hospital in the United States had provided to help Lucinda recover from a leg injury, caused her to suffer a traumatic brain injury while being transported in a government vehicle, and ignored medical advice from doctors, deciding to "treat" her head injuries with ibuprofen despite doctors having recommended that she be cared for at a hospital.

10.      Eventually, after more than a month and with the help of legal representation, the family was released from detention and reunited.  The government's effort to traumatize them, though, was successful.  The separation, and the mistreatment described herein, was devastating for D.A., A.A., and Lucinda.  That harm continues to this day.

### JURISDICTION AND VENUE

11.      This Court has jurisdiction over this claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

12.      Plaintiffs have exhausted their FTCA claims. Plaintiffs filed all required administrative forms with each of the relevant agencies of the United States of America more than six months ago. There has been no final disposition of her administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

13.      The Court has jurisdiction over the claims against Heartland, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

14.     A substantial portion of the acts and omissions giving rise to the claims occurred in this district.  Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).

## PARTIES

15.     D.A. is a sixteen-year-old girl.  At the time of the events described herein, she was fourteen years old.  She is the daughter of Plaintiff Lucinda Padilla-Gonzales.

16.     A.A. is a seven-year-old boy.  At the time of the events described herein, he was five years old.  He is the son of Plaintiff Lucinda Padilla-Gonzales.

17.     Lucinda Padilla-Gonzales is the mother of D.A. and A.A.

18.     Defendant United States of America is a proper defendant under the FTCA. *See* 28 U.S.C. §§ 1346(b), 2671, *et seq*. The United States is sued for the personal injuries of D.A., A.A., and Lucinda Padilla-Gonzales, caused by the wrongful acts or omissions of its employees, including employees of the Department of Health and Human Services' Office of Refugee Resettlement (ORR) and the Department of Homeland Security (DHS) and its constituent units, Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and United States Citizenship and Immigration Services (USCIS), as well as the contractors that the agencies directly supervised.  Those employees and contractors were acting within the scope of their employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1246(b).

19.     Defendants Heartland Alliance for Human Needs and Human Rights and its subsidiary Heartland Human Care Services, Inc. (collectively "Heartland") are organizations located in Chicago that contract with the federal government to house "unaccompanied" foreign

children.  On information and belief, Heartland receives federal funding for its role in "shelter

care and other related services for unaccompanied children" in ORR custody, and other projects.[1]

## ALLEGATIONS

### A.  D.A., A.A., and Lucinda come to the United States seeking asylum.

20.      On the night of May 23, 2018, D.A. and A.A. entered the United States with their

mother, Lucinda Padilla-Gonzales, seeking asylum from political violence in their native

Honduras, along with other asylum seekers.  Shortly after crossing the U.S. border, several CBP

officers approached the group and arrested them. The CBP officers loaded the group into a van

without offering them food or water.  They insulted Lucinda and her children, calling them liars

and telling them that they were tired of immigrants, and questioned their motives for coming to

the United States.  The CBP officers also told the group that they would all lose their children.

### B.  The government confines the family in an "icebox."

21.      CBP officers took Lucinda and her children to the Ysleta Port of Entry in El Paso,

Texas.  Once at this holding center, a federal officer searched Lucinda and confiscated all of her

belongings, including her identification card, birth certificates, and 80 Mexican pesos. These

belongings were never returned to Lucinda.

22.      The type of holding center they were taken to is commonly referred to by asylum

seekers as a "*hielera*" (an "icebox," in Spanish) because of the freezing cold temperatures in

violation of CBP's own internal policies and standards.[2] Lucinda, D.A., and A.A., who were still

---

[1] *See* Department of Health and Human Services Office of the Inspector General, *Office of Refugee Resettlement Unaccompanied Alien Children Grantee Review – Heartland*, Report No. A-05-16-00038 (Sept. 2018), *available at* https://oig.hhs.gov/oas/reports/region5/51600038.asp (last visited May 22, 2020) (detailing Heartland's receipt of federal funds and contractor relationship with ORR and HHS).

[2] CBP issued the National Standards on Transport, Escort, Detention and Search (TEDS) in October of 2015, and CBP officers were required to abide by these standards during the period of

wet from crossing the river, were forced to sit, shivering, on concrete steps in the *hielera*. They were not given any blankets or jackets to protect them from the cold while they waited.

