**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| D. A., A.A., and Lucinda del Carmen Padilla-Gonzales, | ) ) ) | Case No. 20-cv-3082 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Martha M. Pacold |
| The United States of America, Heartland Alliance for Human Needs and Human Rights, and Heartland Human Care Services, Inc., | ) ) ) ) | |
| Defendants. | ) ) | JURY TRIAL DEMANDED AS TO THOSE CLAIMS SO TRIABLE |

**FIRST AMENDED COMPLAINT**

Plaintiffs D.A. and A.A. and their mother, Lucinda Padilla-Gonzales, by their attorneys, bring this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and against Heartland Alliance for Human Needs and Human Rights and Heartland Human Care Services under the Rehabilitation Act, 29 U.S.C. § 794, 42 U.S.C. § 12102(1) and under state law, stating as follows:

**INTRODUCTION**

1.      Siblings D.A. and A.A. and their mother, Lucinda Padilla-Gonzales, came to the United States desperate for help. Upon being taken into custody, however, federal agents and contractors working for the United States government subjected the family to treatment so harsh and deliberately cruel that it could be fairly described as torturous. This action seeks damages for that unlawful mistreatment.

2.      D.A. and A.A. fled Honduras for the United States with Lucinda in May 2018 to seek safety and asylum from political violence that had been directed against the family. D.A.

1

and A.A.'s father, Luis Ardón-Castellanos, and their older brother, L.A., had already fled Honduras the month before.

3.      When Lucinda and her children arrived in the United States, however, they were repeatedly mistreated by Department of Homeland Security ("DHS") agents who acted unlawfully and in violation of applicable regulations and policies. Out of a desire to deliberately inflict cruelty upon a Latino family from Central America, federal agents dragged 14-year-old D.A. and 5-year-old A.A. away from their mother, crying and screaming, and shipped them off to a shelter far away without telling Lucinda or her children about what was happening or where the children were going.

4.      Federal agents did not promptly take action to reunite D.A. and A.A. with their father either, who was already in the United States and anxious to be reunited with his children. Instead, federal agents deliberately moved, detained, and isolated the children in Chicago, Illinois, hundreds of miles away from either of their parents, for more than a month.

5.      Separating D.A. and A.A. from their parents inflicted immense trauma on the children and Lucinda. Federal agents conducted the separation and treated the children in a deliberately cruel manner in order to coerce Lucinda to give up her and D.A. and A.A.'s rights, including their asylum claims, and leave the United States.

6.      For example, contrary to their mandatory obligations, after separating Lucinda and her children, federal agents then prevented them from having a single phone call with their mother, depriving the traumatized children and their mother of the opportunity to even hear the other's voices; or to know the other was okay; or even alive.

7.      Once D.A. and A.A. arrived in Chicago, the government's contractor, Defendants Heartland Alliance for Human Needs and Human Rights and its subsidiary Heartland Human

Care Services, Inc. (collectively "Heartland"), failed to accommodate the siblings' symptoms of post-traumatic stress; subjected the traumatized children to a regimented existence in which they were denied basic features of childhood; deprived the siblings of all privacy; and even separated the two children from each other, for example prohibiting then five-year-old A.A. from hugging his older sister.  This failure to accommodate the children's evident disability further exacerbated their emotional trauma.

8.     Federal agents also recklessly disregarded Lucinda's physical safety and health during her detention.  Agents confiscated crutches that a hospital in the United States had provided to help Lucinda recover from a leg injury, caused her to suffer a traumatic brain injury while being transported in a government vehicle, and ignored medical advice from doctors, deciding to "treat" her head injuries with ibuprofen despite doctors having recommended that she be cared for at a hospital.

9.     Eventually, after more than two months and with the help of legal representation, Lucinda was released from detention and reunited with her children.  But the injuries that D.A., A.A., and Lucinda suffered as a result of the misconduct of federal agents were substantial.  The mistreatment that they were forced to endure, described herein, was devastating, and the resulting harm continues to this day.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this claim for money damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

11.     Plaintiffs have exhausted their FTCA claims. Plaintiffs filed all required administrative forms with each of the relevant agencies of the United States of America more

than six months ago. There has been no final disposition of her administrative claims, and

Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

12.    The Court has jurisdiction over the claims against Heartland, pursuant to 28

U.S.C. § 1331 and 28 U.S.C. § 1367.

13.    A substantial portion of the acts and omissions giving rise to the claims occurred

in this district.  Venue is therefore appropriate under 28 U.S.C. §§ 1391 and 1402(b).

## PARTIES

14.    D.A. is a sixteen-year-old girl.  At the time of the events described herein, she

was fourteen years old.  She is the daughter of Plaintiff Lucinda Padilla-Gonzales.

15.    A.A. is a seven-year-old boy.  At the time of the events described herein, he was

five years old.  He is the son of Plaintiff Lucinda Padilla-Gonzales.

16.    Lucinda Padilla-Gonzales is the mother of D.A. and A.A.

17.    Defendant United States of America is a proper defendant under the FTCA. *See*

28 U.S.C. §§ 1346(b), 2671, *et seq*. The United States is sued for the personal injuries of D.A.,

A.A., and Lucinda Padilla-Gonzales, caused by the wrongful acts or omissions of its employees,

including employees of the Department of Health and Human Services' Office of Refugee

Resettlement (ORR) and the Department of Homeland Security (DHS) and its constituent units,

Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and

United States Citizenship and Immigration Services (USCIS), as well as the contractors that the

agencies directly supervised.  Those employees and contractors were acting within the scope of

their employment under circumstances where the United States, if a private person, would be

liable to Plaintiffs in accordance with the law of the place where the act or omission occurred.

*See* 28 U.S.C. § 1246(b).

