# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| D.A., A.A., and LUCINDA DEL CARMEN PADILLA GONZALES, **Plaintiffs,** | § § § § | |
| v. | § § | **EP-22-CV-00295-FM** |
| UNITED STATES OF AMERICA, **Defendant.** | § § § | |

## SECOND AMENDED RENEWED MOTION TO DISMISS

In response to Plaintiffs' First Amended Complaint, Defendant United States of America respectfully moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For several reasons discussed below, Congress has not waived the United States' sovereign immunity for the types of claims Plaintiffs assert in this action. As such, the claims are jurisdictionally barred. Additionally, Plaintiffs fail to state a claim upon which relief can be granted under Texas law for intentional infliction of emotional distress, abuse of process, and medical negligence. Accordingly, to the extent the Court exercises jurisdiction over Plaintiffs' claims, these claims should be dismissed.

## I.        OVERVIEW

On or about May 23, 2018, Plaintiff Lucinda del Carmen Padilla-Gonzales unlawfully entered the United States with her minor children, D.A. and A.A. Plaintiff Padilla-Gonzales was detained, separated from D.A. and A.A., and prosecuted for and found guilty of unlawful entry. She was then held in secure immigration detention until approximately August 21, 2018, when she was released on bond. The children were placed with the Department of Health and Human Services' Office of Refugee Resettlement (ORR) while a relative was verified. On June 29, 2018,

D.A. and A.A. were released to their father, who was already living in the United States.

Plaintiff Padilla-Gonzales brings this action against the United States on her own behalf and on behalf of two of her children, D.A. and A.A., under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, seeking monetary damages for alleged injuries caused by: (1) Defendant's implementation of a policy to refer for prosecution all individuals suspected of illegally entering the United States at the United States-Mexico border, including parents traveling with children (referred to herein as the "Zero-Tolerance Policy"); and (2) the conditions of confinement and treatment of Plaintiffs after they were separated.

The United States has terminated the Zero-Tolerance Policy. *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021). The Court should not, however, reach the merits of Plaintiff's FTCA claims. Plaintiffs' alleged injuries are not compensable under the FTCA because Congress has not waived the federal government's sovereign immunity from claims for money damages in these circumstances. Assuming arguendo Plaintiffs can establish subject matter jurisdiction, their causes of action for intentional infliction of emotional distress, abuse of process, and medical negligence fail to state a claim under Texas law.

## II.     FACTUAL AND LEGAL BACKGROUND

### A.     Statutory framework for noncitizens entering the United States.[1]

Noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are "inspected by immigration officers" to determine their admissibility to the United States. 8 U.S.C. § 1225(a)(1), (a)(3), (b). When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers." 8 U.S.C. § 1325(a). Violation of § 1325(a) is a misdemeanor punishable by a fine and "imprison[ment] of not more than 6 months" for a first infraction. *Id.*

Individuals arriving in or present in the United States who are deemed inadmissible also are subject to removal from the United States and, as appropriate, detention pending such removal. *See id*. §§ 1225(b), 1226, 1357. These provisions apply to both adults and children. The federal government possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id*. § 1231(g)(1). In some cases, the Department of Homeland Security (DHS) may exercise its discretion to release a noncitizen from custody pending a decision on removal. *See, e.g*., 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

**B.     Statutory framework for immigration custody relating to unaccompanied minors.**

Federal immigration law authorizes the United States to provide for the custody and care of minor children who are present in the United States without lawful immigration status. Specifically, ORR is charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. § 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom … there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), "[e]xcept in the case of exceptional circumstances, any department or agency …

shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). However, ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(2)(B). Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be followed before the child is released to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3). Congress requires that "an unaccompanied alien child may not be placed with a person … unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* § 1232(c)(3)(A). In some instances, a home study is required. *Id.* § 1232(c)(3)(B).

## C.     Flores Agreement requirements.

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement." *See, e.g., Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101). The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9). The Homeland Security Act of 2002 abolished the Immigration and Naturalization Service under the Department of Justice (DOJ) and merged its legacy components into (1) Customs and Border Protection (CBP), (2) Immigration and Customs Enforcement (ICE), and (3) U.S. Citizenship and Immigration Services (USCIS). Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002). These components are within DHS. *See id.*

According to the Ninth Circuit, the Flores Agreement "unambiguously" applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians. *Flores*, 828 F.3d at 901. Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility. *Id*. at 902-03 (quoting Flores Agreement ¶ 12). The government must also "make and record the prompt and continuous efforts on its part toward … release of the minor." *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

Notably, the Flores Agreement applies only to minors. *Flores*, 828 F.3d at 901. It "does not address … the housing of family units and the scope of parental rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Id.* at 906; *see also United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744, 761 (W.D. Tex. 2018) *aff'd* ("nothing in the [Flores] agreement expresses a preference for releasing parents who have violated immigration laws."). Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release. *Flores*, 828 F.3d at 908; *see also Vasquez-Hernandez*, 314 F. Supp. 3d at 761; *Bunikyte v. Chertoff*, 07-CA-164, 2007 WL 1074070, at *16 (W.D. Tex. Apr. 9, 2007). Though the Flores Agreement gives preference to release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

### D.    Executive Branch directives regarding immigration enforcement.

During the time period relevant to this action, the Executive Branch issued several directives regarding enforcement of federal immigration laws. First, Executive Order 13767 was issued in January 2017. *See* § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017) ("EO 13767"). EO 13767 stated

that "[i]t is the policy of the executive branch to … detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations[.]" *Id.* § 2(b). Executive Order 13767 directed DHS to "ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law" (*id.* § 6) and to exercise its parole authority "only on a case-by-case basis in accordance with the plain language of the statute … and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole" (*id.* § 11(d)).

Second, on April 11, 2017, the DOJ issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that federal law enforcement prioritize the prosecution of several immigration offenses, including illegal entry under 8 U.S.C. § 1325. *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

Third, on April 6, 2018, the DOJ issued a "Memorandum for Federal Prosecutors along the Southwest Border" on "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)." U.S. DOJ Memorandum on Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a) (April 6, 2018), available at https://www.justice.gov/opa/press-release/file/1049751/download (the "Zero-Tolerance Memorandum"). The memorandum directed federal prosecutors along the Southwest border "to the extent practicable, and in consultation with DHS, to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)." *Id.* In addition, on May 4, 2018, the DHS Secretary approved the referral for prosecution of all adults amenable for illegal entry violations. Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS

began to refer for prosecution increased numbers of adults – including those traveling with children – who unlawfully entered the United States on the Southwest border in violation of § 1325. *See generally* Executive Order 13767. Minor children designated as UACs were transferred to ORR custody, as required by the TVPRA.

**E.      Prosecution and detention of Plaintiff Padilla-Gonzalez.**

According to the First Amended Complaint, on May 23, 2018, Plaintiff Padilla-Gonzales illegally crossed the United States-Mexico border into Texas with her minor children, D.A. and A.A., in violation of 8 U.S.C. § 1325. ECF No. 35, ¶¶ 2, 19-20. Shortly after crossing, they were apprehended by U.S. Border Patrol agents and transported to nearby Border Patrol stations in Texas. *Id.,* ¶¶ 20, 22.[2] Consistent with the Executive Branch enforcement directives discussed above, Plaintiff Padilla-Gonzales was charged with violating 8 U.S.C. § 1325(a)(1). Plaintiff Padilla-Gonzales was separated from D.A. and A.A. and transported from the Border Patrol holding facility to criminal custody for her criminal proceedings. ECF No. 35, ¶¶ 23.

Because Plaintiff Padilla-Gonzales would no longer be available to provide care and physical custody of her children, D.A. and A.A. were designated unaccompanied minor children and transferred to the custody of ORR pursuant to the TVPRA. *Id.,* ¶¶ 27, 71. D.A. and A.A. were placed with Heartland Human Care Services, Inc. (Heartland) in Chicago, Illinois. *Id.*, ¶¶ 29, 31-33.