23.     The family was held at Ysleta Port of Entry detention facility for approximately a day and a half.  During this time in the holding cell, federal officers repeatedly insulted D.A., A.A., and Lucinda.  They also told Lucinda that her children would be taken away from her, and that she would be deported.[3]

24.     The federal agents also ignored Lucinda's medical needs.  Several days before arriving to the U.S.–Mexico border, Lucinda had fallen and hurt her leg, which was swollen and painful by the time the family crossed into the United States. After Lucinda complained about the pain and swelling, officers handcuffed her in front of her children and took her to a nearby hospital. At the hospital, she was given Ibuprofen to reduce the pain, her leg was wrapped in a

---

plaintiffs' separation and detention. *See* Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search 2015 [Hereinafter TEDS] *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search (last visited May 22, 2020). Section 4.6 of the TEDS "Hold Room Standards" states that "When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. *Under no circumstances will officers/agents use temperature controls in a punitive manner*." TEDS at 16 (emphasis added). By subjecting plaintiffs to freezing cold temperatures deliberately in the *hielera*, CBP officers violated this TEDS standard.

[3] Section 1.2 "Integrity and Professionalism" of the TEDS states that "CBP employees must speak and act with the utmost integrity and professionalism. CBP employees must conduct themselves in a manner that reflects positively on CBP at all times." TEDS at 4. Section 1.4 "Non-Discriminatory Policy" also states that "CBP employees must treat all individuals with dignity and respect. CBP employees will perform their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulation, Executive Order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures." *Id*. at 4. CBP officers violated these standards by insulting Lucinda and other immigration detainees, and making derogatory and unprofessional comments about detainees.

cloth bandage, and she was provided with crutches. CBP officers, however, then confiscated her crutches and never returned them to her.

### C. The government separates D.A. and A.A. from their mother and sends them to Chicago.

25.     On approximately May 24, 2018, shortly after Lucinda returned from the hospital, she was taken by federal agents and told she was going to federal prison. For no apparent purpose other than to inflict pain and humiliation, the federal agents did not give Lucinda an opportunity to explain anything to D.A. and A.A., or hug and kiss them goodbye. As the federal agents took Lucinda away in handcuffs, fourteen-year-old D.A. and five-year-old A.A. screamed and cried for their mother through a plexiglass divider.[4]

26.     The purpose of separating D.A. and A.A. from their mother, and isolating them from any family, was to torment and traumatize the family, and to coerce Lucinda to give up the asylum claims she had made on behalf of herself and her children and accept deportation.

27.     The torment and trauma were inflicted deliberately because of their race and national original. The government's actions were directed at them because they were Latinos from the Central American country of Honduras, and it also served to deter families from Central American countries like Honduras from seeking asylum in the United States.

---

[4] CBP and ICE officers also repeatedly violated their non-discretionary obligations to abide by their own internal policies and standards in their mistreatment of D.A., A.A., and Lucinda. Section 1.9 of the TEDS "General Standards" states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." TEDS at 4. Section 5.6 of the TEDS on "Detention" states that "Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures."  TEDS at 22. Because no legal requirement or safety and security required plaintiffs' separation, CBP officers violated this standard by separating D.A. and A.A. from Lucinda. Additionally, officers failed to follow these standards by separating Lucinda from D.A. and A.A.

28.     After taking D.A. and A.A.'s mother from them, federal officials held the children in the Ysleta Port of Entry facility—the *hielera*—for another day.  Then they took D.A. and A.A. to another detention center that was filled with unaccompanied children.  The facility resembled a jail, and it was impossible to tell whether it was day or night.

29.     D.A. asked to speak with her parents.  She had a small piece of paper with phone numbers on it, and she showed it to the federal agents so that they would let her call her family. The agents said that she was not allowed to have the paper and they took it from her.  They said she could not speak with her father.

30.     After about two days in this second facility, the children were taken to an airport, where they were placed on a commercial flight with two adults.  D.A. asked the adults if they were being reunited with their parents, but the adults ignored her questions.  They did not tell D.A. and A.A. where they were being taken. The children were terrified, anxious and unsure of whether or when they would see their parents again, and fearful about where they were being taken. When the flight landed, the adults told D.A. and A.A. that they were in Chicago.

**D.  In Chicago, D.A. and A.A. are mistreated in the custody of Heartland Alliance.**

31.     After landing in Chicago, the two adults rented a van and drove the children to a detention facility for minors operated by Defendants Heartland Alliance for Human Needs and Human Rights' subsidiary, Heartland Human Care Services, in Chicago, believed to be named Casa Guadalupe.

32.     When D.A. and A.A. arrived at the Heartland facility, the children did not understand why they were there.  Employees at the facility told them that their parents had committed crimes by bringing them to the United States, and that the separation was punishment for their crimes.  During their time at the facility, the children heard at least one employee say

8

ugly things about immigrants coming to the United States without permission, including comments about the children in their care.