18.     Defendants Heartland Alliance for Human Needs and Human Rights and its wholly owned subsidiary Heartland Human Care Services, Inc. (collectively "Heartland") are organizations located in Chicago that contract with the federal government to house "unaccompanied" foreign children.  On information and belief, Heartland receives federal funding for its role in "shelter care and other related services for unaccompanied children" in ORR custody, and other projects.[1]

## ALLEGATIONS

### A.  D.A., A.A., and Lucinda come to the United States seeking asylum.

19.     On the night of May 23, 2018, D.A. and A.A. entered the United States with their mother, Lucinda Padilla-Gonzales, seeking asylum from political violence in their native Honduras, along with other asylum seekers.  Shortly after crossing the U.S. border, several CBP officers approached the group and arrested them. The CBP officers loaded the group into a van without offering them food or water.  They insulted Lucinda and her children, calling them liars and telling them that they were tired of immigrants, and questioned their motives for coming to the United States.  The CBP officers also told the group that they would all lose their children.

### B.  The government confines the family in an "icebox."

20.     CBP officers took Lucinda and her children to the Ysleta Port of Entry in El Paso, Texas.  Once at this holding center, a federal officer searched Lucinda and confiscated all of her belongings, including her identification card, birth certificates, and 80 Mexican pesos. These belongings were never returned to Lucinda.

---

[1] *See* Department of Health and Human Services Office of the Inspector General, *Office of Refugee Resettlement Unaccompanied Alien Children Grantee Review – Heartland*, Report No. A-05-16-00038 (Sept. 2018), *available at* https://oig.hhs.gov/oas/reports/region5/51600038.asp (last visited May 22, 2020) (detailing Heartland's receipt of federal funds and contractor relationship with ORR and HHS).

21.     The holding center they were taken to is commonly referred to by asylum seekers as a "*hielera*" (an "icebox," in Spanish) because of the freezing cold temperatures. Lucinda, D.A., and A.A., who were still wet from crossing the river, were forced to sit, shivering, on concrete steps in the *hielera*. They were not given any blankets or jackets to protect them from the cold while they waited.

22.     The family was held at Ysleta Port of Entry detention facility for approximately a day and a half.  During this time in the holding cell, federal officers repeatedly insulted D.A., A.A., and Lucinda.  They also told Lucinda that her children would be taken away from her, and that she would be deported. The federal agents also ignored Lucinda's medical needs.  Several days before arriving to the U.S.–Mexico border, Lucinda had fallen and hurt her leg, which was swollen and painful by the time the family crossed into the United States. After Lucinda complained about the pain and swelling, officers handcuffed her in front of her children and took her to a nearby hospital. At the hospital, she was given Ibuprofen to reduce the pain, her leg was wrapped in a cloth bandage, and she was provided with crutches. DHS officers, however, then confiscated her crutches and never returned them to her.

### C.  Federal agents separate D.A. and A.A. from their mother.

23.     On approximately May 24, 2018, shortly after Lucinda returned from the hospital, she was taken by federal agents and told she was going to federal prison. For no apparent purpose other than to inflict pain and humiliation, the federal agents denied Lucinda an opportunity to explain anything to D.A. and A.A., or hug and kiss them goodbye. As the federal agents took Lucinda away in handcuffs, fourteen-year-old D.A. and five-year-old A.A. screamed and cried for their mother through a plexiglass divider.

24.     The DHS agents who separated D.A. and A.A. from Lucinda knew that once A.A. and D.A. were separated from Lucinda, ICE and other federal agencies would be unable to

properly track A.A. and D.A., or identify their relationship with either Lucinda, who remained in federal custody, or their father, who was not in custody. The agents further knew that A.A. and D.A. would not be able to communicate with their mother or father for days and/or weeks on end, and that A.A. and D.A. would be unable to be reunited with any family members for several weeks.

25.      The DHS agents separated them anyway, and then used Lucinda's isolation to torment and traumatize her, to coerce her to give up the asylum claims she had made on behalf of herself and her children and to accept deportation, and to coerce her to plead guilty to a criminal charge for unlawful entry.

26.      One of the DHS agents who first took the family into custody attempted to discourage Lucinda from expressing fear of returning to Honduras, threatening her that if she did express such a fear, the government would take her children away. Additionally, after Lucinda and her children were separated, federal agents used the family's separation to continue to coerce Lucinda: first, DHS agents told her that she would only be reunited with her children if she pleaded guilty to misdemeanor unlawful entry charges; then, immigration officers demanded that she sign documents she did not understand, claiming they were required to reunite her with her children. Lucinda was later warned by others in the detention facility that those documents were actually a waiver of her asylum claims and an agreement to be deported.

### D.  D.A. and A.A. are sent to Chicago, rather than released to their father, Luis.

27.      After taking D.A. and A.A.'s mother from them, federal agents held the children in the Ysleta Port of Entry facility—the *hielera*—for another day.  Then they took D.A. and A.A. to another detention center that was filled with unaccompanied children.  The facility resembled a jail, and it was impossible to tell whether it was day or night.

28.     D.A. asked to speak with her parents.  She had a small piece of paper with phone numbers on it, and she showed it to the federal agents so that they would let her call her family. The agents said that she was not allowed to have the paper and they took it from her.  They said she could not speak with her father.[2]

29.     After about two days in this second facility, the children were taken to an airport, where they were placed on a commercial flight with two adults.  D.A. asked the adults if they were being reunited with their parents, but the adults ignored her questions.  They did not tell D.A. and A.A. where they were being taken. The children were terrified, anxious and unsure of whether or when they would see their parents again, and fearful about where they were being taken. When the flight landed, the adults told D.A. and A.A. that they were in Chicago.

30.     There is no reason the children could not have been released to their father, Luis, who was in North Carolina. There was no basis to dispute his parentage, and in any event his paternity could have been quickly verified. Additionally, Luis made every attempt to cooperate with government officials. Yet, federal agents repeatedly, and without basis or explanation, continued to delay releasing D.A. and A.A. to their father.

### E.  In Chicago, D.A. and A.A. are mistreated in the custody of Heartland Alliance.

31.     After landing in Chicago, the two adults rented a van and drove the children to a detention facility for minors operated by Defendants Heartland Alliance for Human Needs and

---

[2]  As discussed below, DHS agents are subject to a consent decree that imposes a mandatory, non-discretionary duty on ICE to ensure that detained minors are allowed to have "contact with family members who were arrested with the minor." DHS agents violated this mandatory duty by refusing to permit D.A. or A.A. to contact Lucinda.