On May 29, 2018, Plaintiff Padilla-Gonzales was found guilty of illegal entry under 8 U.S.C. § 1325 and was sentenced to one year of probation. *Id.*, ¶ 53. Following the criminal proceedings and custody, she was transferred to the custody of ICE, where she remained in secure

---

[2] The U.S. Border Patrol is part of CBP.

adult immigration detention until August 21, 2018, when she was released on bond. ECF No. 35, ¶¶ 54, 60.

On June 29, 2018, after ORR completed its assessment regarding his suitability as a sponsor, D.A. and A.A. were released to their father, who had crossed the United States-Mexico border before Plaintiffs Padilla-Gonzales, D.A., and A.A., and was in the United States. *Id.*, ¶¶ 2, 46, 51.

### F.     Plaintiffs' First Amended Complaint

Plaintiffs bring this action against the United States seeking money damages under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671-2680, alleging that "Defendants needlessly separated the fourteen-year-old and the five-year-old from their parents for approximately five weeks." ECF No. 35, ¶ 51. Plaintiffs allege that they were subjected to the same "family separation practices" ruled "unconstitutional" on due process grounds in *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018). ECF No. 35, ¶¶ 78, 86-94. In addition, Plaintiffs allege that the separation practices were unconstitutional because they were "motivated by discriminatory animus toward Latino immigrants of Central American origin." *Id.*, ¶ 90. Plaintiff Padilla-Gonzales also alleges that she suffered injuries arising out of certain treatment and conditions relating to her confinement. *Id.*, ¶¶ 8, 21, 24, 40, 52, 55, 58, 59, 75, 80, 83, 84, 85, 88.

### III.     LEGAL STANDARDS

### A.     Dismissal for lack of subject-matter jurisdiction.

Federal Rule of Civil Procedure Rule 12(b)(1) allows a party to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143

F.3d 1006, 1010 (5th Cir. 1998). Courts must consider the threshold issue of jurisdiction before addressing the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cty., Tex.*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Plaintiffs bear the burden of establishing jurisdiction because, by filing a complaint in federal court, they seek to invoke it. *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (per curiam)*; Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

**B.      Dismissal for failure to state a claim.**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. A plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint may be dismissed under Rule 12(b)(6) based on a successful affirmative defense that appears on the face of the complaint. *See EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006). A court ruling on a motion to dismiss may rely on documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).

**C.** **Stating a claim under the FTCA.**

In an action against the federal government, a plaintiff must identify a claim as to which the government has waived its sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (describing sovereign immunity as "jurisdictional in nature"). Here, Plaintiffs' First Amended Complaint invokes the FTCA, which waives the United States' sovereign immunity for certain torts committed by federal employees while acting within the scope of their employment. 28 U.S.C. § 1346(b). "Federal courts have jurisdiction over these claims if they are 'actionable' under 1346(b)." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (quoting *Meyer*, 510 U.S. at 477).

Section 1346(b) contains the following six requirements—all of which must be satisfied in order for an action to qualify within the FTCA's jurisdictional grant: the claim must be "'[1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Meyer*, 510 U.S. at 477 (quoting 28 U.S.C. § 1346(b) (bracketed numerals added by the Court)).

As the Supreme Court recently held in *Brownback*, "a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." 141 S. Ct. at 749. "That means a plaintiff must plausibly allege that 'the United States, if a private person, would be liable to the claimant' under state law both to survive a merits determination under Rule 12(b)(6) and to establish subject-matter jurisdiction." *Id*. And it also follows, as the Court held, that "where a plaintiff fails to plausibly

allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6)." *Id*. at 749 n.8.

## IV.   ARGUMENT AND AUTHORITIES

**A.   Plaintiffs' claims are barred for lack of subject matter jurisdiction.**

For the reasons set forth below, Plaintiffs' claims should be dismissed for lack of jurisdiction. Plaintiffs cannot prevail on their FTCA claims because this Court lacks subject-matter jurisdiction under established legal principles. Their claims challenge discretionary decisions that are susceptible to policy analysis, including policies surrounding law enforcement, immigration, and national security. In addition, Plaintiffs' First Amended Complaint challenges actions taken by federal employees reasonably executing federal immigration statutes and regulation. Moreover, these challenged actions do not have private person analogues. Finally, Plaintiffs' claim of conversion is barred by the detention-of-goods exception to the FTCA.

**1.   Plaintiffs' claims are barred by the FTCA's discretionary function exception.**

**a.   Legal standard for the discretionary function exception.**

The United States, as a sovereign entity, "is immune from suit except insofar as it has specifically and expressly consented to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160–61 (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman*, 453 U.S. at 160 (internal quotes and citations omitted). Absent a specific, express waiver, sovereign immunity bars a suit against the government for lack of subject matter jurisdiction. *See Meyer*, 510 U.S. at 475. "The plaintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity." *Spotts v. United States*, 613 F.3d 559, 568 (5th Cir. 2010).

The FTCA is "a limited waiver of sovereign immunity." *Leleux v. United States*, 178 F.3d 750, 754 (5th Cir. 1999). The statute allows individuals to sue the United States where a federal employee's conduct, within the scope of his or her employment, causes "injury, loss of property, or personal injury or death." *See* 28 U.S.C. § 1346(b)(1). However, the FTCA's waiver of sovereign immunity is subject to exceptions. *See id.* § 2680. When an exception applies, the United States retains its sovereign immunity and the court lacks jurisdiction. *Castro v. United States*, 608 F.3d 266, 268 (5th Cir. 2010) (en banc).

The FTCA's "discretionary function exception" (DFE) bars "[a]ny claim" that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

The Supreme Court has applied a two-part test to determine when the DFE applies. *Gaubert*, 499 U.S. at 328–32. Courts first ask whether the challenged conduct was in fact "discretionary in nature"—that is, whether the conduct involved "'an element of judgment or choice.'" *Id.* at 322 (quoting *Berkovitz*, 486 U.S. at 536). This prong is met unless "a federal statute, regulation, or policy specifically prescribes a course of action for the employee to follow." *Id.* A general mandate does not remove discretion. It must be so specific that it leaves the employee with no "room for choice." *Gaubert*, 499 U.S. at 325. In order to eliminate discretion, a directive must "specifically address[] how an official must confront a given situation." *Lopez v. U.S. Immigr. & Customs Enf't,* 455 F. App'x 427, 433 (5th Cir. 2011). It is the plaintiff's burden to identify a specific mandate that removes discretion. *See Campos v. United States*, 888 F.3d 724, 731 (5th Cir. 2018).

Second, if the conduct involves choice or discretion, courts must next determine whether the judgment of the government employee was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23. Recognizing that tort actions challenging the government's discretionary policy judgments could "seriously handicap efficient government operations," Congress incorporated the DFE into the FTCA to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action. *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984). The focus of this inquiry is whether the "nature of the actions taken," pursuant to an exercise of discretion, "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325; *see also Sydnes v. United States,* 523 F.3d 1179, 1185 (10th Cir. 2008) ("[W]e operate at a higher level of generality … asking categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns.").

The government need not prove that it considered these factors and made a conscious decision on the basis of them. *See Spotts*, 613 F.3d at 572. Indeed, under the second prong, the government actors' subjective intent is immaterial: "the focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Gaubert*, 499 U.S. at 325; *see also Freeman v. United States*, 556 F.3d 326, 337 (5th Cir. 2009) (subjective intent irrelevant to application of the DFE). Moreover, "when established government policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion." *Baldassaro v. United States*, 64 F.3d 206, 211 (5th Cir. 1995) (citing *Gaubert*, 499 U.S. at 325). And the statutory text confirms that the exception applies "whether or not the discretion involved [was] abused." 28 U.S.C. § 2680(a). Finally, the fact that

a policy is later rescinded, as here, does not alter the DFE analysis.  As the D.C. Circuit explained in *Loughlin v. United States*, 393 F.3d 155, 166 (D.C. Cir. 2004), when the government discards a previous policy decision, "[t]he earlier judgment was no less a matter of policy because the later judgment was arguably better informed."