33.     Upon arrival, employees at the Heartland facility immediately separated D.A. and A.A. from each other, and took them to different buildings, forbidding them from talking privately or even hugging beforehand.  After separating the children, the employees took what belongings the children had. The children were given clothes from the facility.

34.     After D.A. and A.A. were separated, their ability to see and talk with each other was highly restricted.  They were held in separate buildings, and they only permitted to see each other for short periods when children from the different buildings were scheduled to have recreation at the same time, which did not always happen. When the siblings did see each other, every minute of their interaction was supervised by staff.  During these brief interactions, D.A. and A.A. were not allowed to speak privately, or allowed to make any physical contact, even to hug.

35.     After about a week at the facility, without contact with any other family, the children were finally permitted to talk to their father over the phone for short amounts of time. Staff at the facility prevented these conversations from being private, however.  Instead, each time one of the children spoke with their father, a staff person was present and would listen.

36.     Even after that point, A.A. had difficulty placing regular calls and once was unable to speak to his father for a whole week. The children repeatedly asked to call other family members, but were forbidden from doing so.

37.     The children also asked to talk with their mother, but staff at the facility told them that they could not contact her.  The children never spoke to Lucinda while they were in detention.

38.     At the Heartland shelter, A.A. would cry at night and ask for his mom.  When this happened, a woman told him that she was his new mom.  The shelter staff also forced A.A. to take sleeping pills while he was at the shelter in order to get him to stop crying and to make him sleep.  Shelter staff also punished him for crying by having his food taken away from him.  A.A. lost weight while he was at the shelter.  A.A. was also bullied by larger children at the shelter, and he was punished and confined in the shelter for an additional week after getting into a scuffle with another child.

39.     D.A. was housed in a room with three other girls.  Their room was checked regularly, and staff at the facility would search their beds for contraband.  Her interactions with the other girls were closely supervised and severely restricted.  Staff at the facility forbid the girls from talking about their personal lives or their cases, preventing them from making personal connections with one another or becoming friends.

40.     The facility where D.A. and A.A. were confined was unsanitary. D.A. and A.A. were surrounded by other frightened and traumatized children, many of whom, having also arrived from overcrowded CBP detention facilities on the border, were sick with scabies, shingles, chickenpox, and tuberculosis.  Indeed, while they were at the facility, D.A. became infested with lice.  D.A. asked staff at the facility for lice treatment, but they ignored her, telling her she had dandruff.  When D.A. combed her hair, however, there were bugs in the comb; she received no treatment for the lice until after she was released from Heartland and reunited with her family.

41.     Heartland failed to provide adequate educational services to D.A. and A.A, who were in the classroom very few hours a day, with almost no curriculum, and in combined classrooms with children whose ages ranged from 5 years old to 17 years old.

42.     The treatment D.A. and A.A. received at the Heartland shelter failed to take account of the trauma they had experienced fleeing Honduras and being separated from their mother, and instead exacerbated it.  It is well known that families and children arriving in the United States from Central America are often severely emotionally traumatized by their experiences of persecution and violence in those countries, by their perilous journey to the United States, and by the abusive treatment at the hands of border and immigration officials once they arrive in this country.

43.     It is further well known that children who are subject to these conditions suffer from post-traumatic stress disorder, generalized anxiety, and depression.[5]  Unless programs and detention conditions address these disabilities, traumatized children are prevented from taking advantage of basic services that are offered to unaccompanied children, such as the provision of a safe and non-traumatizing setting in which to sleep, play, learn, and develop.  Indeed, regimented isolation and restriction from interacting with other children, including restrictions that inhibit everyday human contact, are likely to exacerbate children's existing psychological conditions and impose further emotional trauma.

44.     This was true of D.A. and A.A. They had fled their childhood homes under threat of death, were abruptly and traumatically separated from their mother just hours after arriving in a strange and unfamiliar country and were then isolated and confined in the Heartland facility's strictly controlled setting for more than a month.[6]  Heartland's regimented restrictions on the

---

[5] *See* Notification of disabilities of persons targeted in Central American refugee raids and request for immediate modifications, *Letter to DHS and DOJ from 241 Organizations* (Jan. 2016), *available at* https://law.yale.edu/sites/default/files/area/clinic/document/dhs_doj_rehab_act_letter_-_2016.01.11_-_english.pdf (last visited May 22, 2020).