Human Rights' subsidiary, Heartland Human Care Services, in Chicago, believed to be named Casa Guadalupe.

32.     When D.A. and A.A. arrived at the Heartland facility, the children did not understand why they were there.  Employees at the facility told them that their parents had committed crimes by bringing them to the United States, and that the separation was punishment for their crimes.  During their time at the facility, the children heard at least one employee say ugly things about immigrants coming to the United States without permission, including comments about the children in their care.

33.     Upon arrival, employees at the Heartland facility immediately separated D.A. and A.A. from each other, and took them to different buildings, forbidding them from talking privately or even hugging beforehand.  After separating the children, the employees took what belongings the children had. The children were given clothes from the facility.

34.     After D.A. and A.A. were separated, their ability to see and talk with each other was highly restricted.  They were held in separate buildings, and they were only permitted to see each other for short periods when children from the different buildings were scheduled to have recreation at the same time, which did not always happen. When the siblings did see each other, every minute of their interaction was supervised by staff.  During these brief interactions, D.A. and A.A. were not allowed to speak privately, or allowed to make any physical contact, even to hug.

35.     After about a week at the facility, without contact with any other family, the children were finally permitted to talk to their father over the phone for short amounts of time. Staff at the facility prevented these conversations from being private, however.  Instead, each time one of the children spoke with their father, a staff person was present and would listen.

9

36.     Even after that point, A.A. had difficulty placing regular calls and once was unable to speak to his father for a whole week. The children repeatedly asked to call other family members, but were forbidden from doing so.

37.     The children also asked to talk with their mother, but staff at the facility told them that they could not contact her. The children never spoke to Lucinda while they were in detention.

38.     At the Heartland shelter, A.A. would cry at night and ask for his mom. When this happened, a woman told him that she was his new mom. The shelter staff also forced A.A. to take sleeping pills while he was at the shelter in order to get him to stop crying and to make him sleep. Shelter staff also punished him for crying by having his food taken away from him. A.A. lost weight while he was at the shelter. A.A. was also bullied by larger children at the shelter, and he was punished and confined in the shelter for an additional week after getting into a scuffle with another child.

39.     D.A. was housed in a room with three other girls. Their room was checked regularly, and staff at the facility would search their beds for contraband. Her interactions with the other girls were closely supervised and severely restricted. Staff at the facility forbid the girls from talking about their personal lives or their cases, preventing them from making personal connections with one another or becoming friends.

40.     The facility where D.A. and A.A. were confined was unsanitary. D.A. and A.A. were surrounded by other frightened and traumatized children, many of whom, having also arrived from overcrowded CBP detention facilities on the border, were sick with scabies, shingles, chickenpox, and tuberculosis. Indeed, while they were at the facility, D.A. became infested with lice. D.A. asked staff at the facility for lice treatment, but they ignored her, telling

her she had dandruff.  When D.A. combed her hair, however, there were bugs in the comb; D.A. observed that other children in the facility were provided lice treatment shampoo, but that facility staff specifically refused her request.  D.A. felt that staff frequently treated her and other Central American children at the facility worse than others in their care. She received no treatment for the lice until after she was released from Heartland and reunited with her family.

41.    Heartland failed to provide adequate educational services to D.A. and A.A, who were in the classroom very few hours a day, with almost no curriculum, and in combined classrooms with children whose ages ranged from 5 years old to 17 years old.

42.    The treatment D.A. and A.A. received at the Heartland shelter failed to take account of the trauma they had experienced fleeing Honduras and being separated from their mother, and instead exacerbated it.  It is well known that families and children arriving in the United States from Central America are often severely emotionally traumatized by their experiences of persecution and violence in those countries, by their perilous journey to the United States, and by the abusive treatment at the hands of border and immigration officials once they arrive in this country. Indeed, having previously taken in numerous other minors who had crossed the border fleeing persecution and subsequently suffered trauma at the hands of border and immigration officials, Heartland was well aware that such trauma was common and required accommodation.[3]

---

[3] *See* Melissa Sanchez, et al., ProPublica, *After Controversy, Heartland to Close Four Illinois Shelters for Immigrant Youth*, available at: https://www.propublica.org/article/heartland-illinois-shelters-four-to-close-immigrant-youth (last visited May 22, 2020) ("'[W]e cared for the influx of children who had been severely traumatized by the federal government's practice of forcibly separating them from their parents at the border,'" [Heartland Human Care Services] executive director David Sinski wrote in the memo.")

.

11

43.     It is further well known that children who are subject to these conditions suffer from post-traumatic stress disorder, generalized anxiety, and depression.[4]  Unless programs and detention conditions address these disabilities, traumatized children are prevented from taking advantage of basic services that are offered to unaccompanied children, such as the provision of a safe and non-traumatizing setting in which to sleep, play, learn, and develop in a health manner. On information and belief, the services and daily routines that Heartland creates for the children under its care are at least intended to facilitate and promote such basic, health features of childhood, which are necessary for each child's development. But the conditions that D.A. and A.A. experienced at Heartland, including regimented isolation and restriction from interacting with other children and restrictions that inhibit everyday human contact, are likely to exacerbate a traumatized child's existing psychological conditions, impose further emotional trauma, and further inhibit their ability to take advantage of services centers like Heartland offer.

44.     This was true of D.A. and A.A. They had fled their childhood homes under threat of death, were abruptly and traumatically separated from their mother just hours after arriving in a strange and unfamiliar country and were then isolated and confined in the Heartland facility's strictly controlled setting for more than a month. These events were extraordinarily traumatizing, and manifested as anxiety and depression, among others. The conditions that Heartland imposed on D.A. and A.A. described herein, such as the regimented restrictions on the interaction of children, including siblings, failed to take account of these traumatic experiences, thereby imposing on D.A. and A.A. a living situation that further traumatized them and inhibited their

---

[4] *See* Notification of disabilities of persons targeted in Central American refugee raids and request for immediate modifications, *Letter to DHS and DOJ from 241 Organizations* (Jan. 2016), *available at* https://law.yale.edu/sites/default/files/area/clinic/document/dhs_ doj_rehab_act_letter_-_2016.01.11_-_english.pdf (last visited May 22, 2020).

normal development and their ability to take advantage of the programming and services that Heartland offered to the children in custody.