If both prongs of the *Gaubert* test are met, the DFE applies, the court lacks jurisdiction, and the claim must be dismissed.  *See Cohen v. United States*, 151 F.3d 1338, 1341 (11th Cir. 1998).  This result applies even where the government may have been negligent in the performance of such discretionary acts.  The DFE analysis does not call upon the court to evaluate the merits of a given policy.  As the legislative history of the FTCA explains, the statute's limited waiver of sovereign immunity was "not intended to authorize suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion."  H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10.

The Supreme Court's leading decision on the DFE emphasized that the exception protects negligent or wrongful acts that are abuses of discretion.  In *Dalehite v. United States*, 346 U.S. 15 (1953), the Court noted that the exception covers "both negligence and wrongful acts in the exercise of the discretion because the Act itself covers only 'negligent or wrongful act[s] or omission[s]'… The exercise of discretion could not be abused without negligence or a wrongful act."  *Id.* at 33.

        b.    **The decisions to prosecute Plaintiff Padilla-Gonzales under the Zero-Tolerance Policy and then detain her in secure detention facilities pending immigration proceedings are discretionary in nature.**

Plaintiffs' claims based on the decision to prosecute Plaintiff Padilla-Gonzales (which necessarily involved transfer to criminal custody) and detain her pending immigration proceedings, which resulted in the separation of Plaintiff Padilla-Gonzales and D.A. and A.A., are barred by the

DFE because those decisions involved an element of judgment or choice, and are susceptible to policy analysis. Plaintiffs do not contest that Border Patrol agents lawfully apprehended them after crossing the border illegally. Nor do Plaintiffs contest that the government had discretion to refer Plaintiff Padilla-Gonzales for prosecution for illegal entry under 8 U.S.C. § 1325. Moreover, Plaintiffs do not challenge that the government had discretion to hold her in secure detention pending immigration proceedings. And Plaintiffs do not dispute that the government had discretion to conclude that, in these circumstances, D.A. and A.A. were unaccompanied within the meaning of the TVPRA.

These decisions, which resulted in the separation of Plaintiff Padilla-Gonzales from D.A. and A.A. pursuant to the TVPRA, are quintessentially discretionary. The DFE plainly applies to decisions relating to the apprehension of noncitizens for unlawful entry and referral for criminal prosecution. Indeed, "[d]iscretion lies at the heart of the DHS law enforcement function." *Blanco Ayala v. United States*, 982 F.3d 209, 215 (4th Cir. 2020). In exercising this function, DHS agents must "make all the classic judgment calls the discretionary function exception was meant to exempt from tort liability." *Id.* Moreover, immigration policy involves "vital national interests in law enforcement at the borders," and "DHS officers' decisions in investigating and responding to potential violations of immigration law are infused with public policy considerations." *Id.* at 217. Thus, the decision to apprehend and refer for criminal prosecution are discretionary decisions that cannot be challenged.

As the Supreme Court has stated, "the Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation omitted). Indeed, "[t]he Supreme Court has long recognized that the 'Executive Branch has exclusive authority and absolute discretion to decide whether to

prosecute a case.'" *In re Sealed Case,* 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also Smith v. United States*, 375 F.2d 243, 247–48 (5th Cir. 1967) ("as an incident of the constitutional separation of powers, … the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"); *Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983) (prosecutorial decisions are "quintessentially" discretionary).

As other courts have recognized, the particular prosecution policy that was in place when Plaintiff Padilla-Gonzales was prosecuted—the Zero-Tolerance Policy—"amounts to exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General." *Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, 18-1445 (PLF), 2019 WL 4707150, at *5 (D.D.C. Sept. 26, 2019); *see also Peña Arita v. United States*, 470 F. Supp. 3d 663, 686-87 (S.D. Tex. 2020); *Sw. Env't Ctr. v. Sessions*, 355 F. Supp. 3d 1121, 1126 (D.N.M. 2018) ("Whether a person is prosecuted for [8 U.S.C. § 1325(a)] after a referral by DHS is a decision made by DOJ, and is subject to DOJ's prosecutorial discretion.") (citation omitted).

The DFE bars the Court from "second-guessing" or inquiring into government actors' intent in exercising that prosecutorial discretion. *Berkovitz*, 486 U.S. at 536. In determining the applicability of the DFE, the court looks only at whether the conduct or decision at issue is "susceptible' to policy analysis" from an objective perspective – subjective intent is not part of the inquiry. *Freeman*, 556 F.3d at 337. Here, however, the government's decisions were not merely "susceptible to" policy analysis, but the government spelled out the policies it sought to further through its enforcement efforts in a series of Executive Branch directives. Concerns about "subjecting the prosecutor's motives and decision making to outside inquiry" are magnified in the immigration context. *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 490 (1999).

Following completion of her criminal proceedings, Plaintiff Padilla-Gonzales was transferred to ICE custody pending expedited removal proceedings. ECF No. 35, ¶ 54. The government's decisions concerning where to detain Plaintiff Padilla-Gonzales for immigration proceedings were also discretionary and susceptible to policy analysis. The federal government possesses the express statutory authority to "arrange for appropriate places of detention for [noncitizens] detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[3] "Congress has placed the responsibility of determining where [noncitizens] are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The INS necessarily has the authority to determine the location of an alien in deportation proceedings … and therefore, to transfer aliens from one detention center to another."); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that the "Attorney General's discretionary power to transfer aliens from one locale to another, as she deems appropriate, arises from" statute)*; Sasso v. Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General has discretion over the location of detention); *Ortega v. U.S. Dep't of Homeland Sec.*, 1:18-CV-00508, 2018 WL 4222822, at *4 (W.D. La. July 6, 2018), *R. & R. adopted*, 1:18-CV-00508, 2018 WL 4211864 (W.D. La. Sept. 4, 2018) (citing 8 U.S.C. § 1232(g)(1) for the Attorney General's discretion to choose the detention facility of noncitizens).

"Because the decision to detain an alien pending resolution of immigration proceedings is explicitly committed to the discretion of the Attorney General and implicates issues of foreign policy, it falls within [the DFE]." *Mirmehdi v. United States*, 662 F.3d 1073, 1081–82 (9th Cir.

---

[3] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" now mean the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

2011); *see also Ashford v. United States*, 463 F. App'x 387, 395 (5th Cir. 2012) (placement of inmate covered by DFE); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995) (decisions whether to detain or release are policy-based decisions protected by DFE); *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018) (placement decisions are susceptible to policy analysis); *Santa-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) ("assignment to particular institutions or units … must be viewed as falling within the discretionary function exception to the FTCA"); *Cohen*, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons.").

This discretion necessarily entails decisions regarding with whom noncitizens are detained, including decisions about whether adults and minors can be detained together. *See Pena Arita*, 470 F. Supp. 3d at 691–92 (decisions by DHS concerning where to house noncitizens are protected by the DFE, even if those decisions resulted in the separation of family members); *Ms. L.*, 310 F. Supp. 3d at 1143 ("parents and children may lawfully be separated when the parent is placed in criminal custody"). Although the Flores Agreement contains some requirements concerning the detention of minors, it does not specifically prescribe a course of action and thus does not remove the government's discretion. Moreover, the Flores Agreement does not require release of a parent or mandate that parents be housed with their children, and indeed does not apply to parents. *Flores*, 828 F.3d at 908; *see also United States v. Dominguez-Portillo*, EP-17-MJ-4409-MAT, 2018 WL 315759, at *6 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom. Vasquez-Hernandez*, 314 F. Supp. 3d at 744, *aff'd*, 924 F.3d 164 (5th Cir. 2019); *Bunikyte*, 2007 WL 1074070 at *16.