[6] *See* Melissa Sanchez, et al., ProPublica, *After Controversy, Heartland to Close Four Illinois Shelters for Immigrant Youth*, available at: https://www.propublica.org/article/heartland-illinois-shelters-four-to-close-immigrant-youth (last visited May 22, 2020) ("'we cared for the influx of

interaction of children—including the restriction on interactions between siblings—failed to take account of these traumatic experiences, thereby imposing on D.A. and A.A. a living situation that further traumatized them and inhibited their normal development and their ability to take advantage of the programming and services that Heartland offered to the children in custody.

45.    It was only on June 29, 2018, after more than a month of confinement, that the two children were finally allowed to be reunited with their father.

### G. Defendants unnecessarily delay D.A. and A.A.'s reunification with their father and condition reunification on Luis' ability to finance travel.

46.    Soon after D.A. and A.A. arrived at the Heartland facility, Luis was made aware that his children were being held in Chicago. He spoke repeatedly to a Heartland staff member named "Rafael," asking asked how he could be reunited with his children.

47.    Rafael eventually provided Luis a form to request the release of his children, which Luis filled out and returned immediately. After submitting the form, Luis did not hear back from any government or Heartland employee for days. When Luis was eventually contacted, the date he was told his children would be released was repeatedly delayed. In total, Defendants delayed the date of release for A.A. and D.A. by several weeks.

48.    When the children were finally supposed to be released, Luis was suddenly told that their release was contingent upon his paying for his children's airfare and the airfare of a custodian to fly from Chicago.

49.    On June 29, 2018, A.A. and D.A.'s isolation finally ended, more than a month after it began, when they were handed over to their father at the airport in Charlotte, North

---

children who had been severely traumatized by the federal government's practice of forcibly separating them from their parents at the border,'" [Heartland Human Care Services] executive director David Sinski wrote in the memo.")

.

Carolina.  By that point, Defendants had needlessly separated the fourteen-year-old and the five-year-old from their parents for approximately five weeks.

**H. The government mistreated Lucinda, who remained in its custody.**

50.      Meanwhile, after Lucinda was separated from A.A. and D.A. on approximately May 24, 2018, federal officers took her to another facility. After arriving at the facility, Lucinda was forced to wait for approximately six hours in a freezing cold area, during which time she was tightly handcuffed.  When she asked the federal officers to loosen them, they refused, and instead insulted her and told her that she had no right to ask for anything.  The federal officers also told Lucinda that no matter what she said or did, she wouldn't get out.  At approximately 3:00 a.m., she was taken to the showers by federal officers.  They ordered her to strip and to shower in cold water.  Then the federal officers moved her to a cell, where she continued to shiver due to the low temperatures at the facility.

51.      On June 4, 2018 Lucinda was found guilty of improper entry.  She received a one-year sentence of probation.

52.      Even though Lucinda had not been sentenced to any period of incarceration, she was not reunited with her children, sent to a family residential center, or released to join her family.  Instead, federal officers continued to imprison her, transferring her to the West Texas Detention Facility in Sierra Blanca, Texas, which is operated by ICE.[7]  At this point, despite her repeated requests, she had still not heard from her children and did not know where they were.

---

[7] In 2000, the Immigration and Nationality Act introduced the Performance Based National Detention Standards (PBNDS) for detention facilities, which ICE officers are required to follow in their treatment of detainees. *See* U.S. IMMIGRATION & CUSTOMS ENF'T, PERFORMANCE-BASED NAT'L DET. STANDARDS 2011 (rev. ed. 2016) [Hereinafter 2016 PBNDS] (the applicable version of the PBNDS at the time of the plaintiffs' detention) [available at https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf].

I.   **The government recklessly causes Lucinda to suffer a traumatic brain injury.**

53.     Sometime later in June, in the middle of the night, several federal agents believed to be ICE agents came into Lucinda's cell and told her that she was leaving. Lucinda thought that she was being released from detention and being reunited with her family. The agents, however, handcuffed her behind her back and shackled her ankles before loading her into the backseat of a government vehicle. No seatbelt was placed on her. Lucinda asked where she was being taken, but her questions were ignored. During transit, the driver suddenly slammed on the brakes. Lucinda, who was still handcuffed and shackled, could not use her arms to protect herself and was thrown forward. She slammed headfirst directly into the metal bars that separated her from the federal officers. The sudden impact caused an injury to her head and upper body. She was in severe pain, and began bleeding. She told the federal agents she was lightheaded and needed to vomit, but her cries were ignored.[8]