45.     Additionally, both children were further traumatized and injured when Heartland employees engaged in active disability discrimination as described herein. This included punishing of A.A. for crying and getting in a scuffle, and making hostile remarks to A.A. and D.A. regarding the precise traumatic events (their flight from Central America, apprehension at the border, and separation from their mother) to which both children had been exposed.

46.     It was only on June 29, 2018, after more than a month of confinement, that the two children were finally allowed to be reunited with their father.

### G. Defendants unnecessarily delay D.A. and A.A.'s reunification with their father.

47.     Soon after D.A. and A.A. arrived at the Heartland facility, Luis was made aware that his children were being held in Chicago. He spoke repeatedly to a man named "Rafael," who he believes was either a Heartland staff member or an ORR official. Anxious to be reunited with his children, Luis cooperated with Rafael's every request.

48.     Rafael eventually provided Luis a form to request the release of his children, which Luis filled out and returned immediately. After submitting the form, Luis did not hear back from anyone for days. When Luis was eventually contacted, the date he was told his children would be released was repeatedly delayed. In total, Defendants delayed the date of release for A.A. and D.A. by several weeks.

49.     When the children were finally supposed to be released, Luis was suddenly told that their release was contingent upon his paying for his children's airfare and the airfare of a custodian to fly from Chicago. Desperate to be reunited with his children, Luis quickly paid more than a thousand dollars.

50.     Even after their father paid for airfare and cooperated with Rafael's every request, however, A.A. and D.A's release was delayed further. Luis received a call from Rafael claiming that A.A. and D.A. could not yet be returned because A.A, who was five years old at the time, had allegedly hit another child in the shelter where he was being held and was being "punished."

51.     On June 29, 2018, A.A. and D.A.'s isolation finally ended, more than a month after it began, when they were handed over to their father at the airport in Charlotte, North Carolina.  By that point, Defendants had needlessly separated the fourteen-year-old and the five-year-old from their parents for approximately five weeks.

**H.  The government mistreated Lucinda, who remained in its custody.**

52.     Meanwhile, after Lucinda was separated from A.A. and D.A. on approximately May 24, 2018, federal agents took her to another facility. After arriving at the facility, Lucinda was forced to wait for approximately six hours in a freezing cold area, during which time she was tightly handcuffed.  When she asked the agents to loosen them, they refused, and instead insulted her and told her that she had no right to ask for anything.  The federal agents also told Lucinda that no matter what she said or did, she wouldn't get out.  At approximately 3:00 a.m., she was taken to the showers by federal agents.  They ordered her to strip and to shower in cold water.  Then they moved her to a cell, where she continued to shiver due to the low temperatures at the facility.

53.     On June 4, 2018, Lucinda was found guilty of improper entry.  She was sentenced to time served and one year of probation.

54.     Even though Lucinda had not been sentenced to any period of incarceration, she was not reunited with her children, sent to a family residential center, or released to join her family.  Instead, federal agents continued to imprison her, transferring her to the West Texas

Detention Facility in Sierra Blanca, Texas, which is operated by ICE.  At this point, despite her repeated requests, she had still not heard from her children and did not know where they were.

**I.  The government recklessly causes Lucinda to suffer a traumatic brain injury.**

55.    Sometime later in June, in the middle of the night, several federal agents believed to be ICE agents came into Lucinda's cell and told her that she was leaving. Lucinda thought that she was being released from detention and being reunited with her family. The agents, however, handcuffed her behind her back and shackled her ankles before loading her into the backseat of a government vehicle. No seatbelt was placed on her. Lucinda asked where she was being taken, but her questions were ignored. During transit, the driver suddenly slammed on the brakes. Lucinda, who was still handcuffed and shackled, could not use her arms to protect herself and was thrown forward. She slammed headfirst directly into the metal bars that separated her from the federal agents. The sudden impact caused an injury to her head and upper body. She was in severe pain and began bleeding profusely. She told the agents she was lightheaded and needed to vomit, but her cries were ignored.

56.    Lucinda suffers the effects of this injury to this day.

57.    The federal agents took no actions to respond to or even acknowledge Lucinda's obvious injuries. When they arrived at their destination, Lucinda realized she was at an airport and was on the brink of being deported by airplane, without her children. She was taken from the vehicle by federal agents, and they attempted to deport her by forcing her onto the plane, even though she was bleeding from her head, and even though her children were not with her. Lucinda refused to get on the airplane and steadfastly indicated that she would not leave without her children.

15

58.    The federal agents returned Lucinda to the Sierra Blanca facility later that night. The next day, she was taken to the medical unit at the facility to address her head injury, and medical providers indicated that she should be taken to a hospital. At the hospital, doctors examined her and indicated that she needed to return if her condition did not improve within a few days. Over the next several days Lucinda's condition did not improve—she suffered swelling, difficulty eating, vision problems, and even trouble navigating her detention area—but federal agents never returned her to the hospital.  Instead, they merely gave her ibuprofen.

59.    Aside from her lack of medical care, the conditions at the West Texas Detention Facility where Lucinda was held were miserable.[5]  She was housed in a small detention pod with approximately one hundred other women, who had to clean the space themselves.  Guards would turn the lights out around 11:00 p.m. and turn them on again around 4:30 a.m., and throughout the night they would purposefully turn lights on and off, and yell at detainees.  Anything resembling consistent sleep was impossible.  This compounded Lucinda's traumatic brain injury, causing her significant pain.

60.    The family eventually was able to obtain the services of an immigration attorney for Lucinda.   The attorney was able to secure a Credible Fear Interview for Lucinda on July 9, 2018, which she passed.  Finally, through further advocacy by the immigration attorney, on August 21, 2018, Lucinda was granted bond.  She was released from immigration detention and

---

[5] In 2000, the Immigration and Nationality Act introduced the Performance Based National Detention Standards (PBNDS) for detention facilities, which ICE officers are required to follow in their treatment of detainees. *See* U.S. IMMIGRATION & CUSTOMS ENF'T, PERFORMANCE-BASED NAT'L DET. STANDARDS 2011 (rev. ed. 2016) [Hereinafter 2016 PBNDS] (the applicable version of the PBNDS at the time of the plaintiffs' detention) [available at https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf].