In this case, Plaintiffs can cite to no statutes, regulations, or policies that prescribe a specific course of action that the government was required to take in connection with the prosecution and

immigration detention of Plaintiff Padilla-Gonzales. Instead, the challenged decisions were the result of the exercise of discretion. Accordingly, the exercise of the statutory authority regarding whether and where to detain Plaintiff Padilla-Gonzales for immigration proceedings following her criminal proceedings is protected by the DFE.[4]

For similar reasons, the determination that D.A. and A.A. were "unaccompanied" within the meaning of the TVPRA is a decision covered by the DFE. *See* 6 U.S.C. § 279(g)(2). Whether a parent is "available to provide care and physical custody" is a policy question vested in federal officials. *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482–83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied minor children."), *aff'd in part and vacated in part D.B. v. Cardall,* 826 F.3d 721 (4th Cir. 2016); *see also Baie v. Sec'y of Def.*, 784 F.2d 1375, 1377 (9th Cir. 1986) ("interpretation of the statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA.").

Here, Plaintiff Padilla-Gonzales was referred for prosecution, transferred to criminal custody and prosecuted, and then held in secure immigration detention following her criminal proceedings. The DFE protects the government's determination that D.A. and A.A. should have been deemed unaccompanied and thus transferred to the custody of the ORR. *See Fisher Bros. Sales v. United States*, 46 F.3d 279, 287 (3d Cir. 1995) (holding that a decision was protected by the DFE when it "necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete data or more confirmation of the existing data.").

---

[4] Plaintiffs' suggestion that a CBP policy referencing family unity constrained its discretion (ECF No. 35, ¶ 76) is refuted by the policy itself, which addresses family unity only during the limited time that noncitizens are in CBP custody and even then affords discretion to agents based on operational considerations.

In the end, Plaintiffs do not allege injury from government action or decision that was not subject to discretion and susceptible to policy analysis. To the extent that Plaintiffs suggest that the government should have released them into the interior, did not have the discretion to prosecute Plaintiff Padilla-Gonzales for criminal violations of immigration law, did not have the discretion to determine that D.A. and A.A. were unaccompanied, or should not have adopted the Zero-Tolerance Policy and related Executive Branch directives regarding immigration enforcement, they are challenging quintessential discretionary policy judgments subject to the DFE.

Plaintiffs also allege that defendants "unnecessarily delay[ed]" the release of the children to their father until five weeks after their apprehension (ECF No. 35, ¶¶ 48-50). However, the timing of D.A. and A.A.'s release from ORR custody was occasioned by discretionary decisions regarding the health and safety of children in the government's custody. As outlined above, ORR seeks to verify the "custodian's identity and relationship to the child" and ensure "that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. §1232(c)(3)(A). Plaintiffs have not alleged any specific deadline imposed by statute or regulation on ORR for release of children to custodians.[5] Such discretionary decisions are the precise sort of decisions that are protected by the DFE.

---

[5] Plaintiffs' suggestion that the Flores Agreement and 8 C.F.R. § 1236.3 required immediate release of D.A. and A.A. from ORR custody is incorrect. ECF No. 25, ¶ 70. Nothing in the Flores Agreement or the regulation provides a deadline for release, much less provides that release shall be immediate. Rather, those authorities merely address the individuals to whom children are released, expressing a "preference" for release to parents followed by legal guardians and adult relatives. *See* 8 C.F.R. § 1236.3 (providing "preference" for release to certain individuals); *Flores*, 828 F.3d at 908 ("if available, the parent is the first choice"). Moreover, § 1236.3 is not applicable here because it applies only to "[j]uveniles for whom bond has been posted, for whom parole is authorized, or who have been ordered released on recognizance." Similarly, the Flores Agreement provides no deadline for release of children from a facility such as Heartland. *See* ECF No. 35, ¶ 69. While, as noted above, the Flor*es* Agreement addresses the length of time minors may be detained in DHS custody, it does not say anything about the length of time children may remain in the custody of ORR.

      **c.**     **Plaintiffs' remaining claims concerning their conditions of confinement are also barred by the discretionary function exception.**

Plaintiffs also challenge their conditions of detention, including the frequency of communications between Plaintiff Padilla-Gonzales and D.A. and A.A. (ECF No. 35, ¶¶ 24, 88), lack of adequate computer systems for tracking children (*id.*, ¶¶ 24, 28), crowding, temperature and lighting (*id.*, ¶¶ 21, 40, 52, 59, 75, 80), removal of Plaintiff Padilla-Gonzales' crutches (*id.*, ¶¶ 8, 83), adequacy of restraints when Plaintiff Padilla-Gonzales was transported (*id.*, ¶¶ 55, 84), and decisions regarding whether to transport her to a hospital (*id.*, ¶¶ 8, 58, 85).

Courts have repeatedly held that claims based on acts or omissions relating to "conditions of confinement" are barred by the DFE because the manner in which the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. Such discretionary decisions are the precise sort of decisions that are protected by the DFE. *See Huff v. Neal*, 555 F. App'x 289, 298–99 (5th Cir. 2014) (per curiam) (DFE applied to placement of inmates and internal prison security); *Campos*, 888 F.3d at 733 (DFE applied to deficiencies in computer database that failed to reveal immigration status); *Patel v. United States*, 398 F. App'x 22, 29 (5th Cir. 2010) (per curiam) (DFE applied to decision to transfer prisoner); *Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) (decision not to provide bed rails susceptible to policy considerations); *Lineberry v. United* States, 3:08-cv-0597, 2009 WL 763052, at *6 (N.D. Tex. Mar. 23, 2009) (allegation of overcrowding in prison barred by DFE); *Antonelli v. Crow*, 08-261, 2012 WL 4215024, at *3 (E.D. Ky. Sept. 19, 2012) (collecting cases in which myriad conditions of confinement claims, including claims based on temperature and crowding, were barred by the DFE). In *Pena Arita*, the court rejected the plaintiffs' contention that associated determinations regarding conditions of confinement such as transfer decisions, where and how to house detainees or appropriate medical care were "nondiscretionary" in nature. Concluding that

the DFE applied because the government decision-making regarding conditions of confinement was "susceptible to policy analysis," the court observed that it "must generally defer to the expertise of prison officials and is not to substitute its judgment for the consideration of such officials." 470 F. Supp. 3d at 691.[6]

In particular, courts have held that detained individuals have "no right to unlimited telephone use," *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994), and that a detainee's right to telephone access is "subject to rational limitations in the face of legitimate security interests." *Id.* (quoting *Strandburg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *see also Waganfeald v. Gusman,* 674 F.3d 475, 485-86 (5th Cir. 2012) (in light of security risks and unique emergency conditions, it was not objectively unreasonable to prohibit pretrial detainees from using cellphones when landlines were unavailable during Hurricane Katrina); *see also Harrison v. Fed. Bureau of Prisons*, 464 F. Supp. 2d 552, 559 (E.D. Va. 2006) ("[T]he BOP's provision of telephone services is a matter committed to its discretion that will not be second-guessed through an FTCA claim."); *Janis v. United* States, 1:06-cv-1613, 2009 WL 564207, at *14 (S.D. Ind. Mar. 4, 2009) ("telephone usage policy is discretionary with the authority of prison administrators, and the exercise of that discretion requires the balancing of policy considerations such as budget, facilities, staff resources, etc.").[7]

---

[6] Moreover, Plaintiff Padilla-Gonzales' allegation that the government sought to mislead her into giving up her asylum rights is barred by the FTCA's "misrepresentation" exception, which bars "[a]ny claim arising out of … misrepresentation [or] deceit." 28 U.S.C. § 2680(h); *see In re FEMA Trailer Formaldehyde Product Liability Litigation*, 713 F.3d 801 (5th Cir. 2016) (misrepresentation exception barred claim that FEMA failed to disclose that trailers it used for emergency housing emitted formaldehyde); *Wong v. Beebe,* Civ. 01-718-ST, 2007 WL 1170621, at ** 25, 26, 27 (D. Or. Apr. 10, 2017) (misrepresentation exception barred noncitizen's claim that INS sent her a deceitful letter to induce her to appear at an INS office and failed to advise her of her right to appeal adjustment of her immigration status), *rev'd on other grounds*, 381 F. App'x 715 (9th Cir. 2010).