54.     Lucinda suffers the effects of this injury to this day.

55.     The federal agents took no actions to respond to or even acknowledge Lucinda's obvious injuries. When they arrived at their destination, Lucinda realized she was at an airport and was on the brink of being deported by airplane, without her children. She was taken from the vehicle by federal agents, and they attempted to deport her by forcing her onto the plane, even

---

[8] ICE officers violated their non-discretionary obligations under the PBNDS when they failed to properly secure Lucinda while transporting her and recklessly caused her severe head injury. Section 1.3 of the 2016 PBNDS addresses "Transportation (by Land)," and requires that transporting officers "shall comply" with requirements to "transport[] detainees in a safe and humane manner," and that officers must ensure that "vehicles are equipped with seatbelts, [and] detainees are properly secured before the transport begins." *Id.* at 38, 40. ICE officers violated their non-discretionary duties by failing to transport Lucinda in a humane fashion and failing to make sure that she was secure before the transport began. The reckless disregard for these non-discretionary duties caused Lucinda's head trauma and its long-lasting effects.

though she was bleeding from her head, and even though her children were not with her. Lucinda refused to get on the airplane and steadfastly indicated that she would not leave without her children.

56.     The federal agents returned Lucinda to the Sierra Blanca facility later that night. The next day, she was taken to the medical unit at the facility to address her head injury, and medical providers indicated that she should be taken to a hospital. At the hospital, doctors examined her and indicated that she needed to return if her condition did not improve within a few days. Over the next several days Lucinda's condition did not improve—she suffered swelling, difficulty eating, vision problems, and even trouble navigating her detention area—but federal agents never returned her to the hospital.  Instead, they merely gave her ibuprofen.

57.     Aside from her lack of medical care, the conditions at the West Texas Detention Facility where Lucinda was held were miserable.  She was housed in a small detention pod with approximately one hundred other women, who had to clean the space themselves.  Guards would turn the lights out around 11:00 p.m. and turn them on again around 4:30 a.m., and throughout the night they would purposefully turn lights on and off, and yell at detainees.  Anything resembling consistent sleep was impossible.  This compounded Lucinda's traumatic brain injury, causing her significant pain.

58.     The family eventually was able to obtain the services of an immigration attorney for Lucinda.   The attorney was able to secure a Credible Fear Interview for Lucinda on July 9, 2018, which she passed.  Finally, through further advocacy by the immigration attorney, on August 21, 2018, Lucinda was granted bond.  She was released from immigration detention and traveled to Charlotte, North Carolina, where she was finally reunited with Luis and her three children.

J.   **The trauma that D.A., A.A. and Lucinda suffered from Defendants'**
     **misconduct continues to this day.**

59.   The trauma caused by the forced separation of D.A. and A.A. from their parents
did not end, however.  When Lucinda attempted to hug A.A. upon reuniting, he rejected her and
told her that he hated her for abandoning him and that he never wanted to see her again. He
asked why she left him. D.A., meanwhile, told Lucinda that after experiencing the separation
from her mother and life in the shelter, she wished she had never been born.

60.   D.A. keeps to herself and is closed off. When D.A. comes home from school, she
often closes herself in her bedroom, pulls down the curtains and just wants to be alone.

61.   A.A. was five years old when government employees forcibly separated him from
his mother and sent him to the Heartland shelter. At the time he was completely toilet trained.
Shortly after he was released from the Heartland shelter, however, A.A. began losing control of
his bowel movements and frequently defecated and urinated himself.  A.A. continues to have
trouble with his bodily functions. He frequently urinates himself due to nervousness, especially
when he is outside of the house. Since being released from the shelter in Chicago, he also has not
been able to maintain a regular sleeping schedule, is particularly scared of being alone for any
length of time, and he has hidden under tables out of fear from his experiences at the shelter.

62.   Lucinda still suffers greatly from her forced separation from her children.  It is
extremely difficult for her to talk about what happened to her and to her children during
separation, and during her detention.  She still has problems sleeping, and often wakes up in the
middle of the night reaching for her children to make sure that they are still there.  Memories of
being forcibly separated from her children cause her severe stress and anxiety, overwhelming
bouts of sadness and trauma, fear, and even loss of appetite for days at a time.

63.     In addition, Lucinda still suffers pain from her head injury including vision problems, trouble reading, and bouts of forgetfulness that had not occurred before her head injury.