16

traveled to Charlotte, North Carolina, where she was finally reunited with Luis and her three children.

**J.  The trauma that D.A., A.A., and Lucinda suffered from Defendants' misconduct continues to this day.**

61.     The trauma caused by the forced separation of D.A. and A.A. from their parents did not end, however.  When Lucinda attempted to hug A.A. upon reuniting, he rejected her and told her that he hated her for abandoning him and that he never wanted to see her again. He asked why she left him. D.A., meanwhile, told Lucinda that after experiencing the separation from her mother and life in the shelter, she wished she had never been born.

62.     D.A. keeps to herself and is closed off. When D.A. comes home from school, she often closes herself in her bedroom, pulls down the curtains and just wants to be alone.

63.     A.A. was five years old when government employees forcibly separated him from his mother and sent him to the Heartland shelter. At the time he was completely toilet trained. Shortly after he was released from the Heartland shelter, however, A.A. began losing control of his bowel movements and frequently defecated and urinated himself.  A.A. continues to have trouble with his bodily functions. He frequently urinates himself due to nervousness, especially when he is outside of the house. Since being released from the shelter in Chicago, he also has not been able to maintain a regular sleeping schedule, is particularly scared of being alone for any length of time, and he has hidden under tables out of fear from his experiences at the shelter.

64.     Lucinda still suffers greatly from her forced separation from her children.  It is extremely difficult for her to talk about what happened to her and to her children during separation, and during her detention.  She still has problems sleeping, and often wakes up in the middle of the night reaching for her children to make sure that they are still there.  Memories of

being forcibly separated from her children cause her severe stress and anxiety, overwhelming bouts of sadness and trauma, fear, and even loss of appetite for days at a time.

65.    In addition, Lucinda still suffers pain from her head injury including vision problems, trouble reading, and bouts of forgetfulness that had not occurred before her head injury.

### K. The government separation and treatment of D.A. and A.A. from Lucinda was unlawful, violated numerous non-discretionary obligations on federal agents, and was done in order to coerce them into abandoning their legitimate immigration claims

66.    Under long-standing legal obligations, imposed by regulations and by consent decree, federal agents who took custody of Lucinda and her children, subjected them to harsh and deliberately cruel treatment, and separated mother and children without any legitimate reason for doing so, violated multiple, non-discretionary duties that were designed to protect families, particularly D.A. and A.A.

> 1.    *The separation and treatment of Plaintiffs violated DHS agents' non-discretionary obligations to D.A. and A.A. under the Flores consent decree*

67.    Among other things, DHS agents have a well-established legal obligation to ensure the prompt release of minors held in immigration custody and to favor preserving family unity whenever possible. *See Flores v. Reno*, CV 85-cv-4544, Dkt. No. 177 (C.D. Cal. July 24, 2015); 8 C.F.R. § 1236.3. The *Flores* class action litigation, brought on behalf of minor children held in immigration detention, began in 1985 and resulted in a 1997 consent decree that remains binding on the United States. The decree also significantly limits the circumstances, duration, and manner of immigration detention of minor children, and requires DHS agents to prioritize the prompt release of detained minors.

68.    The *Flores* consent decree applies to minors, like D.A. and A.A, who arrived in the United States to seek asylum with their parents. *See Flores v. Lynch*, 828 F.3d 898, 907-08 (9th Cir. 2016) (holding that *Flores* decree "unambiguously applies to accompanied minors"); *see also Bunikyte ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.").

69.    *Flores* also limits the time that accompanied minors may be held in immigration detention to twenty days, and requires that minors be released to a relative, legal guardian, or licensed program within five days of detention. *Flores v. Reno*, CV 85-4544-DMB-AGR, 2015 WL 9915880, at *5 (C.D. Cal. Aug. 21, 2015); *J.P. v. Sessions*, 2019 WL 6723686, at *6 (C.D. Cal. Nov. 5, 2019).

70.    DHS agents violated their obligations under the *Flores* consent decree and 8 C.F.R. § 1236.3 by not prioritizing family unity, instead removing A.A. and D.A. from Lucinda's care, and then failing to promptly reunify the children with their father.

71.    Federal agents had no reason to believe that Lucinda was an unfit parent or otherwise an inappropriate caregiver for D.A. and A.A.  And nothing about the decision to subject her to misdemeanor criminal prosecution (not challenged in this lawsuit) created any need or basis to violate the requirements of *Flores* that Lucinda, D.A., and A.A. remain together. Indeed, the misdemeanor prosecution was a pretext to separate the family and was done to punish Lucinda. The deliberate separation from their mother then left D.A. and A.A. as unaccompanied minors, 6 U.S.C. § 279.

72.    And within hours of first apprehending the family, federal officials knew that the children's father, Luis, could be contacted and was available and anxious to take them in and

care for them.  As such, in separating D.A. and A.A. from their mother, refusing to release them

to their father, and then confining them in Chicago for more than a month, hundreds of miles

from both their parents, the federal agents violated their non-discretionary obligations.

73.    The *Flores* consent decree also created standards for the treatment of minors

while in federal custody and recognized the vulnerability of immigrant children detained without

a parent or other legal guardian. The *Flores* consent decree includes a requirement that

immigration officers hold minor children in facilities that provide (1) access to food and drinking

water; (2) medical assistance in the event of emergencies; (3) toilets and sinks; (4) adequate

temperature control and ventilation; (5) adequate supervision to protect minors from others; (6)

separation from unrelated adults whenever possible; and (7) contact with family members who

were arrested with the minor.

74.    DHS agents also violated *Flores* through the numerous forms of harsh and

inexcusable treatment to which they subjected D.A. and A.A., as discussed above.