[7] The manuals and other materials cited in the Amended Complaint demonstrate that what measures are "reasonable," "acceptable", and "proper[]" involve discretionary determinations.

>  d.   **Plaintiffs' assertion of unconstitutional conduct does not preclude application of the discretionary function exception.**

That Plaintiffs claim that certain alleged conduct violated the Constitution does not alter the discretionary function analysis. Congress did not create the FTCA to address constitutional violations, but rather to address violations of state tort law committed by federal employees. *See Meyer*, 510 U.S. at 477 (recognizing that "§ 1346(b) does not provide a cause of action for" a "constitutional tort claim"). As noted, the Supreme Court has explained that when a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow," there is no further discretion to exercise. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis added). The Constitution is no different: in some cases, the Constitution may establish such a specific prescription that removes an official's discretion, but the requirement of specificity applies with the same force whether the prescription is found in the Constitution or a statute.

The Supreme Court has long recognized that conduct may be discretionary even if it is later determined to have violated the Constitution. The common law doctrine of official immunity thus applies to the exercise of "discretionary functions" even when the conduct violated the Constitution, so long as the constitutional right was not defined with sufficient specificity that the official should have known the act was prohibited. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also Wilson v. Layne*, 526 U.S. 603, 614–15 (1999) (applying the "discretionary function[]" formulation and holding that

---

*See, e.g.,* ECF No. 35, ¶ 80 (CBP manual stating temperatures are to be "within a reasonable and comfortable range for both detainees and officers/agents"); *id.*, ¶ 83 (CBP manual stating observed medical issues should receive "appropriate" and "timely" attention); *id.*, ¶ 84 (ICE manual stating transport should occur in a "safe and humane manner" and detainees should be "properly" secured); *id.*, ¶ 85 (ICE manual providing detainees entitled to "request" care and should receive "timely" follow-up); *id.*, ¶ 81 (CBP manual stating officers should behave in manner that "reflects positively" on agency and treat others with "dignity and respect"); *id.*, ¶ 73 (Flores provisions calling for access to food, water, sinks and toilets "as appropriate" and "adequate" temperature, ventilation, and supervision).

officers were entitled to qualified immunity because, although their conduct violated the Fourth Amendment, the law was not clearly established at the time).

Thus, when the Supreme Court in *Berkovitz* held that a federal mandate must "specifically prescribe[]" conduct in order to overcome the discretionary function exception, it referred to official immunity precedent, underscoring that the two standards operate in tandem. 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296–97 (1988)). Accordingly, the DFE is not made inapplicable by every allegation of unlawful or unconstitutional conduct, but only by a showing that the government official's discretion was cabined by a specific, clearly established directive, accompanied by plausible assertions that the specific directive was violated. *See*, *e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because … the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the discretionary function exception.).

Indeed, even before it specifically addressed the qualified immunity standards applicable to federal employees, the Supreme Court in *Butz v. Economou*, 438 U.S. 478 (1978), explicitly recognized that the DFE would apply even if alleged conduct might later be held unconstitutional. The Court in that case held that officials sued for violations of constitutional rights were entitled to qualified, but not absolute immunity. The Court explained that were it otherwise, the recently recognized *Bivens* remedy would be illusory, and, as relevant here, it noted that "no compensation would be available from the Government, for the Tort Claims Act prohibits recovery for injuries stemming from discretionary acts, even when that discretion has been abused." *Id.* at 505. *Butz* and subsequent decisions thus leave no doubt that conduct that violates the Constitution may constitute the type of abuse of discretion that falls within the scope of the discretionary function exception.

The Fifth Circuit has not, in a controlling opinion, addressed under what circumstances an allegation of a constitutional violation removes discretion under the DFE. *See Campos*, 888 F.3d at 735 ("This Court has not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function

exception") (quoting *Spotts*, 613 F.3d at 569). However, in two unpublished opinions, the Fifth Circuit has held that a constitutional violation only removes discretion if it prescribed a specific course of conduct. *See Garza v. United States*, 161 F. App'x 341, 343–44 (5th Cir. 2005) (rejecting allegation that Eighth Amendment violation precluded application of DFE, and instead deciding to "join [its] sister circuits in recognizing that … the Eighth Amendment's prohibition against cruel and unusual punishment [does not] define a non-discretionary course of action specific enough to render the discretionary function exception inapplicable"); *Campillo v. U.S. Penitentiary Beaumont, Tex.*, 203 F. App'x 555 (5th Cir. 2006) (per curiam) (same). In the Fifth Circuit, unpublished decisions are not treated as precedent but they can be relied upon as persuasive authority. *See Ballard v. Burton*, 444 F.3d 391, n.7 (5th Cir. 2006).

Several district courts in Texas have agreed with *Garza. See*, *e.g.*, *Ahern v. United States*, 2:14-cv-259, 2017 WL 2215633, at *10 (S.D. Tex. May 19, 2017), *R. & R. adopted*, 2:14-CV-259, 2017 WL 2821949 (S.D. Tex. June 29, 2017) ("adopting the reasoning articulated in *Garza*" and finding § 2680(a) applicable despite argument that the government violated the plaintiff's rights under the Fifth Amendment, which was found to lack requisite specificity); *Fabian v. Dunn*, SA-08-cv-269, 2009 WL 2567866, at *8 (W.D. Tex. Aug. 14, 2009) (unaccompanied minors who illegally entered United States alleged government violated their Fifth Amendment rights in choosing detention facility where they were allegedly abused; claim held barred by DFE because Fifth Amendment does not prescribe a specific course of conduct, citing *Garza* as the "most applicable case"); *Lane v. Brockman*, 3:18-cv-02745, 2019 WL 360836, at *3 (N.D. Tex. Jan. 9, 2019), *R. & R. adopted*, 3:18-CV-2745, 2019 WL 359215 (N.D. Tex. Jan. 29, 2019) (relying on *Garza* to hold DFE applicable to defeat claim alleging constitutional violation).

In any event, whatever the precise standard, it is not satisfied here. Regardless of whether some or all of these acts reflected an abuse of discretion, Plaintiffs have identified nothing in the decisions of the Supreme Court or the Fifth Circuit that removed any official's discretion with respect to any of the categories of asserted actions by "specifically prescrib[ing] a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322. Indeed, as the Fourth Circuit observed, "we … have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210–11 (4th Cir. 2019); *see also Dominguez-Portillo*, 2018 WL 315759 at *6 ("the case law provides little guidance on how such parental rights are actually manifested when a parent charged with a petty misdemeanor illegal entry offense is separated from their child who allegedly accompanied them across the border"); *see also id.* (noting "lack of clearly established parental rights in these circumstances and under case law"), *aff'd sub nom Vasquez-Hernandez*, 314 F. Supp. 3d at 763 ("any time the government detains or imprisons a parent for criminal activity, that parent's rights as to her children are implicated … But if that kind of interference were actionable under the Eighth Amendment, every imprisoned parent would arguably have a claim. That is not the state of the law."); *aff'd Vasquez- Hernandez*, 924 F.3d at 164; *see also Ms. L.*, 310 F. Supp. 3d at 1144 ("[P]arents and children may lawfully be separated when the parent is placed in criminal custody[.]").