### K. The government separation of D.A. and A.A. from Lucinda was unconstitutional, unlawful and done in order to coerce them into abandoning their legitimate immigration claims

64.     The government forced Plaintiffs' separation by sending the children to its contractor, Heartland, in Chicago.  But there was no legitimate reason to do this. Indeed, in *Ms. L. v. U.S. Immigration and Customs Enforcement*, Judge Sabraw addressed the family separation practices that Lucinda, D.A., and A.A. were subject to and concluded that "nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective." 310 F. Supp. 3d 1133, 1142 (S.D. Cal. 2018).

65.     Under long-standing legal obligations, imposed by regulations and by consent decree, the federal officers who took custody of Lucinda and her children violated multiple, non-discretionary duties that were designed to protect the families, particularly D.A. and A.A.

66.     Among other things, those non-discretionary obligations impose a duty on federal officers not to separate immigrant families who are arrested together, to prioritize release of minors to family members over refugee shelters or foster care,  to allow detained children to have contact with family members who were arrested with them, and to ensure the prompt release of minors held in immigration custody.  In its treatment of the Plaintiffs, the government violated all of these obligations.

67.     ICE and CBP have a well-established legal obligation to ensure the prompt release of minors held in immigration custody and to favor preserving family unity whenever

possible. *See Flores v. Reno*, CV 85-cv-4544, Dkt. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* class action litigation, brought on behalf of minor children held in immigration detention, began in 1985 and resulted in a 1997 consent decree that remains binding on the United States. The decree also significantly limits the circumstances, duration, and manner of immigration detention of minor children. Among other things, the decree requires ICE to prioritize the prompt release of detained minors.

68.     The *Flores* consent decree also created standards for the treatment of minors while in federal custody and recognizes the vulnerability of immigrant children detained without a parent or other legal guardian. The *Flores* consent decree includes a requirement that immigration officers hold minor children in facilities that provide (1) access to food and drinking water; (2) medical assistance in the event of emergencies; (3) toilets and sinks; (4) adequate temperature control and ventilation; (5) adequate supervision to protect minors from others; (6) separation from unrelated adults whenever possible; and (7) contact with family members who were arrested with the minor.

69.     DHS and its agents violated its obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity, instead removing A.A. and D.A. from Lucinda's care, and then failing to promptly reunify the children with their father.

70.     Federal officers also had no reason to believe that Lucinda was an unfit parent or otherwise an inappropriate caregiver for D.A. and A.A.  And within hours of first apprehending the family, federal officials knew that the children's father, Luis, could be contacted and was available to take them in and care for them.  As such, in separating D.A. and A.A. from their mother, then confining them in Chicago for more than a month, hundreds of miles from both their parents, the government violated its non-discretionary obligations.

71.     Additionally, the separation of D.A. and A.A. from Lucinda violated their constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e. g.*, *Quilloin v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally important for children to remain with their parents, *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligation the state can neither supply nor hinder.").

72.     Judge Sabraw also concluded in *Ms. L.* that the family separation practice Lucinda, D.A. and A.A. were subjected to likely violated parents and children's due process rights. *See Ms. L.*, 310 F. Supp. 3d at 1144–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' interferes with rights "'implicit in the concept of ordered liberty[,]'" and is so "'brutal" and "offensive" that it [does] not comport with traditional ideas of fair play and decency.'") (citations omitted); *see also C.M. v. United States*, 2020 WL 1698191, at *7 (D. Ariz. Mar. 30, 2020) (finding that plaintiffs in a related family separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights.")

73.     The separation of Lucinda, D.A., and A.A. was additionally unconstitutional because it was motivated by discriminatory animus towards Latino immigrants of Central American origin in particular. Central American asylum seekers in particular were targeted for deprivation of their right to family integrity as means to deter them from pursuing legitimate immigration claims and multiple federal government officials stated publicly that the purpose of

family separation was to deter Central American families from seeking asylum in the United States.

74.     Additionally, and relatedly, federal officials also separated Lucinda from her children in order to impede her case for immigration protection in the United States.  It is a common and long-standing government tactic to pressure immigrant parents into giving up their immigration cases by separating them from their children in order to demoralize them and convince them to abandon their claims for asylum.  *See*, *e.g*., *Lopez Venegas v. Napolitano*, Complaint, No. 2:13-cv-03972 (C.D. Cal. Aug. 18, 2014); *Doe v. Johnson*, No. 4:15-cv-00250, ECF 1 (D. Ariz. June 8, 2015); Human Rights Watch, *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm* 20-29 (Oct. 2014) available at: https://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf (last visited May 22, 2020).