> 2.    *The separation and treatment of Plaintiffs violated DHS agents' non-discretionary obligations to Plaintiffs under various applicable regulations and other rules and standards*

75.    Consistent with *Flores*, 8 C.F.R. § 12236.3 impose a mandatory, non-

discretionary duty on ICE to prioritize release to family members—here D.A. and A.A.'s father,

Luis—over refugee shelters or foster care.

76.    And likewise, Section 1.9 of the General Standards on Transport, Escort,

Detention and Search (TEDS) states that "CBP will maintain family unity to the greatest extent

operationally feasible, absent a legal requirement or an articulable safety or security concern that

requires separation." *See* Customs and Border Protection, National Standards on Transport,

Escort, Detention, and Search 2015 [Hereinafter TEDS] *available at*

https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search (last visited May 22, 2020). Section 5.6 of the TEDS on "Detention" states that "Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures." TEDS at 22.

77.     Because no legal requirement, safety or security concern required plaintiffs' separation, these DHS officers violated this standard by separating D.A. and A.A. from Lucinda.

78.     Indeed, in *Ms. L. v. U.S. Immigration and Customs Enforcement*, Judge Sabraw addressed the family separation practices that Lucinda, D.A., and A.A. were subjected to and concluded that "nothing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective." 310 F. Supp. 3d 1133, 1142 (S.D. Cal. 2018).

79.     In addition, as part of the separation of Lucinda, D.A. and A.A., federal agents subjected Lucinda, D.A. and A.A. to harsh and deliberately cruel treatment, discussed above, that violated numerous mandatory, non-discretionary obligations the agents were required to follow.

80.     For example, DHS agents' treatment of the family while in the *hielera* violated CBP's internal policies and standards requiring that temperatures in holding centers be kept within a reasonable and comfortable range. CBP issued the TEDS National Standards in October of 2015, and CBP officers were required to abide by these standards during the period of plaintiffs' detention. Section 4.6 of the TEDS "Hold Room Standards" states, "*Under no circumstances will officers/agents use temperature controls in a punitive manner*." TEDS at 16 (emphasis added). By subjecting plaintiffs to freezing cold temperatures deliberately in the

*hielera*, CBP officers violated this TEDS standard, as well as obligations under the *Flores* consent decree.

81.    And Section 1.2 "Integrity and Professionalism" of the TEDS states that "CBP employees must speak and act with the utmost integrity and professionalism. CBP employees must conduct themselves in a manner that reflects positively on CBP at all times." TEDS at 4. Section 1.4 "Non-Discriminatory Policy" also states that "CBP employees must treat all individuals with dignity and respect. CBP employees will perform their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulation, Executive Order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures." *Id*. at 4. CBP officers violated these standards by insulting Lucinda and other immigration detainees, mocking them, and making derogatory and unprofessional comments about detainees.

82.    Federal agents also violated mandatory, non-discretionary obligations in deliberately ignoring Lucinda's obvious medical needs.

83.    Section 4.3 "General Detention Procedures" of the TEDS states that "[u]pon a detainee's entry into any CBP hold room, officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question the detainee about any prescription medications. Observed or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner." By failing to adequately inspect Lucinda for injury and confiscating her crutches, CBP officers violated this obligation.

22

84.    ICE officers violated their non-discretionary obligations under the PBNDS when they failed to properly secure Lucinda while transporting her and recklessly caused her severe head injury. Section 1.3 of the 2016 PBNDS addresses "Transportation (by Land)," and requires that transporting officers "shall comply" with requirements to "transport[] detainees in a safe and humane manner," and that officers must ensure that "vehicles are equipped with seatbelts, [and] detainees are properly secured before the transport begins." *Id*. at 38, 40. ICE officers violated their non-discretionary duties by failing to transport Lucinda in a humane fashion and failing to make sure that she was secure before the transport began. The reckless disregard for these non-discretionary duties caused Lucinda's head trauma and its long-lasting effects.

85.    Section 4.3 of the PBNDS addresses "Medical Care" and requires that detainees "shall be able to request health services on a daily basis and shall receive timely follow-up" and "shall receive continuity of care from time of admission to time of transfer, release or removal." After causing Lucinda's head trauma, DHS agents failed to return Lucinda to the hospital as her doctor instructed. In doing so, they violated their non-discretionary duties to provide her continuity of care and timely follow-up on her injury.

86.    The implementation of the separation policy intentionally against Lucinda and her children also violated the constitutional rights of Lucinda, D.A. and A.A. *See C.M. v. United States*, 2020 WL 1698191, at *7 (D. Ariz. Mar. 30, 2020) (finding that plaintiffs in a related family separation case had "plausibly alleged that the government's separation of their families violated their constitutional rights.")

87.    First, it violated their constitutional right to family integrity. The Supreme Court has consistently recognized that the parent-child relationship is constitutionally protected, *see, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, (1978); *Wisconsin v. Yoder*, 406 U.S. 205, 231–233

(1972); *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923), and that it is constitutionally

important for children to remain with their parents, *see Prince v. Massachusetts*, 321 U.S. 158,

166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the

parents, whose primary function and freedom include preparation for obligation the state can

neither supply nor hinder."). These constitutional protections extend to citizens and non-citizens

alike, even when confined by the government. *Jacinto-Castanon de Nolasco v. U.S. Immigration

& Customs Enforcement*, 319 F. Supp. 3d 491, 500 (D.D.C. 2018).

88.     Second, in tearing D.A. and A.A. from Lucinda, sending them nearly 1,500 miles

away, refusing to inform Lucinda or D.A. and A.A. of each other's whereabouts or well-being,

depriving them of any means to communicate with one another, failing to have any system for

tracking the children or ensuring that they would be reunited, and engaging in inordinate delays

in reuniting the children with their father, federal agents also violated Plaintiffs' substantive due

process rights.

89.     Indeed, in *M.s L*, the district court concluded that the family separation practice

Lucinda, D.A. and A.A. were subjected to likely violated parents and children's substantive due

process rights. 310 F. Supp. 3d at 1144–46 ("A practice of this sort implemented in this way is

likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary

conscience,' interferes with rights "'implicit in the concept of ordered liberty[,]'" and is so

'"brutal" and "offensive" that it [does] not comport with traditional ideas of fair play and

decency.'") (citations omitted); *see also Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502

("[N]othing in federal law suggests that deterring immigration by indefinitely separating families

once the parents have been transferred to immigration custody is a compelling or legitimate

government objective.").