In their First Amended Complaint, Plaintiffs generally allege that their rights to procedural and substantive due process of law, equal protection, and family integrity were violated. *See* ECF No. 35, ¶¶ 86-93. However, "[t]he assertion of a *general* constitutional right that is clearly established is not sufficient; 'the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense … [so] that a

reasonable official would understand that what he is doing violates that right.'" *Burney v. Carrick*, 170 F.3d 183 at *3 (5th Cir. 1999) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

   **e.**  **Plaintiffs' negligent supervision claims are barred by the DFE.**

  Plaintiffs' negligent supervision claims are barred by the DFE. Plaintiffs allege that government employees in supervisory roles have a duty to properly supervise federal officers and to oversee their treatment of noncitizens in their custody. ECF No. 35, ¶ 127. They allege that the "blatant disregard for CBP ICE's own internal policies and standards by officers also show CBP and ICE management staff were negligent in their non-discretionary duties to supervise individual officers." *Id.*, ¶ 128. Plaintiffs' conclusory assertions, however, cannot overcome Fifth Circuit precedent barring claims of negligent supervision against the United States as asserted by Plaintiffs.

  Plaintiffs have not identified any mandatory policy that directs precisely how to supervise federal officers and to oversee their treatment of migrants in their custody.

  The Fifth Circuit agrees with other circuits in holding "that federal employees' supervision of subordinates involves the kind of judgment that the discretionary function exception was meant to protect." *M.D.C.G. v. United States*, 956 F.3d 762, 772 (5th Cir. 2020) (citing *Gordo-Gonzalez v. United States*, 873 F.3d 32, 37 (1st Cir. 2017)); *Snyder v. United States*, 590 F. App'x 505, 509-10 (6th Cir. 2014); *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997)). *M.D.C.G.* involves an adult plaintiff and two minors who brought suit under the FTCA. The facts alleged in the case are horrific and include assertions of extreme violence. One of plaintiffs' causes of action was a claim of negligent supervision by the supervisors of the abusive agent. In its analysis, the Fifth Circuit cited to the First Circuit's decision in *Gordo-Gonzalez* to

support its holding that negligent supervision claims are barred by the DFE. *See M.D.C.G.*, 956

F.3d at 772. In *Gordo-Gonzalez*, the First Circuit held that:

> [b]y its very nature, supervision is an ad hoc exercise, sensitive to policy considerations, the type of work being performed, and the experience and training of those performing that work. It almost always demands flexibility. […] Inherent in the performance of supervisory tasks are considerations of policy, a balancing of competing interests, and careful decision making regarding the level of micro-management of one's subordinates.

*Gordo-Gonzalez*, 873 F.3d at 37.

Similarly, in *M.D.C.G.* the Fifth Circuit held "[a]n agency's supervision of its employees

involves matters of balancing management interests in the administration and operation of the

agency to carry out effectively its governmental mission." *M.D.C.G.*, 956 F.3d at 772. The Court

found that it had no jurisdiction over the negligent supervision claims because supervision of the

Border Patrol Agent was within the agency's discretion.

Plaintiffs' conclusory allegations of negligent supervision fail to consider or address the

Fifth Circuit's precedent that the DFE protects the United States from such claims. The operational

interests that an agency must balance in supervising employees to accomplish the agency's mission

is the type of conduct the discretionary function exception is intended to protect. The Fifth Circuit

has applied the DFE not only to the supervision of federal employees but also to the supervision

of government contractors. *See Doe v. United States*, 831 F.3d 309, 319-21 (5th Cir. 2016).

Accordingly, Plaintiffs' claims of negligent supervision are barred.

## 2. Plaintiffs' claims relating to the decision to transfer D.A. and A.A. to the custody of ORR are barred by the FTCA's exception for actions taken while reasonably executing the law.

Plaintiffs' claims relating to the decision to transfer D.A. and A.A. to the custody of ORR

are independently precluded because the FTCA prevents the United States from being held liable

for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due

care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). Thus, "[w]here government employees act pursuant to and in furtherance of regulations, resulting harm is not compensable under the act[.]" *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir. 1970) (claim based on "enforcement of 'rules and regulations'" barred by § 2680(a)); *Lively v. United States*, 870 F.2d 296, 297–98 (5th Cir. 1989) (recognizing that the exception for actions taken while reasonably executing the law and the DFE are two separate exceptions under 28 U.S.C. § 2680(a)).

This exception "bars tests by tort action of the legality of statutes and regulations." *Dalehite,* 346 U.S. at 33; *see also* H.R. Rep. No. 77-2245, 77th Cong., 2d Sess., at 10 (noting that it was not "desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort"); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956) (FTCA does not waive sovereign immunity for claims based on employees' acts "performed under and in furtherance of the regulation … even though the regulation may be irregular or ineffective"). Thus, where a government employee's actions are authorized by statute or regulation—even if that statute or regulation is later found unconstitutional or invalid—the claim must be dismissed for lack of subject matter jurisdiction. *See e.g. Bub Davis Packing Co. v. United States*, 443 F. Supp. 589, 593 (W.D. Tex. 1977), *aff'd*, 584 F.2d 116 (5th Cir. 1978); *Sickman v. United States*, 184 F.2d 616, 619 (7th Cir. 1950); *F.D.I.C. v. Citizens Bank & Tr. Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir. 1979); *Borquez v. United States*, 773 F.2d 1050, 1052–53 (9th Cir. 1985); *Hydrogen Tech. Corp. v. United States*, 831 F.2d 1155, 1160–61 & n.5 (1st Cir. 1987) (exception barred FTCA claim for destruction of prototype after FBI dismantled it during criminal investigation); *Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir.

1973) (exception barred property damage claim of Lee Harvey Oswald's widow for damage to personal effects belonging to her late husband during FBI's investigation into President John F. Kennedy's assassination).

Here, the United States is required to "transfer the custody" of unaccompanied children to the care of ORR "not later than 72 hours after" determining that there is no parent available to provide care and physical custody absent exceptional circumstances. 8 U.S.C. § 1232(b)(3). In this case, the government made the determination that there was no parent available to provide care and physical custody for D.A. and A.A., on account of its discretionary decisions to refer Plaintiff Padilla-Gonzales for criminal prosecution, to transfer her to criminal custody for prosecution, and to detain her in an adult immigration detention facility. Once those protected discretionary determinations were made, the TVPRA required that D.A. and A.A. be transferred to ORR custody. The enforcement of that statutory command cannot form the basis of an FTCA claim.[8]

### 3.   Plaintiffs' claims are barred because there is no private person analogue.

Plaintiffs' claims also fail because the government acts that Plaintiffs challenge have no private person analogue. The FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute authorizes tort recovery against the United States only "in the same manner and to the same extent

---

[8] In reaching the contrary conclusion, district courts have stated that there is no statute or regulation "requiring the separation of Plaintiffs upon their entry into the country." *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020); *see also C.M. v. United States*, CV-19-05217-PHX-SRB, 2020 WL 1698191, at *4 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied,* CV-19-05217, 2020 WL 5232560 (D. Ariz. July 6, 2020). But, as just described, federal law does require that children be placed into ORR custody if their parents are unavailable to provide care and physical custody. And for the reasons described above, the decision to detain those parents for prosecution is a quintessentially discretionary one. In *A.P.F.* and *C.M.*, the plaintiffs were not charged with any crime, and the decisions are distinguishable on that basis.

as a private individual under like circumstances." 28 U.S.C. § 2674. The FTCA does not waive

sovereign immunity for claims against the United States based on governmental "action of the type

that private persons could not engage in and hence could not be liable for under local law." *Chen*

*v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotes omitted).

The FTCA "requires a court to look to the state-law liability of private entities, not to that

of public entities, when assessing the Government's liability under the FTCA [even] in the

performance of activities which private persons do not perform." *United States v. Olson*, 546 U.S.