75.     In this case, on more than one occasion immigration officers pressured Lucinda to sign away her rights and agree to be deported back to Honduras. Relying on family separation to coerce asylum seekers into giving up their immigration claims is also a violation of existing regulations and a breach of the United States' non-discretionary legal obligations. *See* 8 C.F.R. § 235.4 (noting that an immigrant's "decision to withdraw his or her application for admission must be made voluntarily[.]"); *see also*, *Ms. L*, 403 F. Supp. 3d 853, 865 (S.D. Cal. 2019) (finding that for a number of parents the coercion of family separation rendered their decision to withdraw applications for admission involuntary).

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (United States of America)

76.     The other paragraphs of this complaint are incorporated as if set forth here.

77.     By engaging in the acts described in this Complaint, the federal employees, officials, and contractors referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs D.A., A.A., and Lucinda to suffer severe emotional distress.

78.     As a direct and proximate result of that conduct, Plaintiffs D.A., A.A., and Lucinda suffered severe emotional distress.

79.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs D.A., A.A., and Lucinda for intentional infliction of emotional distress.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (United States of America)

80.     The other paragraphs of this complaint are incorporated as if set forth here.

81.     The federal employees, officials, and contractors referenced above were guardians of D.A. and A.A.

82.     In turn, D.A. and A.A. were wards of the federal employees, officials, and contractors.

83.     As guardians, these federal employees had a fiduciary relationship to D.A. and A.A. as children housed in federal facilities.

84.     Among their obligations as guardians, the federal employees, officials, and contractors were obligated to act in the best interest of D.A. and A.A.

85.     As described more fully throughout this complaint, however, these federal employees, officials, and contractors breached these fiduciary duties to D.A. and A.A.

86.     As a direct and proximate result of those breaches D.A. and A.A. suffered severe emotional distress.

87.     Under the Federal Tort Claims Act, the United States is liable to D.A. and A.A. for breach of fiduciary duty.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (Heartland)

88.     The other paragraphs of this complaint are incorporated as if set forth here.

89.     Heartland and its employees referenced above were guardians of D.A. and A.A.

90.     In turn, D.A. and A.A. were wards of Heartland.

91.     As guardians, Heartland and its employees had a fiduciary relationship to D.A. and A.A. as children housed in their facilities.

92.     Among their obligations as guardians, Heartland and its employees were obligated to act in the best interest of D.A. and A.A.

93.     As described more fully throughout this complaint, however, Heartland and its employees breached these fiduciary duties to D.A. and A.A.

94.     As a direct and proximate result of those breaches D.A. and A.A. suffered severe emotional distress.

95.     Under Illinois state law, the Heartland Defendants are liable to D.A. and A.A. for breach of fiduciary duty.

## COUNT IV
## NEGLIGENCE
### (United States of America)

96.     The other paragraphs of this complaint are incorporated as if set forth here.

97.     The federal employees, officials, and contractors referenced above had a duty to Plaintiffs D.A., A.A., and Lucinda to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, D.A., A.A., and Lucinda.

98.     By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs D.A., A.A, and Lucinda.

99.     As a direct and proximate result of the referenced conduct, Plaintiffs, D.A., A.A., and Lucinda suffered substantial damages.

100.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs, D.A., A.A., and Lucinda for negligence.

**COUNT V**
**NEGLIGENCE**
**(Heartland Alliance)**

101.    The other paragraphs of this complaint are incorporated as if set forth here.

102.    Heartland and its employees referenced above had a duty to Plaintiffs D.A., A.A., and Lucinda to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, D.A., A.A., and Lucinda.

103.    By engaging in the acts alleged herein, Heartland and its employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs D.A., and A.A.

104.    As a direct and proximate result of the referenced conduct, Plaintiffs, D.A., A.A., and Lucinda suffered substantial damages.

105.    Under Illinois state law Heartland is liable to Plaintiffs, D.A., A.A., and Lucinda for negligence.

**COUNT VI**
**NEGLIGENT SUPERVISION**
**(United States of America)**

106.    The other paragraphs of this complaint are incorporated as if set forth here.

107.    Plaintiffs suffered damages from foreseeable misconduct of an employee supervised by the defendant.

108.    The government's employees in supervisory roles have a duty to properly supervise federal officers and to oversee their treatment of immigrants in their custody.

109.    The blatant disregard for CBP ICE's own internal policies and standards by officers also shows CBP and ICE management staff were negligent in their non-discretionary duties to supervise individual officers.

110.    The government's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Lucinda, D.A., and A.A.

111.    As a proximate result of this failure to supervise, Lucinda, D.A., and A.A. suffered the injuries described herein.

112.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligent supervision.