90.    Third, the separation and treatment of Lucinda, D.A., and A.A. additionally violated Plaintiff's constitutional right to equal protection because it was motivated by discriminatory animus towards Latino immigrants of Central American origin in particular. DHS agents targeted Central American asylum seekers in particular for separation and harsh treatment as a means to deter them from pursuing legitimate immigration claims and deter Central American families from seeking asylum in the United States.

91.    Indeed, other individuals subjected to the same harsh treatment and separation as Plaintiffs were disproportionately from Central America: more than 95 percent of the members in the *Ms. L* certified class are from Central American countries.

92.    As with the fundamental right to family integrity, the constitutional right to equal protection under the law, and to freedom from invidious discrimination by the government on the basis of race or national origin has long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present. *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

93.    Fourth, and relatedly, DHS agents also separated Lucinda from her children and subjected them to harsh and deliberately cruel treatment in order to impede her case for immigration protection in the United States, and thereby violated Plaintiffs' procedural due process rights.

94.    On more than one occasion immigration officers pressured Lucinda to sign away her rights and agree to be deported back to Honduras. Using family separation to threaten and coerce asylum seekers into giving up their immigration claims violates the existing non-discretionary regulations and directives applicable to DHS and violates Plaintiffs' procedural due process rights. *See* 8 C.F.R. § 235.4 (noting that an immigrant's "decision to withdraw his or her

application for admission must be made voluntarily[.]"); CBP Directive No. 3340-043; *see also*, *Ms. L*, 403 F. Supp. 3d 853, 865 (S.D. Cal. 2019) (finding that for a number of parents the coercion of family separation rendered their decision to withdraw applications for admission involuntary).

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (United States of America)

95.　　The other paragraphs of this complaint are incorporated as if set forth here.

96.　　By engaging in the acts described in this Complaint, the federal employees, officials, and contractors referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs D.A., A.A., and Lucinda to suffer severe emotional distress.

97.　　As a direct and proximate result of that conduct, Plaintiffs D.A., A.A., and Lucinda suffered severe emotional distress.

98.　　Under the Federal Tort Claims Act, the United States is liable to Plaintiffs D.A., A.A., and Lucinda for intentional infliction of emotional distress.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (United States of America)

99.　　The other paragraphs of this complaint are incorporated as if set forth here.

100.　　The federal employees, officials, and contractors referenced above were guardians of D.A. and A.A.

101.　　In turn, D.A. and A.A. were wards of the federal employees, officials, and contractors.

102.    As guardians, these federal employees had a fiduciary relationship to D.A. and A.A. as children housed in federal facilities.

103.    Among their obligations as guardians, the federal employees, officials, and contractors were obligated to act in the best interest of D.A. and A.A.

104.    As described more fully throughout this complaint, however, these federal employees, officials, and contractors breached these fiduciary duties to D.A. and A.A.

105.    As a direct and proximate result of those breaches D.A. and A.A. suffered severe emotional distress.

106.    Under the Federal Tort Claims Act, the United States is liable to D.A. and A.A. for breach of fiduciary duty.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (Heartland)

107.    The other paragraphs of this complaint are incorporated as if set forth here.

108.    Heartland and its employees referenced above were guardians of D.A. and A.A.

109.    In turn, D.A. and A.A. were wards of Heartland.

110.    As guardians, Heartland and its employees had a fiduciary relationship to D.A. and A.A. as children housed in their facilities.

111.    Among their obligations as guardians, Heartland and its employees were obligated to act in the best interest of D.A. and A.A.

112.    As described more fully throughout this complaint, however, Heartland and its employees breached these fiduciary duties to D.A. and A.A.

113.    As a direct and proximate result of those breaches D.A. and A.A. suffered severe emotional distress.

114.    Under Illinois state law, the Heartland Defendants are liable to D.A. and A.A. for breach of fiduciary duty.

## COUNT IV
### NEGLIGENCE
**(United States of America)**

115.    The other paragraphs of this complaint are incorporated as if set forth here.

116.    The federal employees, officials, and contractors referenced above had a duty to Plaintiffs D.A., A.A., and Lucinda to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, D.A., A.A., and Lucinda.

117.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs D.A., A.A, and Lucinda.

118.    As a direct and proximate result of the referenced conduct, Plaintiffs, D.A., A.A., and Lucinda suffered substantial damages.

119.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs, D.A., A.A., and Lucinda for negligence.

## COUNT V
### NEGLIGENCE
**(Heartland Alliance)**

120.    The other paragraphs of this complaint are incorporated as if set forth here.

121.    Heartland and its employees referenced above had a duty to Plaintiffs D.A., A.A., and Lucinda to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs, D.A., A.A., and Lucinda.

122.    By engaging in the acts alleged herein, Heartland and its employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs D.A., and A.A.

123.    As a direct and proximate result of the referenced conduct, Plaintiffs, D.A., A.A., and Lucinda suffered substantial damages.

124.    Under Illinois state law Heartland is liable to Plaintiffs, D.A., A.A., and Lucinda for negligence.

## COUNT VI
## NEGLIGENT SUPERVISION
### (United States of America)

125.    The other paragraphs of this complaint are incorporated as if set forth here.

126.    Plaintiffs suffered damages from foreseeable misconduct of an employee supervised by the defendant.

127.    The government's employees in supervisory roles have a duty to properly supervise federal officers and to oversee their treatment of immigrants in their custody.

128.    The blatant disregard for CBP ICE's own internal policies and standards by officers also shows CBP and ICE management staff were negligent in their non-discretionary duties to supervise individual officers.

129.    The government's negligent supervision proximately caused the unlawful conduct described herein, including the violation of non-discretionary, mandatory obligations imposed on the federal agencies that had custody of Lucinda, D.A., and A.A.