43, 46 (2005) (internal quotations omitted); *Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir.

2012). Though the private analogue need not be exact, a plaintiff must offer "a persuasive analogy"

showing that the government actor sued would be subject to liability under state law if he or she

were a private person. *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992).

Because only the federal government has the authority to enforce federal criminal and

immigration laws and make determinations concerning detention, there is no private person

analogue that would support a claim under the FTCA. The alleged harms here stem from the

federal government's decision to enforce federal immigration laws, criminally prosecute certain

individuals, and hold parents in custody pending immigration proceedings or prosecution, resulting

in their children's placement in the care and custody of ORR. The United States has not waived

its sovereign immunity for such decisions to enforce federal law, as the decisions have no private-

person counterpart. *See*, *e.g.*, *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir.

1997) (decision regarding whether to take enforcement action under federal law was not conduct

for which private individual could be held liable and thus did not give rise to FTCA action); *Ryan*

*v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 26 (1st Cir. 2020) ("Controlling immigration and the

presence of noncitizens within the country are duties and powers vested exclusively in the

sovereign."); *Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th Cir. 2018) ("[B]ecause no private person could be sued for anything sufficiently analogous to the negligent denial of an immigration status adjustment application, that claim must be dismissed as well."); *Elgamal v. United States*, CV-13-00867, 2015 WL 13648070, at *5 (D. Ariz. July 8, 2015), *aff'd sub nom. Elgamal*, 714 F. App'x at 741 (recognizing that "immigration matters" are "an inherently governmental function"); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th Cir. 2019) ("[T]here is, as a general matter, no private analogue to governmental withdrawal of immigration benefits."); *Mazur v. U.S. I.N.S.*, 957 F. Supp. 1041, 1042–43 (N.D. Ill. 1997) (in matters relating to naturalization of noncitizens, "only the United States has the power to act," and, "[a]ccordingly … there is no private analog under state law").[9]

### 4.   Plaintiff Padilla-Gonzales' claim of conversion is barred by the detention of goods exception.

Plaintiff Padilla-Gonzales alleges that while at the Ysleta Port of Entry in El Paso, Texas, a federal officer searched her and confiscated all her belongings, including her identification card, birth certificates, and 80 Mexican pesos. ECF No. 35, p. 5, ¶ 20. This appears to form the basis of her claim for conversion. However, that claim is barred by the detention-of-goods exception. *See* 28 U.S.C. § 2680(c). The FTCA excepts from its waiver of sovereign immunity claims for property losses arising out of the detention of goods by federal law enforcement officers. *See Halverson v. United States*, 972 F.2d 654, 656 (5th Cir. 1992) (per curiam). The Fifth Circuit "interpret[s] this subsection broadly." *Davila v. United States*, 713 F.3d 248, 256 (5th Cir. 2013). The exception precludes any claim arising out of the detention of property, *Kosak v. United States*, 465 U.S. 848,

---

[9] Although civil in nature, immigration arrests and resulting detention are viewed as more akin to criminal enforcement. *See Ryan*, 974 F.3d at 27 ("Just as criminal arrests implicate the uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil immigration arrests seek to vindicate similar kinds of interests in controlling immigration and the presence of noncitizens in the country.").

854 (1984), by any law enforcement officer, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228

(2008), even if the officer's conduct is unauthorized, tortious, or intentionally wrongful, *see*

*Davila*, 713 F.3d at 256; *Krug v. United States*, 442 F. App'x 950, 951 (5th Cir. 2011) (per curiam);

*Solus Ocean Sys., Inc. v. U.S. Customs Serv.*, 777 F.2d 326, 328 (5th Cir.1985). As such, this claim

is barred.

**B.     Plaintiffs fail to state a claim under Texas law.**

**1.     Plaintiffs fail to state a claim of intentional infliction of emotional distress.**

In their first cause of action, Plaintiffs allege a claim for intentional infliction of emotional

distress related to their separation and treatment while in detention. ECF No. 35, p. 26, ¶¶ 95-98.

As previously argued, Plaintiffs' separation-based claims are not cognizable under the FTCA and

Texas law. In addition, because Plaintiffs have not pleaded facts which support the essential

elements of this claim giving rise to a plausible right of recovery for intentional infliction of

emotional distress, their separation-based claims should be dismissed.

The elements of intentional infliction of emotional distress are: (1) the defendant acted

intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the

defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the

plaintiff was severe. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993); *Halbert v. City of*

*Sherman, Tex.*, 33 F.3d 526, 529 (5th Cir. 1994). In *Wornick*, the Texas Supreme Court described

the outrageous conduct element as that which "[goes] beyond all possible bounds of decency, and

to be regarded as atrocious, and utterly intolerable in a civilized community" *Wornick*, 856 S.W.2d

at 734 (citing Restatement (Second) of Torts § 46 (1965)). The Court must determine as a matter

of law whether the alleged conduct may reasonably be regarded as so extreme and outrageous so

as to permit recovery. *Wornick*, 856 S.W.2d at 734; *see also Wyatt v. Kroger Co.*, 891 S.W.2d 749,

754 (Tex. App.—Fort Worth 1994), *writ denied* (Aug. 1, 1995).

Texas public policy strongly favors the reporting and prosecution of crime. *See Smith v. Sneed*, 938 S.W.2d 181, 184 (Tex. App.—Austin 1997, no pet.) ("Texas courts have long recognized a strong public policy in favor of exposing crime.") (collecting cases). This policy is so strong that it "prohibits a person convicted of a crime from suing another for damages caused by conviction," including for claims of false imprisonment and intentional infliction of emotional distress. *Jones v. Hyman*, 107 S.W.3d 830, 831–32 (Tex. App.—Dallas 2003, no pet.). This is based on the principle that allowing civil recovery impermissibly shifts responsibility for the crime away from the person convicted. *Id.* (citing *Johnson v. Odom*, 949 S.W.2d 392, 393 (Tex. App.— Houston [14th Dist.] 1997, pet. denied)). There is no dispute that Plaintiff Padilla-Gonzales was found guilty of improper entry and sentenced for such offense. ECF No. 35, ¶ 53.

Here, Plaintiffs' intentional infliction of emotional distress claims are largely based on their separation. Plaintiffs' allegations are insufficient to state a plausible claim for intentional infliction of emotional distress under Texas law. *See Twombly*, 550 U.S. at 555. Stated simply, the prosecution of crime and enforcement of federal immigration law is neither extreme nor outrageous under Texas law, even when that prosecution and enforcement results in the separation of a parent from his or her child. *Cf. Dillard Dep't Stores, Inc. v. Silva*, 106 S.W.3d 789, 797 (Tex. App.—Texarkana 2003, pet. granted) (where probable cause exists for an arrest, the decision to initiate criminal proceedings "cannot constitute outrageous behavior"), *aff'd in part, mod. in part on other grounds*, 148 S.W.3d 370 (Tex. 2004). Indeed, the risk of interference with the parent-child relationship is inherent to criminal and immigration detention. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 22 (1st Cir. 2007) (recognizing that "every [detention pending removal] of a parent, like every lawful arrest of a parent, runs the risk

34

of interfering in some way with the parent's ability to care for his or her children"); *cf. Payne-Barahona v. Gonzales*, 474 F.3d 1, 3 (1st Cir. 2007) (holding that if a child had a constitutional right to object to his or her parent's deportation it would be "difficult to see why children would not also have a constitutional right to object to a parent being sent to prison or, during periods when the draft laws are in effect, to the conscription of a parent for prolonged and dangerous military service.").

Where, as here, a parent is separated from her children due to the parent's criminal prosecution and/or immigration proceedings, the decision to separate is neither extreme nor outrageous under Texas law. The separation is a consequence of those proceedings that cannot rise to the level of intentional infliction of emotional distress. Plaintiffs therefore fail to state a claim for intentional infliction of emotional distress based on their separation.