## COUNT VII
## NEGLIGENT SUPERVISION
### (Heartland)

113.    The other paragraphs of this complaint are incorporated as if set forth here.

114.    Plaintiffs suffered damages from foreseeable misconduct of one or more employees supervised by the Heartland Defendants.

115.    Heartland and its employees in supervisory roles have a duty to properly supervise their agents and to oversee their treatment of immigrants in their care.

116.    Heartland's negligent supervision proximately caused the unlawful conduct described herein.

117.    As a proximate result of this failure to supervise, Lucinda, D.A., and A.A. suffered the injuries described herein.

24

118.     Under Illinois state law, the Heartland Defendants are liable to plaintiffs for negligent supervision.

## COUNT VIII
## CONVERSION
### (United States of America)

119.     The other paragraphs of this complaint are incorporated as if set forth here.

120.     Plaintiff had a legal right to property described in this complaint.

121.     Federal employees, officials, and/or contractors intentionally interfered with that right.

122.     The actions of the federal employees, officials, and/or contractors proximately caused Plaintiff to lose her property.

123.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for conversion.

## COUNT IX
## ABUSE OF PROCESS
### (United States of America)

124.     The other paragraphs of this complaint are incorporated as if set forth here.

125.     The government's employees, officials, and/or contractors abused legal processes within their control for the unlawful purposes of traumatizing Plaintiffs, coercing Plaintiffs to abandon their lawful claims to asylum, and deterring future migrants from seeking refuge in the United States.

126.     Lucinda, D.A., and A.A. were injured by this misconduct, as described herein.

## COUNT X
## LOSS OF CONSORTIUM
### (United States of America)

127.     The other paragraphs of this complaint are incorporated as if set forth here.

128.    Plaintiffs had a legal right to parent child consortium, which the government's employees, officials, and/or contractors violated.

129.    The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family.

130.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their loss of consortium.

**COUNT XI**
**REHABILITATION ACT**
**(Heartland Alliance)**

131.    The other paragraphs of this complaint are incorporated as if set forth here.

132.    At all times relevant to this Complaint, in light of the mental and emotional injuries created by their trauma, D.A. and A.A. were qualified individuals with a disability as defined in Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, 42 U.S.C. § 12102(1).

133.    Heartland receives federal funding.

134.    Under the Rehabilitation Act, no qualified individual with a disability may be excluded from participation in or be denied the benefits of the services, programs, or activities of a recipient of federal funding, or be subjected to discrimination by any such entity.

135.    To prevent discrimination, such recipients must make reasonable modifications to their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless doing so would fundamentally alter the nature of the services provided by the entity.

136.    Due to the symptoms caused by their trauma, D.A. and A.A. had impairments that substantially limited one or more major life activities, including thinking, sleeping, eating, learning, and safe play.  As a result of these disabilities, they required the ability to interact and

develop in a therapeutic setting that did not restrict basic human interaction including, physical touch, hugging of family members, phone calls with family and relatives, and personal conversation.  At the Heartland shelter in Chicago, such accommodations could have been made without fundamentally altering the services that Heartland provided.

137.    Even though it was well-known that children like D.A. and A.A. are disabled, the Heartland Defendants did not modify its programs and services to permit basic human interaction contact, and educational development, preventing D.A. and A.A. from participating in the programs and services offered at the shelter.

138.    D.A. and A.A. were injured by the failure of Heartland to provide reasonable accommodation of their disabilities, as described herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

(1) Compensatory damages;

(2) Punitive damages;

(3) Attorneys' fees and costs; and

(4) Such other and further relief as the Court may deem just and appropriate.

\*      \*      \*

Dated: May 22, 2020                          Respectfully submitted,


                                             _/s/ Anand Swaminathan_
                                             Anand Swaminathan – anand@loevy.com
                                             Sarah C. Grady – sarah@loevy.com
                                             Stephen H. Weil – weil@loevy.com
                                             Loevy & Loevy
                                             311 N. Aberdeen Street 3rd Floor
                                             Chicago, IL 60607
                                             312-243-5900


                                             _/s/ Conchita Cruz_
                                             *Conchita Cruz –
                                             conchita.cruz@asylumadvocacy.org
                                             *Zachary Manfredi –
                                             zachary.manfredi@asylumadvocacy.org
                                             *Jasmina Nogo –
                                             jasmina.nogo@asylumadvocacy.org
                                             Asylum Seeker Advocacy Project (ASAP)
                                             228 Park Ave. S. #84810
                                             New York, NY 10003
                                             305.484.9260

                                             *Pro Hac Vice motions forthcoming.


                                             _Counsel for Plaintiffs_