130.    As a proximate result of this failure to supervise, Lucinda, D.A., and A.A. suffered the injuries described herein.

131.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligent supervision.

## COUNT VII
## NEGLIGENT SUPERVISION
### (Heartland)

132.    The other paragraphs of this complaint are incorporated as if set forth here.

133.    Plaintiffs suffered damages from foreseeable misconduct of one or more employees supervised by the Heartland Defendants.

134.    Heartland and its employees in supervisory roles have a duty to properly supervise their agents and to oversee their treatment of immigrants in their care.

135.    Heartland's negligent supervision proximately caused the unlawful conduct described herein.

136.    As a proximate result of this failure to supervise, Lucinda, D.A., and A.A. suffered the injuries described herein.

137.    Under Illinois state law, the Heartland Defendants are liable to plaintiffs for negligent supervision.

## COUNT VIII
## CONVERSION
### (United States of America)

138.    The other paragraphs of this complaint are incorporated as if set forth here.

139.    Plaintiff had a legal right to property described in this complaint.

140.    Federal employees, officials, and/or contractors intentionally interfered with that right.

141.    The actions of the federal employees, officials, and/or contractors proximately caused Plaintiff to lose her property.

142.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for conversion.

## COUNT IX
## ABUSE OF PROCESS
### (United States of America)

143.    The other paragraphs of this complaint are incorporated as if set forth here.

144.    The government's employees, officials, and/or contractors abused legal processes within their control for the unlawful purposes of traumatizing Plaintiffs, coercing Plaintiffs to abandon their lawful claims to asylum, and deterring future migrants from seeking refuge in the United States.

145.    The government's employees also abused the legal process by separating D.A. and A.A. from Lucinda and sending them to the Heartland shelter, rather than releasing them to their father.

146.    Lucinda, D.A., and A.A. were injured by this misconduct, as described herein.

**COUNT X**
**LOSS OF CONSORTIUM**
**(United States of America)**

147.    The other paragraphs of this complaint are incorporated as if set forth here.

148.    Plaintiffs had a legal right to parent child consortium, which the government's employees, officials, and/or contractors violated.

149.    The substantial mental and physical injuries suffered by Plaintiffs continue to frustrate their ability to interact and communicate as a family.

150.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for their loss of consortium.

**COUNT XI**
**REHABILITATION ACT**
**(Heartland Alliance)**

151.    The other paragraphs of this complaint are incorporated as if set forth here.

152.    At all times relevant to this Complaint, in light of the mental and emotional injuries created by their trauma, D.A. and A.A. were qualified individuals with a disability as defined in Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, 42 U.S.C. § 12102(1).

153.    Heartland receives federal funding.

154.    Under the Rehabilitation Act, no qualified individual with a disability may be excluded from participation in or be denied the benefits of the services, programs, or activities of a recipient of federal funding, or be subjected to discrimination by any such entity.

155.    To prevent discrimination, such recipients must make reasonable modifications to their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless doing so would fundamentally alter the nature of the services provided by the entity.

156.    Due to the symptoms caused by their trauma, D.A. and A.A. had impairments that substantially limited one or more major life activities, including thinking, sleeping, eating, learning, and safe play.  As a result of these disabilities, they required the ability to interact and develop in a therapeutic setting that did not restrict basic human interaction including, physical touch, hugging of family members, phone calls with family and relatives, and personal conversation.  At the Heartland shelter in Chicago, such accommodations could have been made without fundamentally altering the services that Heartland provided.

157.    Even though it was well-known that children like D.A. and A.A. are disabled, the Heartland Defendants did not modify its programs and services to permit basic human interaction contact, and educational development, preventing D.A. and A.A. from participating in the programs and services offered at the shelter.

158.    Heartland further actively discriminated against A.A. and D.A. because of their disabilities.

159.    D.A. and A.A. were injured by the failure of Heartland to provide reasonable accommodation of their disabilities, as described herein.

## COUNT XII
## ASSAULT/BATTERY
### (United States of America)

160.    The other paragraphs of this complaint are incorporated as if set forth here.

161.    By engaging in the acts described above, federal employees engaged in reckless conduct.

162.    Through that reckless conduct, federal employees caused Plaintiff Lucinda bodily injury.

163.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff Lucinda for assault/battery.

## COUNT XIII
## MEDICAL NEGLIGENCE
### (United States of America)

164.    The other paragraphs of this complaint are incorporated as if set forth here.

165.    The federal employees, officials, and contractors referenced above had a duty to Plaintiff Lucinda to provide appropriate medical care.

166.    By engaging in the acts alleged herein, the federal officers referenced above breached their duty of care owed to Plaintiff Lucinda.

167.    As a direct and proximate result of the referenced conduct, Plaintiff Lucinda suffered substantial damages.

168.    Under the Federal Tort Claims Act, the United States is liable to Plaintiff Lucinda for medical negligence.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand as follows:

    (1) Compensatory damages;

    (2) Punitive damages;

    (3) Attorneys' fees and costs; and

    (4) Such other and further relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on any and all issues triable by a jury.

*    *    *

Dated: September 30, 2020                    Respectfully submitted,


                                             */s/ Sarah Grady*
                                             Anand Swaminathan – anand@loevy.com
                                             Sarah C. Grady – sarah@loevy.com
                                             Stephen H. Weil – weil@loevy.com
                                             Loevy & Loevy
                                             311 N. Aberdeen Street 3rd Floor
                                             Chicago, IL 60607
                                             312-243-5900


                                             */s/ Conchita Cruz*
                                             Conchita Cruz –
                                             conchita.cruz@asylumadvocacy.org
                                             *Pro Hac Vice*
                                             Zachary Manfredi –
                                             zachary.manfredi@asylumadvocacy.org
                                             *Pro Hac Vice*
                                             *Dennise Moreno
                                             dennise.moreno@asylumadvocacy.org
                                             Asylum Seeker Advocacy Project (ASAP)
                                             228 Park Ave. S. #84810
                                             New York, NY 10003
                                             305.484.9260

                                             *Pro Hac Vice motion forthcoming.


                                             *Counsel for Plaintiffs*