To the extent Plaintiffs claim that alleged threats and insults lodged by various federal agents (*see e.g.,* ECF No. 35, ¶¶ 19, 22, 25, 26) constitute intentional infliction of emotional distress, they fail to state a claim. "Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions." *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993) (citing *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991)). This claim should be dismissed.

### 2.      Plaintiffs fail to state a claim for abuse of process.

Without specifying the legal process in question, Plaintiffs allege that the "government's employees, officials, and/or contractors abused legal processes within their control for the unlawful purpose of traumatizing Plaintiffs, coercing Plaintiffs to abandon their lawful claims to asylum, and deterring future migrants from seeking refuge in the United States." ECF No. 35, p. 31, ¶ 144. They also allege that "the government's employees also abused the legal process by

separating D.A. and A.A. from Lucinda and sending them to the Heartland shelter, rather than releasing them to their father." *Id.*, at ¶ 145. Abuse of process is the malicious use or misapplication of process to accomplish an ulterior purpose. *See Roe v. United States*, 839 F. App'x 836, 846 (5th Cir. 2020) (per curiam); *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Because Plaintiffs fail to plead facts supporting essential elements of their claim, this claim should be dismissed.

The elements of abuse of process are: (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act. *Id.*; *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994), *writ denied* (Nov. 16, 1995). Implicit in the elements is the requirement that the process in question be improperly used after it was issued. *Hunt*, 68 S.W.3d at 130; *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 133 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) *holding modified by Baty v. ProTech Ins. Agency*, 73 S.W.3d 841 (Tex. App—Houston [14th Dist.] 2001). In other words, the tort assumes that the original issuance of a legal process was justified, but the process itself is subsequently used for a purpose for which it was not intended. *Hunt*, 68 S.W.3d at 130 (concluding that use of a false affidavit to support a writ of execution did not support a claim for abuse of process).

"The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Blackstock v. Tatum*, 396 S.W.2d 463, 468 (Tex. App.—Houston [1st Dist.] 1965, no writ history). "There is, in other words, a form of

extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." *Id.* When the process is used for the purpose for which it is intended, even though accomplished for an ulterior motive, no abuse of process has occurred. *Hunt*, 68 S.W.3d at 130; *see also* 59 Tex. Jur.3d Process, Notices, and Subpoenas § 10 (3).

Plaintiffs' abuse of process claim should be dismissed because they have not pled facts showing that any federal employee "made an illegal, improper, or perverted use of [] process, a use neither warranted nor authorized by the process." *Hunt*, 68 S.W.3d at 129. Indeed, it is unclear what "legal processes within their control" Plaintiffs allege were abused. If Plaintiffs allege that the criminal prosecution of Plaintiff Padilla-Gonzales is the process that was abused, then they have not alleged how D.A. and A.A., who were not criminally prosecuted, have standing to assert this claim. *See Kjellvander v. Citicorp*, 156 F.R.D. 138, 142 (S.D. Tex. 1994) ("In the absence of further criminal proceedings, the plaintiffs' arrest and subsequent detention provide an inadequate factual basis for an abuse of process claim under Texas law."). Assuming Plaintiff Padilla-Gonzales claims an abuse of criminal process for her prosecution, she has not alleged that her prosecution was unwarranted or unauthorized by law. As such, Plaintiffs have failed to state the first element of an abuse of process claim under Texas law. *See E.L.A. v. United States*, 2:20-cv-1524-RAJ, 2022 WL 2046135, at *6 (W.D. Wash. June 3, 2022) (dismissing claim for abuse of process under Texas law in family separation case).

Plaintiffs also do not adequately allege any coercion or extortion. Although Plaintiffs allege to have experienced pressure to relinquish their immigration claims by alleging that immigration officers "demanded that [Padilla-Gonzales] sign documents she did not understand, [and] claiming they were required to reunite her with her children [,]" (*see* ECF No. 35, p. 7, ¶ 26), Plaintiffs do

not allege that she in fact signed any documents waiving any of their immigration claims. Further, regardless of the officers' purported behavior, Plaintiffs also fail to adequately allege damages as a result of the behavior.

Plaintiffs also vaguely allege that the government abused "the legal process" by separating the minors from their mother and sending them to a shelter rather than releasing them to their father. *Id.* p. 31, ¶ 145. This also fails to state a claim because Plaintiffs' allegations are devoid of any process that was allegedly abused. "Process" is traditionally defined as the writ, summons, mandate, or other process which is used to inform the defendant of the beginning of judicial proceedings against him and to compel his appearance in court. *See Kjellvander,* 156 F.R.D. at 142 (citing *Snyder v. Byrne,* 770 S.W.2d 65, 69 (Tex.App.—Corpus Christi 1989, no writ)). These vague and conclusory allegations fail to state a legally cognizable claim.

    **3.**    **Plaintiffs fail to state a claim of medical negligence.**

In alleging a claim of medical negligence, Plaintiffs assert the government had a duty to Plaintiff Padilla-Gonzales to provide appropriate medical care. ECF No. 35, ¶ 165. Because Plaintiffs again fail to plead essential elements of their claim, this claim must be dismissed.

In Texas, medical negligence requires the showing of 1) a duty by a physician or hospital to act according to an applicable standard of care; 2) a breach of that standard of care; 3) an injury; and 4) a causal connection between the breach of care and the injury. *See Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (citing *Mills v. Angel*, 995 S.W.2d 262, 267 (Tex. App.–Texarkana 1999, no. pet.). Plaintiffs do not allege any medical negligence on behalf of any government medical providers. Instead, Plaintiff Padilla-Gonzales's allegations of medical negligence appear to stem from the assertion that federal agents did not heed the advice of doctors at the hospital to return her to the hospital if her condition did not improve, but instead gave her

ibuprofen.  ECF No. 35, ¶ 58.  However, "in the case of medical negligence or malpractice [under the FTCA], a plaintiff must identify the specific medical professional, or professionals, liable for his or her claim." *See Jones v. United States*, CV-20-02145-PHX-SMB, 2021 WL 5505787, at *4 (D. Ariz. Nov. 24, 2021). Therefore, because Plaintiffs do not assert that any federal agent involved in the decision to give Plaintiff Padilla-Gonzales ibuprofen was a medical provider, Plaintiffs do not state a claim for medical negligence. *See Olivas v. Corr. Corp. of Am.*, 408 F. Supp. 2d 251, 259 (N.D. Tex. 2006) *aff'd*, 215 F. App'x 332 (5th Cir. 2007) (dismissing action against private prison-management company because it was not a "health care provider" or "health care institution" as defined under Texas law). These allegations fail to state a legally cognizable claim.

## V.    CONCLUSION

For the foregoing reasons, Defendant United States requests that this action be dismissed.

Respectfully submitted,

**ASHLEY C. HOFF**
UNITED STATES ATTORNEY

/s/ Manuel Romero
**MANUEL ROMERO**
Assistant United States Attorney
Texas State Bar No. 24041817
700 E. San Antonio, Ste. 200
El Paso, Texas 79901
Office: (915) 534-6555
Facsimile: (915) 534-3490
Email: Manuel.Romero@usdoj.gov
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of October, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant: Joe A. Spencer; and I have mailed by certified mail, return receipt requested, the document to the following non-CM/ECF system participants: Anand Swaminathan and Stephen H. Weil, Loevy & Loevy, 311 N. Aberdeen St., 3rd Floor, Chicago, IL 60607; and Conchita Cruz, Zachary Manfredi, Asylum Seeker Advocacy Project, 228 Park Ave. S. #84810, New York, NY 1003, *Attorneys for Plaintiffs.*

/s/ Manuel Romero
**MANUEL ROMERO**
Assistant United States Attorney