# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **D.A., A.A., and LUCINDA DEL CARMEN PADILLA-GONZALES,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **EP-22-CV-00295-FM** |
| **UNITED STATES OF AMERICA,** | § § § | |
| **Defendant.** | § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Before the court is "Second Amended Renewed Motion to Dismiss" ("Motion") [ECF No. 105], filed October 13, 2022, by the United States of America ("Defendant"). Therein, Defendant moves to dismiss the above-captioned action for lack of subject-matter jurisdiction, citing its sovereign immunity.[1] Alternatively, it moves to dismiss certain causes of action for failure to state a claim.[2] For the following reasons, Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

### A.   Factual Background

Between April and June 2018, the Trump Administration implemented a so-called "Zero Tolerance Policy" toward illegal immigration across the southern border of the United States.[3] Under that policy, federal authorities separated children from parents with whom they had

---

[1] "Second Amended Renewed Motion to Dismiss" ("Mot.") 1, ECF No. 105, filed Oct. 13, 2022.

[2] *Id.*

[3] "Memorandum for Federal Prosecutors Along the Southwest Border" (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download (last visited Mar. 7, 2023) (emphasis added).

improperly entered the United States. Parents were prosecuted for illegal entry and children were transferred to the custody of the Department of Health and Human Services ("DHHS").

Prior to the Zero Tolerance Policy, "administrations used family detention facilities, allowing the whole family to stay together while awaiting their deportation case in immigration court, or alternatives to detention, which required families to be tracked but released from custody to await their court date."[4] Under the Trump Administration's new policy, however, forced family separation was utilized as a means of deterring immigration.[5] As the Attorney General told several prosecutors in May 2018, "[w]e need to take away children."[6] Indeed, over 5,000 were separated from their parents under this policy, "with no tracking process or records that would allow them to be reunited."[7]

Lucinda del Carmen Padilla-Gonzales ("Padilla-Gonzales") and her minor children D.A. and A.A. (collectively, "Plaintiffs") were one of the families separated under the Zero Tolerance Policy. Plaintiffs fled Honduras in May 2018 and traveled to the United States to seek political asylum.[8] When they arrived at the United States-Mexico border on May 23, Customs and Border Protection ("CBP") agents arrested Plaintiffs and transported them to a nearby holding center.[9]

---

[4] *Why Are Families Being Separated at the Border? An Explainer*, BIPARTISAN POLICY CENTER, https://bipartisanpolicy.org/blog/why-are-families-being-separated-at-the-border-an-explainer/ (last visited Mar. 7, 2023).

[5] Michael D. Shear, Katie Benner, and Michael S. Schmidt, *'We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, THE NEW YORK TIMES, https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html (last visited Mar. 7, 2023).

[6] *Id.*

[7] *How a Trump-era policy that separated thousands of migrant families came to pass*, POLITICO (Aug. 13, 2022), https://www.pbs.org/newshour/show/how-a-trump-era-policy-that-separated-thousands-of-migrant-families-came-to-pass (last visited Mar. 7, 2023).

[8] "First Amended Complaint" ("Am. Compl.") 5 ¶ 19, ECF No. 35, filed Sept. 30, 2020.

[9] *Id.* at 5 ¶ 20.

Once there, Department of Homeland Security ("DHS") officers confiscated Padilla-Gonzales' identification card, birth certificates, and money and detained Plaintiffs in a frigid cell for a day and a half, while neglecting to provide them blankets or jackets.[10]

At one point, Padilla-Gonzales requested medical attention for a leg injury she had sustained several days prior.[11] DHS officers took her to a hospital, where she received ibuprofen, a cloth bandage, and crutches.[12] Back at the holding center, DHS officers confiscated her crutches.[13]

The next day, DHS officers separated Plaintiffs without giving them a chance to say goodbye, transferring Padilla-Gonzales to criminal custody and D.A. and A.A. to a juvenile shelter in Chicago.[14] Officers then used Padilla-Gonzales' isolation and separation from her children to "coerce her to give up [her] asylum claims . . . and plead guilty to a criminal charge for unlawful entry."[15] They also "demanded that she sign documents she did not understand, claiming they were required to reunite her with her children."[16] Other detainees later told her the documents "were actually a waiver of her asylum claims and an agreement to be deported."[17]

On May 29, a mere six days after entering the United States, Padilla-Gonzales pled guilty to a Class B misdemeanor charge of entering the United States at an undesignated place and was

---

[10] *Id.* at 5 ¶ 20, 6 ¶¶ 21, 22.

[11] *Id.* at 6 ¶ 22.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 6 ¶ 23, 14 ¶ 53.

[15] *Id.* at 7 ¶ 25.

[16] *Id.* at 7 ¶ 26.

[17] *Id.*

sentenced to one year of non-reporting, unsupervised probation.[18] Two days later, she was returned to immigration detention to await deportation.[19] "[S]he had still not heard from her children and did not know where they were."[20]

"Sometime later in June," Padilla-Gonzales was transported by Immigration and Customs Enforcement ("ICE") agents to an airport for deportation.[21] She was handcuffed and shackled and placed in the back of a government vehicle without a seatbelt.[22] On the way to the airport, the vehicle made an abrupt stop and Padilla-Gonzales was "slammed headfirst directly into the metal bars that separated her from the federal agents."[23] She began to bleed "profusely" and felt lightheaded.[24] She told the agents she needed to vomit, but they ignored her.[25] Once at the airport, Padilla-Gonzales refused to get on the airplane without her children, so she was returned to the detention facility.[26]

The next day she was taken to a hospital for treatment of her head wound where doctors "indicated that she needed to return if her condition did not improve."[27] Although her condition did not improve, detention facility staff declined to return her to the hospital and instead simply

---

[18] "Judgment in a Criminal Case" 1, 3:18-mj-03687-LS, ECF No. 1, entered May 29, 2018, and filed June 4, 2018; *see* 8 U.S.C. § 1325(a)(1). Plaintiffs erroneously allege that Padilla-Gonzales was "sentenced to time served and one year probation" on June 4. Am. Compl. at 14 ¶ 53.

[19] Judgment in a Criminal Case at 1; Am. Compl. at 14–15 ¶ 54.

[20] Am. Compl. at 14–15 ¶ 54.

[21] *Id.* at 15 ¶¶ 55–57.

[22] *Id.* at 15 ¶ 55.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* at 15–16 ¶¶ 57–58.

[27] *Id.* at 16 ¶ 58.

gave her ibuprofen.[28] Padilla-Gonzales continues to suffer the effects of this injury "including vision problems, trouble reading, and bouts of forgetfulness."[29]

Meanwhile, rather than send D.A. and A.A. to live with their father in North Carolina, DHHS' Office of Refugee Resettlement ("ORR") sent them to a Chicago shelter facility for minors operated by government contractor Heartland Alliance for Human Needs and Human Rights and its subsidiary Heartland Human Care Services (collectively, "Heartland").[30] At the time, D.A. was fourteen years old and her brother A.A. was five.[31] Once at Heartland, they were separated, housed in different buildings, and given very limited opportunities to interact.[32] They were only rarely permitted to call their father and never permitted to call their mother or other family members.[33]

The children struggled at Heartland, which failed to provide adequate educational services, exacerbated the emotional trauma that D.A. and A.A. experienced fleeing Honduras, and frequently treated them more poorly than other non-Central American kids.[34] The children were kept in unsanitary conditions, leading D.A. to contract lice, which Heartland neglected to treat.[35] A.A. would often cry for his mother at night, so Heartland staff forced him to take

---

[28] *Id.*

[29] *Id.* at 17–18 ¶¶ 64–65.

[30] *Id.* at 8 ¶¶ 29–31.

[31] *Id.* at 4 ¶¶ 14–15.

[32] *Id.* at 9 ¶ 33.

[33] *Id.* at 9–10 ¶¶ 35–37.

[34] *Id.* at 10–12 ¶¶ 40–43.

[35] *Id.* at 10–11 ¶ 40.

sleeping pills.[36] He began to lose weight and was bullied by other kids.[37] After roughly five weeks at Heartland, D.A. and A.A. were sent to live with their father, who was required to pay over a thousand dollars for their airfare.[38]

By early July, Padilla-Gonzales had found an immigration attorney, who scheduled a credible fear interview for her, which she passed on July 9, and secured her release on bond on August 21.[39] She was then reunited with her husband and children in North Carolina.[40]

Padilla-Gonzales, D.A., and A.A. continue to suffer the effects of their early experiences in the United States. Padilla-Gonzales battles insomnia, "severe stress and anxiety, overwhelming bouts of sadness and trauma, fear, . . . loss of appetite for days at a time," and complications from her head injury.[41] D.A. "keeps to herself and is closed off."[42] A.A., who was toilet trained before being sent to Heartland, now has trouble with bodily functions and "frequently urinates himself due to nervousness."[43] He also suffers from fear and anxiety and cannot "maintain a regular sleeping schedule."[44]

---

[36] *Id.* at 10 ¶ 38.

[37] *Id.*

[38] *Id.* at 13–14 ¶¶ 46–50.

[39] *Id.* at 16–17 ¶ 60.

[40] *Id.*

[41] *Id.* at 17–18 ¶¶ 64–65.

[42] *Id.* at 17 ¶ 62.

[43] *Id.* at 17 ¶ 63.

[44] *Id.*

B.    *Procedural Background*

. Plaintiffs filed a complaint in the Northern District of Illinois in May 2020 against Defendant and Heartland, alleging: breach of fiduciary duty, negligence, and negligent supervision against Defendant and Heartland; intentional infliction of emotional distress ("IIED"), conversion, abuse of process, loss of consortium, assault and battery, and medical negligence against Defendant; and violations of the Rehabilitation Act against Heartland.[45] Plaintiffs' claims against Defendant arise under the Federal Tort Claims Act ("FTCA"). [46] Plaintiffs settled their claims against Heartland in March 2022.[47] In August, the case was transferred to the Western District of Texas.[48]

In October, Defendant filed its Motion, arguing Plaintiffs' FTCA claims should be dismissed because they fall under several exceptions to the FTCA's waiver of sovereign immunity.[49] Alternatively, Defendant contends, "Plaintiffs fail to state a claim upon which relief can be granted under Texas law for [IIED], abuse of process, and medical negligence."[50]

## II.    **APPLICABLE LAW**

A.    *Waiver of Sovereign Immunity and Exceptions*

"Sovereign immunity deprives the court of subject matter jurisdiction."[51] Thus, a plaintiff "may only sue the United States if a federal statute explicitly provides for a waiver of sovereign

---

[45] *Id.* at 26–33.

[46] *See id.*

[47] "Motion to Dismiss the Heartland Defendants," ECF No. 74, filed Mar. 4, 2022; "Order Dismissing Heartland Defendants," ECF No. 75, entered Mar. 7, 2022.

[48] "Transferring Order," ECF No. 85, entered Aug. 11, 2022.

[49] *See generally* Mot.

[50] *Id.*

[51] *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019).

immunity," which "is a prerequisite to federal jurisdiction."[52] That said, "[a] motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears certain" the plaintiff is not entitled to relief.[53]

The FTCA waives the United States' sovereign immunity to tort claims where its employees were acting within the scope of their office or employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with" state law.[54] "Generally, such cases unfold much as cases do against other employers who concede *respondeat superior* liability."[55] However, the United States retains sovereign immunity under certain FTCA exceptions, such as the discretionary function, due care, misrepresentation, and detention of goods exceptions.

### a.   Discretionary Function Exception

The United States retains sovereign immunity for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government."[56] This exception applies even where the Government was negligent in the performance of discretionary functions.[57]

"The Supreme Court has developed a two-part test for determining whether agency conduct qualifies as a discretionary function or duty."[58] "Under the first prong, the conduct must

---

[52] *In re FEMA Trailer Formeldahyde Prods. Liab. Litig.*, 668 F.3d 281, 287 (5th Cir. 2012).

[53] *Id.*

[54] 28 U.S.C. § 2671 *et seq.*; 28 U.S.C. § 1346(b)(1); *see United States v. Olson*, 546 U.S. 43, 44 (2005).

[55] *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995).

[56] 28 U.S.C. § 2680(a); *see Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010).

[57] *Dalehite v. United States*, 346 U.S. 15, 33 (1953) ("The exercise of discretion could not be abused without negligence or a wrongful act.").

[58] *Spotts*, 613 F.3d at 567.

be a matter of choice for the acting employee."[59] "If a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."[60] However, "[t]he requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive."[61] "In other words, the discretionary function exception does not apply if the challenged actions in fact violated a federal statute, regulation, or policy."[62] This is true for constitutional violations as well, presuming "there is a specific and intelligible constitutional mandate."[63]

Under the second prong, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."[64] "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social,

---

[59] *Id.* (citation and international quotation marks omitted).

[60] *Id.*

[61] *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citation and international quotation marks omitted).

[62] *Spotts*, 613 F.3d at 567.

[63] *McElroy v. United States*, 861 F.Supp. 585, 593 (W.D. Tex. 1994). The Fifth Circuit, admittedly, has been unclear on whether constitutional violations suffice to defeat the FTCA's discretionary function exception. On the one hand, the Court once noted that it has "not hesitated to conclude that [] action does not fall within the discretionary function of [the FTCA] when governmental agents exceed the scope of their authority as designated by statute or the Constitution." *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987). On the other, the Court later stated in that it had "not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception." *Spotts*, 613 F.3d at 569. Nevertheless, the Supreme Court would likely agree with this court's conclusion that constitutional violations defeat the discretional function exception. *See Owen v. City of Independence, Mo.*, 445 US 622, 649 (1980) ("[A] municipality has no 'discretion' to violate the Federal Constitution."). To be sure, *Owen* dealt with a municipality's common-law immunity for discretionary functions rather than a statutory waiver of immunity for the federal government, but there is no reason to think a prohibition on violating the Constitution affects one category of immunity but not the other.

[64] *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

economic, and political policy," it protects only governmental conduct "susceptible to policy analysis," which must be "based on the purposes that the regulatory regime seeks to accomplish."[65] That said, when statutes, regulations, or policies allow "a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."[66]

> b.    Due Care Exception

The United States also retains sovereign immunity for any claim "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid."[67] This exemption pertains to acts or omissions "mandated by statute or regulation."[68] As such, it "bars tests by tort action of the legality of statutes and regulations."[69]

The Fifth Circuit has not established a test for the due care exception, although many courts, including one in-circuit, follow the two-prong test laid out by the Fourth Circuit in *Welch v. United States*.[70] Under that test, courts must "determine (1) whether the statute or regulation in question specifically proscribes a course of action, and (2) if mandated, whether due care was exercised."[71]

---

[65] *Gaubert*, 499 U.S. at 323, 325, 325 n. 7 (internal citations and quotation marks omitted).

[66] *Id.* at 324.

[67] 28 U.S.C. § 2680(a); *see Spotts*, 613 F.3d at 566.

[68] *Buchanan v. United States*, 915 F.2d 969, 970–71 (5th Cir. 1990).

[69] *Dalehite*, 346 U.S. at 33.

[70] *See, e.g., In re Katrina Canal Breaches Consol. Litig.*, 627 F.Supp.2d 656, 667 (E.D. La. 2009) (citing *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005)).

[71] *In re Katrina Canal Breaches Consol. Litig.*, 627 F.Supp.2d at 667 (citing *Welch*, 409 F.3d at 652).

c.      Misrepresentation Exception

The FTCA's waiver of sovereign immunity does not extend to "[a]ny claim arising out of . . . misrepresentation [or] deceit."[72] The Fifth Circuit "uses a two-step process for determining whether a claim is barred" under this exception.[73] The first question is "whether 'the chain of causation' from the alleged negligence to the injury depends upon a misrepresentation by a government agent."[74] "Second, if the plaintiff's claim does depend on a misrepresentation, [the court] must determine 'whether Congress has nonetheless waived sovereign immunity independently of the FTCA.'"[75]

d.      Detention of Goods Exception

The FTCA's waiver of sovereign immunity also does not extend to any claim "arising in respect of . . . the detention of any goods, merchandise, or other property by any . . . law enforcement officer."[76] Courts "broadly" interpret this exception, which includes a detention of goods that is "unauthorized, tortious, or wrongful" as well as "all injuries associated in any way with the 'detention.'"[77]

B.      *Failure to State a Claim*

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint for "failure to state a claim for which relief can be granted."[78] "The central issue is whether, in the light most

---

[72] 28 U.S.C. § 2680(h).

[73] *Life Partners Inc. v. United States*, 650 F.3d 1026, 1031 (5th Cir. 2011).

[74] *Id.*

[75] *Id.* at 1032.

[76] 28 U.S.C. § 2680(c); *see Davila v. United States*, 713 F.3d 248, 256 (5th Cir. 2013).

[77] *Id.*; *Krug v. United States*, 442 Fed.App'x 950, 951 (5th Cir. 2011); *Kosak v. United States*, 465 U.S. 848, 854 (1984).

[78] FED. R. CIV. P. 12(b)(6).

11

favorable to the plaintiff, the complaint states a valid claim for relief."[79] To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[80] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[81] "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[82] Therefore, a complaint is not required to set out "detailed factual allegations," but it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."[83] Although the court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[84]

## III. **DISCUSSION**

Defendant argues the court lacks subject-matter jurisdiction over Plaintiffs' claims, invoking its sovereign immunity under the aforementioned exceptions.[85] It is also entitled to sovereign immunity, it asserts, because Plaintiffs' claims have no private person analogs.[86] Even if the court finds it retains subject-matter jurisdiction, however, Defendant argues Plaintiffs'

---

[79] *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[80] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[81] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[82] *Id.* (citing *Twombly*, 550 U.S. at 556).

[83] *Twombly*, 550 U.S. at 555.

[84] *See Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

[85] *See generally* Mot.

[86] *Id.* at 30.

"causes of action for [IIED], abuse of process, and medical negligence fail to state a claim under Texas law."[87]

### A.    Subject-Matter Jurisdiction and Sovereign Immunity

"Sovereign immunity deprives the court of subject matter jurisdiction."[88] Defendant asserts it retains sovereign immunity from any claims based on Plaintiffs' allegations that federal employees 1) separated Padilla-Gonzales from her children and kept them separated following her criminal prosecution, 2) misled her into waiving her asylum claim, 3) subjected Plaintiffs to harsh conditions of confinement, 4) confiscated their property, and 5) delayed release of D.A. and A.A. to their father, and 6) that federal supervisors negligently supervised their subordinates.[89]

### a.    Separating Plaintiffs

Plaintiffs were initially separated as a result of Padilla-Gonzales' incarceration, following which D.A. and A.A. were transferred to Heartland under ORR custody.[90] Eleven days later, after her sentence of time-served, Padilla-Gonzales was sent to an adult immigration detention facility to await resolution of her immigration proceedings, where she remained for almost three months.[91] Defendant argues sovereign immunity bars Plaintiffs' claims to the extent they are based on this separation. First, it asserts it had discretion to incarcerate and prosecute Padilla-Gonzales for improper entry and, subsequently, to detain her in an adult immigration detention

---

[87] *Id.* at 2.

[88] *Walker*, 938 F.3d at 734.

[89] Mot. at 14, 22, 21, 32, 28, 20, and 27.

[90] Am. Compl. at 6 ¶ 23, 7–8 ¶¶ 27–29.

[91] *Id.* at 14–15 ¶¶ 53–54, 16–17 ¶ 60.

facility.[92] Second, it contends the due care exception protects its decision to transfer D.A. and A.A. to ORR custody.[93]

*Discretion to Incarcerate and Detain*: According to Plaintiffs, Defendant's decisions to separate them and keep them separated violated "a well-established legal obligation . . . to favor preserving family unity whenever possible."[94] In support, they cite: a consent decree known as the *Flores* Agreement; CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS"); and the United States Constitution.[95]

The *Flores* Agreement is a binding settlement on the United States between the Immigration and Naturalization Service ("INS")—the former federal immigration agency—and a plaintiff class of minors in INS custody.[96] It "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS" and "create[s] minimum requirements and guidelines regarding the condition of confinement for juveniles to ensure their well-being and safety."[97] INS has since dissolved and its functions transferred to various organizations including CBP, ICE, DHS, and ORR. As successor organizations, the *Flores* Agreement is binding on them as well.[98]

The *Flores* Agreement does not mandate that INS successor organizations preserve family unity in circumstances such as Plaintiffs'. This is because the problem it sought to remedy

---

[92] Mot. at 14–20; *see* 8 U.S.C. § 1325.

[93] *Id.* at 7–8, 17–18, 28–30.

[94] Am. Compl. at 18 ¶ 67.

[95] Am. Compl. at 18 ¶ 67, 20 ¶ 76, 23 ¶ 86.

[96] *United States v. Dominguez-Portillo*, 2018 WL 315759, at *7 (W.D. Tex. Jan. 5, 2018).

[97] *Flores* Agreement ¶ 9; *see Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017).

[98] *Flores* Agreement ¶ 1.

was the poor treatment of unaccompanied minors in INS custody. It does, however, require that successor organizations house unaccompanied minors in facilities that provide "contact with family members who were arrested with" them.[99] Plaintiffs allege that D.A. and A.A. were prohibited from ever speaking with their mother while at Heartland.[100] Therefore, the *Flores* Agreement did not remove Defendant's discretion to physically separate Plaintiffs or keep them separated, but it did remove discretion to house D.A. and A.A. in a facility that prohibited them from speaking to Padilla-Gonzales. Accordingly, Defendant is not immune from Plaintiffs' separation-based claims to the extent they are predicated on D.A. and A.A. being prohibited from contacting Padilla-Gonzales.

Plaintiffs also claim sections 1.9 and 5.6 of TEDS prohibited federal agents from separating them.[101] However, neither of those policies specifically mandate that federal employees maintain family unity under Plaintiffs' circumstances. Section 1.9 states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."[102] In using the phrases "greatest extent operationally feasible" and "articulable safety or security concern," section 1.9 grants CBP discretion by tasking it with determining operational feasibility as well as safety and security concerns. Section 5.6 states that, "[g]enerally, family units with juveniles should not be separated."[103] This qualified rule similarly does not specifically mandate that families remain

---

[99] *Id.* at ¶ 12; *Dominguez-Portillo*, 2018 WL 315759, at *9.

[100] Am. Compl. at 10 ¶ 37.

[101] Am. Compl. at 20–21 ¶¶ 75–77.

[102] CBP, TEDS, Oct. 2015, at § 1.9.

[103] *Id.* at § 5.6.

together under circumstances such as Plaintiffs' (i.e., when the accompanying adult is criminally prosecuted).

Finally, Plaintiffs assert their separation violated their constitutional due process rights, including 1) equal protection, 2) procedural due process, and 3) substantive due process.[104]

First, in as much as Plaintiffs do not argue the statute under which Padilla-Gonzales was charged[105] is facially discriminatory but rather was applied discriminatorily, their equal protection claim is properly construed as one of selective prosecution. To prevail on such a claim, they "must show that others similarly situated have not been subject to enforcement proceedings by the government and that there was an impermissible basis for the decision to institute enforcement action against" them, "such as race, religion, or arbitrary classification."[106]

Here, Plaintiffs were separated, and Padilla-Gonzales incarcerated, as part of Defendant's Zero Tolerance Policy.[107] That policy "direct[ed] each United States Attorney's Office *along the Southwest Border*—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)."[108] It did not direct law enforcement to increase prosecution for *all* offenses of 8 U.S.C. § 1325(a), such as those occurring along the northern border of the United States. To that end, practically all the illegal border crossings along the southwestern border are by Latino, Spanish-speaking migrants, but the same cannot be said for the northern border. Indeed, Plaintiffs allege their separation "was motivated by discriminatory animus towards Latino immigrants of Central

---

[104] Am. Compl. at 23–25 ¶¶ 86–92.

[105] 8 U.S.C. § 1325 (improper entry by a noncitizen).

[106] *See United States v. Sage Pharm., Inc.*, 210 F.3d 475, 480 (2000) (quoting *id.*) (internal quotation marks omitted).

[107] Mot. at 2.

[108] Memorandum for Federal Prosecutors Along the Southwest Border.

American origin" and that "DHS agents targeted Central American asylum seekers in particular for separation and harsh treatment as a means to deter them from pursuing legitimate immigration claims."[109]

Thus, Defendant's Zero Tolerance Policy plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants. As a possible violation of Plaintiffs' equal protection rights, Defendant's incarceration of Padilla-Gonzales and separation from her children under the Zero Tolerance Policy is not protected by the discretionary function exception.[110]

Even if that were not the case, however, Plaintiffs also allege Defendant violated their constitutional right to family integrity, which is secured by procedural and substantive due process.[111] This right extends to each Plaintiff individually and to citizens and noncitizens alike.[112] Procedurally, due process requires "notice and an opportunity to be heard . . . at a meaningful time and in a meaningful manner."[113] In the context of the right to family integrity, procedural safeguards also dictate that "[a] child cannot be removed without a court order or

---

[109] Am. Compl. at 25 ¶ 90.

[110] *See In re FEMA Trailer Formeldahyde Prods. Liab. Litig.*, 668 F.3d at 287 (""[a] motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears certain" the plaintiff is not entitled to relief").

[111] *See Morris v. Dearborne*, 181 F.3d 657, 666–67 (5th Cir. 1999); *Romero v. Brown*, 937 F.3d 514, 521 (5th Cir. 2019). Although *Morris* and *Romero* addressed Fourteenth Amendment protections for family integrity, whereas the Fifth Amendment is implicated here, the due process clauses of those amendments are practically identical and mean the same thing. *See Malinski v. New York*, 324 U.S. 401, 415 (1945) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth Amendment is too frivolous to require elaborate rejection.") (Frankfurter, J., concurring).

[112] *See Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000) ("[A] child's right to family integrity is concomitant to that of a parent."); *Wong Wing v. United States*, 163 U.S. 228, 242 (1896) ("The term 'person,' used in the fifth amendment, is broad enough to include any and every human being within the jurisdiction of the republic.").

[113] *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 530 (5th Cir. 2020) (citation and internal quotation marks omitted).

exigent circumstances."[114] Exigency means "there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse."[115]

Substantively, the right to family integrity recognizes a "fundamental liberty interest" in "a parent's custody and control of her children."[116] The right is not unlimited, however, as it "must be balanced against the [Government's] interests in protecting the health, safety, and welfare of children."[117] Like other substantive due process rights, the right to family integrity is violated when government action "can properly be characterized as arbitrary, or conscience shocking."[118]

Here, Defendant's incarceration of Padilla-Gonzales did not violate Plaintiffs' right to family integrity. As noted in a leading case on migrant family separation, "parents and children may lawfully be separated when the parent is placed in criminal custody."[119] But the same cannot be said for Plaintiffs' subsequent, continued separation. After Padilla-Gonzales was sentenced to time served, she was returned to an adult immigration detention facility.[120] Roughly a month passed between when her children were initially taken from her and when they were reunited

---

[114] *Romero*, 937 F.3d at 521 (citation and internal quotation marks omitted).

[115] *Gates v. Tex. Dept. of Protective and Regul. Servs.*, 537 F.3d 404, 429–30 (5th Cir. 2008) (evidence that father punched, kicked, and was otherwise physically abusive to children supported a finding of exigent circumstances justifying their removal without court order); *see Romero*, 937 F.3d at 522 (holding allegedly distressing state of the plaintiffs' cluttered home was not an imminent danger justifying warrantless removal of children).

[116] *Romero*, 937 F.3d at 519.

[117] *Id.* at 520 (citation and internal quotation marks omitted).

[118] *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

[119] *Ms. L. v. United States Immigr. and Customs Enforcement*, 310 F.Supp.3d 1133, 1143 (S.D. Cal. 2018).

[120] Am. Compl. at 14–15 ¶¶ 53–54, 16–17 ¶ 60.

with their father.[121] For much of this period, she was not allowed to speak to them or even know where they had been taken.[122]

Such extreme separation following Padilla-Gonzales' incarceration plausibly violated Plaintiffs' due process rights to family integrity. Procedurally, Plaintiffs were given no meaningful opportunity to be heard. Nor did a court order or exigent circumstances justify their continued separation. There was no reason to believe that D.A. and A.A. would have been in imminent danger of physical or sexual abuse in Padilla-Gonzales' care. Nor was her right to the custody and care of her children adverse to Defendant's interest in protecting their health, safety, and welfare. Instead, Plaintiffs' long-term separation was arguably arbitrary since, following Padilla-Gonzales' incarceration, she could have been reunited with her children in a family immigration detention center. Alternatively, she could have promptly been given a credible fear interview and released on bond. It was made conscience shocking, moreover, by virtue of the sheer completeness of the separation and the cruel, heartless way it was effectuated and maintained. Indeed, the staggering backlash that the Trump Administration received following implementation of its Zero Tolerance Policy—which caused that administration to retract the policy after little over two months—evinces the conscience-shocking nature of its forced family separations.

Finally, Defendant attempts to undermine Plaintiffs' contention that their constitutional rights were violated, but none of its efforts are convincing. First, it points out the FTCA does not provide a cause of action for constitutional torts.[123] But this conflates the difference between a

---

[121] *Id.* at 6 ¶ 23, 13 ¶ 46.

[122] *Id.* at 14–15 ¶ 54, 10 ¶ 37.

[123] Mot. at 23.

cause of action and a basis for immunity from a cause of action. Here, Plaintiffs are asserting causes of action based on state tort law not constitutional law. The issue of constitutional rights is relevant only with respect to whether Defendant had discretion to act as it did and, therefore, whether it retains immunity from suit regarding Plaintiffs' state law causes of action. Second, Defendant asserts the Constitution's mandates concerning family integrity are not sufficiently specific such that federal agents should have known that separating Plaintiffs was prohibited.[124] But that is simply not true. At least with respect to procedural due process, the constitutional right to family integrity is protected by a clear and straightforward rule: "[a] child cannot be removed 'without a court order or exigent circumstances.'"[125] Third, Defendant argues "conduct may be discretionary even if it is later determined to have violated the Constitution."[126] But the constitutional right to family integrity has been "well established" since at least 1992[127] and its clear and straightforward rule was in place at least a decade prior to the events alleged here.[128]

In sum, the court finds that Plaintiffs' separation, including during the period of Padilla-Gonzales' incarceration, plausibly violated their constitutional rights. As such, the court parts ways with its sister court in *Peña Arita v. United States*[129] and joins many district courts around

---

[124] *Id.*

[125] *Romero*, 937 F.3d at 521 (citation and internal quotation marks omitted).

[126] Mot. at 23.

[127] *Morris*, 181 F.3d at 671.

[128] *See Gates*, 537 F.3d at 434.

[129] *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 687–88 (S.D. Tex. 2020) (dismissing the plaintiff's IIED claim, which was based on similar family separation, finding it barred by the FTCA's discretionary function exception, but neglecting to consider the constitutional right to family integrity).

the country that have found forced family separations in comparable circumstances likely unconstitutional.[130]

Because Defendant likely did not have discretion to separate Plaintiffs, the court need not reach the second prong of the discretionary function analysis—namely, whether the decision to separate Plaintiffs was grounded in social, economic, and political policy.

The final question, then, is whether the separation of Padilla-Gonzales, D.A., and A.A has a private person analog. Such a comparison need only be reasonably similar: "[i]nherent differences between the government and a private person cannot be allowed to disrupt this analysis."[131] Defendant argues no appropriate analog exists here since "only the federal government has the authority to enforce federal criminal and immigration laws and make determinations concerning detention."[132] That misses the point, however. Plaintiffs are not challenging Defendant's authority to enforce federal law but rather the forced separation of their family.

To that end, the court finds an analogous circumstance exists under which "the United States, if a private person, would be liable" under Texas law.[133] Specifically, Texas courts recognize a tort cause of action for interruption of the parent-child relationship when someone

---

[130] *See, e.g., A.F.P. v. United States*, No. 121CV00780DADEPG, 2022 WL 2704570, at *1 (E.D. Cal. July 12, 2022); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996–97 (D. Ariz. 2020); *D.J.C.V. v. United States*, 605 F.Supp.3d 571, 591 (S.D.N.Y. 2022); *M.G.U. v. Nielsen*, 325 F.Supp.3d 111, 121 (D.D.C. 2018); *Ms. L. v. United States Immigr. and Customs Enforcement*, 302 F.Supp.3d 1149, 1161–67 (S.D. Cal. 2018); *Nunez Euceda v. United States*, No. 220CV10793VAPGJSX, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021); *see also Dominguez-Portillo*, 2018 WL 315759, at * 6 ("If Defendants are in fact separated from their children at the time of their arrest, prohibited from communicating with their children, not given any substantive information about the location and well-being of their children, and effectively barred from participating in their children's immigration proceedings up until the time of their (or their children's) deportation, then Defendants' constitutional rights to familial association may be implicated.").

[131] *In re FEMA Trailer Formeldahyde Prods. Liab. Litig.*, 668 F.3d at 288.

[132] Mot. at 31.

[133] *See* 28 U.S.C. § 1346(b)(1); *Olson*, 546 U.S. at 44.

abducts, entices away, or harbors a parent's minor child.[134] Here, Defendant took Padilla-Gonzales' children from her plausibly without due process of law. Had it done so as a private person, it would be liable under Texas law.

For the foregoing reasons, federal agents likely did not have discretion to separate Plaintiffs. Further, since Plaintiffs' forced separation has a private person analog, Defendant is not shielded by the discretionary function exception to the extent Plaintiffs' claims are based on that separation.

*Due Care in Transferring D.A. and A.A.*: The due care exception applies to any claim based on a federal employee carefully executing a statute or regulation, "whether or not such statute or regulation be valid."[135] As such, it "bars tests by tort action of the legality of statutes and regulations."[136] Here, Defendant was required under 8 U.S.C. § 1232 to transfer any unaccompanied noncitizen children to DHHS (which includes ORR) "not later than 72 hours after determining that" they are unaccompanied.[137] Nor have Plaintiffs shown that Defendant did not exercise due care in fulfilling this mandatory duty.[138] Accordingly, Plaintiffs are barred from challenging Defendant's discrete decision to transfer D.A. and A.A. to ORR custody once Padilla-Gonzales was incarcerated.

> b.    Misleading Padilla-Gonzales to Waive Asylum Claim

Plaintiffs allege that "immigration officers demanded that [Padilla-Gonzales] sign documents she did not understand, claiming they were required to reunite her with her children.

---

[134] *See* Resp. at 33 (citing *Silcott v. Oglesby*, 721 S.W.2d 290, 292 (Tex. 1986)).

[135] 28 U.S.C. § 2680(a); *see Spotts*, 613 F.3d at 566.

[136] *Dalehite*, 346 U.S. at 33.

[137] 8 U.S.C. § 1232(b)(3).

[138] *See In re Katrina Canal Breaches Consol. Litig.*, 627 F.Supp.2d at 667 (describing the *Welch* test).

[She] was later warned by others in the detention facility that those documents were actually a waiver of her asylum claims and an agreement to be deported."[139] Defendant argues it is protected from such allegations by the FTCA's "misrepresentation" exception, under which the United States retains sovereign immunity from "[a]ny claim arising out of . . . misrepresentation [or] deceit."[140] Plaintiffs do not challenge Defendant's contention. Nor have they shown a "chain of causation" from Defendant's alleged misrepresentation to any injury.[141] Accordingly, Plaintiffs' claims are barred to the extent they rely on allegations of federal employee misrepresentation.

c.      Conditions of Confinement

Defendant contends it is shielded by the discretionary function exception from various allegations concerning conditions of confinement. Specifically, Plaintiffs allege that federal employees: subjected them to freezing cold, crowded, and otherwise harsh conditions at holding and detention facilities[142]; confiscated Padilla-Gonzales' crutches[143]; failed to safely restrain her during transport, causing her to injure her head[144]; and chose not to take her to a hospital after her head injury failed to improve.[145]

*Harsh conditions of holding and detention facilities*: Plaintiffs allege they were subjected to harsh conditions at holding and detention facilities. They were initially kept in a very cold

---

[139] Am. Compl. at 7 ¶ 26.

[140] Mot. at 22 fn. 6; 28 U.S.C. § 2680(h).

[141] *See Life Partners Inc.*, 650 F.3d at 1031.

[142] Am. Compl. at 6 ¶¶ 21, 14 ¶ 52, 16 ¶ 59.

[143] *Id.* at 6 ¶ 22.

[144] *Id.* at 15 ¶ 55.

[145] *Id.* at 16 ¶ 58.

holding facility (often known as a "hielera," which is Spanish for "icebox") without blankets or jackets.[146] For several hours, Padilla-Gonzales was kept handcuffed, unable to warm herself.[147] She was also forced to take a cold shower at that facility.[148] She was later housed at the West Texas Detention Facility in a "small detention pod with approximately one hundred other women."[149] Guards there "would turn the lights out around 11:00 p.m. and turn them on again around 4:30 a.m., and throughout the night they would purposefully turn lights on and off, and yell at detainees."[150]

Plaintiffs point to only one non-discretionary duty that Defendant violated with respect to these conditions.[151] TEDS section 4.6 states that CBP "should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents."[152] Although "reasonable" would appear to grant CBP discretion in setting temperature controls, section 4.6 nevertheless sets a minimum standard below which temperatures may not fall: the comfort of detainees. When shivering immigrant detainees are kept handcuffed in a frigid holding center, not provided blankets or jackets, forced to take cold showers, and then returned to the "icebox" where they continued to shiver, it cannot be said that CBP maintained room temperature within a comfortable range for those detainees. Therefore, Defendant likely did not have discretion to

---

[146] Am. Compl. at 6 ¶ 21.

[147] *Id.* at 14 ¶ 52.

[148] *Id.*

[149] *Id.* at 16 ¶ 59.

[150] *Id.*

[151] *See id.* at 21 ¶ 80.

[152] CBP, TEDS, Oct. 2015, at § 4.6.

subject Plaintiffs to frigid conditions of confinement, and the court need not reach the second prong of the discretionary function analysis.

Because Defendant is not shielded from claims based on the decision to keep holding areas at frigid temperatures, the FTCA will provide a basis for suit "under circumstances where [Defendant], if a private person, would be liable to [Plaintiffs] in accordance with" Texas law.[153] Plaintiffs attempt vaguely to argue that a breach-of-fiduciary-duty claim under Texas law is a viable private person analog.[154] But such a claim requires a showing of injury, which Plaintiffs do not allege.[155] Accordingly, even if Defendant were a private person, the circumstances alleged show that it would not be liable to Plaintiffs.

With respect to crowding and lighting decisions, however, Defendant is presumed to have had discretion since Plaintiffs have not identified a specific, non-discretionary duty pertaining to crowding or lighting that was violated.[156] The court must therefore determine whether Defendant's decisions regarding crowding and lighting were grounded in social, economic, and political policy.

The court finds that they were. Importantly, "when established government policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion."[157] Thus, the discretionary function exception

---

[153] *See* 28 U.S.C. § 1346(b)(1); *Olson*, 546 U.S. at 44.

[154] Resp. at 26.

[155] *See Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015).

[156] It is the plaintiff's burden to identify a specific, non-discretionary duty. *Campos v. United States*, 888 F.3d 724, 731 (5th Cir. 2018).

[157] *Baldassaro v. United States*, 64 F.3d 206, 211 (5th Cir. 1995).

protects even negligent or wrongful acts that are abuses of discretion.[158] Here, determinations of how many detainees to hold in a given area or how lighted holding areas should be during nighttime hours are susceptible to policy analysis. They touch on economic and security concerns that the court is not entitled to second-guess. Therefore, even if holding areas were negligently overcrowded or if lights were used in a wrongful way, the discretionary function exception still applies. As a result, Defendant is immune from Plaintiffs' claims to the extent they are based on crowded, over-lit conditions of confinement.

For the foregoing reasons, Defendant retains sovereign immunity from Plaintiffs' claims to the extent they are based on the temperature, crowding, and lighting of the detention centers in which they were held.

*Confiscating Padilla-Gonzales' crutches*: Plaintiffs allege that, shortly after being apprehended by border patrol agents, Padilla-Gonzales was taken to a nearby hospital for treatment of a recent leg injury.[159] "At the hospital, she was given Ibuprofen to reduce the pain, her leg was wrapped in a cloth bandage, and she was provided with crutches. DHS officers, however, then confiscated her crutches and never returned them to her."[160] This, Plaintiffs contend, violated non-discretionary duties under section 4.3 of TEDS, which dictates that "appropriate medical care should be provided or sought in a timely manner."[161]

Plaintiffs are correct for at least two reasons. First, hospitals to which CBP detainees may be taken are pre-approved and, as such, operate as an extension of CBP operations. Thus, CBP is

---

[158] *Dalehite*, 346 U.S. at 33 ("The exercise of discretion could not be abused without negligence or a wrongful act.").

[159] Am. Compl. at 6 ¶ 22.

[160] *Id.*

[161] *Id.* at 22 ¶ 83; CBP, TEDS, Oct. 2015, at § 4.3.

not solely tasked with determining what constitutes "appropriate" medical care. Indeed, in order to provide "appropriate medical care," federal agents apparently felt it necessary to secure the input and services of an outside hospital. Second, clearly implicit in section 4.3's instruction is the notion that appropriate medical care be *maintained*. Here, medical professionals provided medical care and determined that, to be "appropriate," such care should include providing Padilla-Gonzales with crutches. Therefore, by confiscating her crutches, federal agents terminated her appropriate medical care and thereby violated a non-discretionary duty.

Because Defendant likely did not have discretion to confiscate Padilla-Gonzales' crutches, the court need not reach the second prong of the discretionary function analysis. Plaintiffs may challenge this conduct if Defendant, as "a private person, would be liable to [Plaintiffs] in accordance with" Texas law.[162]

Under Texas law, federal agents' confiscation of Padilla-Gonzales' crutches would plausibly state a claim for negligence, which requires showing "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach."[163] Defendant had a duty to provide appropriate medical care. By confiscating Padilla-Gonzales' crutches, it breached that duty. Unable to utilize the tools doctors provided to aid her in her recovery, she was undoubtedly damaged by that breach. Thus, Plaintiffs sufficiently allege circumstances under which Defendant, as a private person, would likely be liable to Padilla-Gonzales.

*Failing to safely restrain Padilla-Gonzales during transport*: Plaintiffs allege federal agents, while transporting Padilla-Gonzales to the airport, "handcuffed her behind her back,"

---

[162] *See* 28 U.S.C. § 1346(b)(1); *Olson*, 546 U.S. at 44.

[163] *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App. 2012).

"shackled her ankles," but neglected to secure her with a seatbelt.[164] At one point during transit, the driver slammed on the breaks, Padilla-Gonzales was "thrown forward," "slamm[ing] headfirst directly into the metal bars that separated her from the federal agents," causing her severe pain and injury.[165] Plaintiffs contend this failure to properly secure Padilla-Gonzales violated non-discretionary duties under section 1.3 of ICE's Performance-Based National Detention Standards ("PBNDS").[166]

PBNDS section 1.3 states that ICE officers must "ensure that when vehicles are equipped with seatbelts, detainees are properly secured before the transport begins."[167] As such, federal agents likely did not have discretion to transport Padilla-Gonzales without securing her with a seatbelt.[168] The first prong of the discretionary function analysis is not met, therefore, and the discretionary function exception does not apply.

As a result, the FTCA may permit Plaintiffs to litigate this alleged tort, if Defendant, as "a private person, would be liable to [Plaintiffs] in accordance with" Texas law.[169] Here, a ready vehicle is a negligence claim, which, again, requires showing "(1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach."[170] Drivers owe passengers a duty of care, which federal agents breached by failing to safely restrain Padilla-Gonzales, who was injured as a result of that breach. Thus, Plaintiffs'

---

[164] Am. Compl. at 15 ¶ 55.

[165] *Id.*

[166] *Id.* at 22 ¶ 83.

[167] ICE, PBNDS 2011, revised Dec. 2016, at § 1.3(V)(F)(7).

[168] Although Plaintiffs do not explicitly allege that the vehicle in which Padilla-Gonzales was transported had seatbelts, the court construes their complaint as implying as much.

[169] *See* 28 U.S.C. § 1346(b)(1); *Olson*, 546 U.S. at 44.

[170] *Gann*, 394 S.W.3d at 88.

allegations sufficiently make out circumstances under which Defendant, as a private person, would be liable for Padilla-Gonzales' injuries.

*Declining to take Padilla-Gonzales to a hospital*: The day after sustaining her head injury, Padilla-Gonzales was taken to a nearby hospital. Doctors there determined "that she needed to return if her condition did not improve within a few days."[171] Her condition failed to improve, "but federal agents never returned her to the hospital. Instead, they merely gave her ibuprofen."[172] Plaintiffs assert federal agents, in failing to return her to the hospital, violated their non-discretionary duties under section 4.3 of PBNDS.[173]

PBNDS section 4.3 states that detainees "shall be able to request health services on a daily basis and shall receive timely follow-up" and "shall receive continuity of care from time of admission to time of transfer, release or removal."[174] Importantly, however, these requirements, properly interpreted, pertain to medical services *at detention facilities*. Indeed, section 4.3 requires detention facilities themselves to provide "medical, dental and mental health care and pharmaceutical services;" they need only provide outside hospitalization "as needed."[175] In other words, detainees are entitled to daily health services, timely follow-ups, and continuity of care at their respective detention facility, but not necessarily from hospitals involved at some point in the course of their care. Thus, ICE agents had discretion under PBNDS section 4.3 not to return Padilla-Gonzales to the hospital, even though that decision contravened medical advice.

---

[171] Am. Compl. at 16 ¶ 58.

[172] *Id.*

[173] *Id.* at 23 ¶ 85.

[174] ICE, PBNDS 2011, revised Dec. 2016, at § 4.3(II)(5).

[175] Id. at § 4.3(V)(A).

Further, under the second prong of the discretionary function exception, the decision not to return Padilla-Gonzales to the hospital is susceptible to policy analysis. ICE officers may have evaluated the priority of following the hospital's recommendations in light of their limited resources and other responsibilities. They may have determined that detention facilities could provide Padilla-Gonzales with adequate care notwithstanding hospital guidance. These kinds of concerns touch on social, economic, and political policies that inform ICE's mission.

Because both prongs of the discretionary function analysis are met here, the discretionary function exception applies, and Plaintiffs are barred from challenging federal agents' decision not to return Padilla-Gonzales to the hospital.

d.    Confiscating Plaintiffs' Property

Plaintiffs bring a claim of conversion, alleging that, shortly after being apprehended by border patrol, "a federal officer searched [Padilla-Gonzales] and confiscated all of her belongings, including her identification card, birth certificates, and 80 Mexican pesos. These belongings were never returned to [her]."[176] Defendant argues, however, that Plaintiffs' conversion claim is barred by the FTCA's detention of goods exception.[177] Plaintiffs do not challenge this argument. More importantly, the court agrees with Defendant given the detention of goods exception is broad and includes unauthorized, tortious, or wrongful confiscations. Accordingly, sovereign immunity bars Plaintiffs' conversion claim.[178]

---

[176] Am. Compl. at 5 ¶ 20.

[177] Mot. at 32–33.

[178] *See* 28 U.S.C. § 2680(c); *Davila*, 713 F.3d at 256.

   e.  Delaying D.A. and A.A.'s Release from ORR Custody to Their Father

Plaintiffs allege that D.A. and A.A. remained in ORR custody for over a month.[179] This

delay, they argue, violated Defendant's non-discretionary duties under the *Flores* Agreement and

8 C.F.R. § 1236.3 to promptly reunify D.A. and A.A. with their father.[180]

  Neither of these authorities, however, specifically delineate such a duty.[181] The *Flores*

Agreement states that when CBP, ICE, or any other INS successor organization determines "that

the detention of the minor is not required either to secure his or her timely appearance before

[that organization] or the immigration court, or to ensure the minor's safety or that of others, [the

organization] shall release a minor from [its] custody without unnecessary delay."[182] Release to a

parent is the top priority.[183] Because the *Flores* Agreement tasks successor organizations with

making certain determinations and requires them to release minors without "unnecessary" delay,

it does not specify a timeline for release. Instead, federal conduct with respect to this provision of

the *Flores* Agreement involves "an element of judgment or choice."[184] Likewise, 8 C.F.R. §

1236.3 does not establish a specific timeline for reunifying unaccompanied minors with their

---

 [179] Am. Compl. at 14 ¶ 51.

 [180] *Id.* at 18–20 ¶¶ 67, 69, 71, 73, 76. Plaintiffs also note that "*Flores* also limits the time that accompanied minors may be held in immigration detention to twenty days, and requires that minors be released to a relative, legal guardian, or licensed program within five days of detention." *Id.* at 19 ¶ 69. But they do not allege that Defendant failed to abide by either requirement.

 [181] *See Gaubert*, 499 U.S. at 322.

 [182] *Flores* Settlement Agreement ¶ 14; *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016).

 [183] *Flores* Settlement Agreement ¶ 14; *Flores*, 828 F.3d at 903.

 [184] *A.E.S.E. v. United States*, No. 21-cv-0569 RB-GBW, 2022 WL 4289930, at *11 (D.N.M. Sept. 16, 2022); *see Gaubert*, 499 U.S. at 322 (citation and internal quotation marks omitted).

parents. The regulation merely states that, for such minors, release to a parent is the top priority.[185]

Because the delay in releasing D.A. and A.A. to their father was not legally proscribed, the court must determine whether timing decisions were grounded in social, economic, and political policy.[186] To that end, ORR is tasked with "coordinating and implementing the care and placement of unaccompanied alien children."[187] It may not release unaccompanied children until it determines that the proposed custodian can provide "for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child."[188]

With that in mind, the court finds that decisions regarding the timing of D.A. and A.A.'s release to their father are susceptible to policy analysis. Plaintiffs assert that "federal agents repeatedly, and without basis or explanation, continued to delay releasing D.A. and A.A. to their father" even though there was no reason "to dispute his parentage," which "could have been quickly verified."[189] But the assertion that delays were "without basis" is conclusory. Further, even assuming their father's parentage is genuine and verifiable, D.A. and A.A. do not claim that the delays were unrelated to ORR's efforts to verify his identify or determine that he was able to care for D.A. and A.A.

---

[185] *Id.*

[186] *See Gaubert*, 499 U.S. at 323.

[187] 6 U.S.C. § 279(b)(1)(A).

[188] 8 U.S.C. § 1232(c)(3)(A).

[189] Am. Compl. at 8 ¶ 30.

The only exception is their allegation that one of the delays was based on A.A.'s punishment for fighting with another child at Heartland.[190] But even that is susceptible to policy analysis since implementing and enforcing a disciplinary system accords with ORR's duty to oversee the care of unaccompanied alien children given that childcare encompasses the protection and structured supervision of children.

Because both prongs of the discretionary function exception are met, Defendant is immune from suit to the extent Plaintiffs' claims are based on the timing of D.A. and A.A.'s release from ORR custody.

>    f.    Negligent Supervision

Plaintiffs assert a negligent supervision claim, alleging vaguely that "CBP and ICE management staff were negligent in their non-discretionary duties to supervise individual officers" as shown by those officers' "blatant disregard" for CBP and ICE's internal policies and standards.[191] Defendant argues, however, that Plaintiffs' negligent supervision claim is barred by the discretionary function exception, noting "Plaintiffs have not identified any mandatory policy that directs precisely how to supervise federal officers and to oversee their treatment of migrants in their custody."[192]

Defendant is correct. Plaintiffs have failed to carry their burden of establishing that a specific mandate removed federal employees' discretion with respect to supervision of subordinates.[193] Furthermore, supervision of subordinates "involves the kind of judgment that the

---

[190] *Id.* at 14 ¶ 50.

[191] Am. Compl. at 29 ¶ 128.

[192] Mot. at 27–28.

[193] *See Campos*, 888 F.3d at 731.

discretionary function exception was meant to protect."[194] Accordingly, Defendant is immune from Plaintiffs' negligent supervision claim.

> g.      Sovereign Immunity Conclusions

Plaintiffs bring nine causes of action against Defendant: conversion, negligent supervision, medical negligence, negligence, breach of fiduciary duty, IIED, abuse of process, loss of consortium, and assault and battery.

The court makes the following findings:

First, Plaintiffs' conversion claim is barred by the FTCA's detention of goods exception.

Second, the discretionary function exception bars Plaintiffs' negligent supervision claim.

Third, Plaintiffs' remaining causes of action are barred *only* to the extent they are based on: 1) federal agents' attempts to mislead Padilla-Gonzales into waiving her asylum claim; 2) temperature, crowding, and lighting at detention and holding facilities; 3) federal agents' decision not to return Padilla-Gonzales to the hospital following her head injury; 4) their decision to transfer D.A. and A.A. to ORR custody; and 5) the timing of D.A. and A.A.'s release to their father.

Two important notes, however: Plaintiffs' prohibition on litigating the narrow, discrete decision to transfer D.A. and A.A. to ORR custody while Padilla-Gonzales was incarcerated does not bar them from litigating their initial family separation as a violation of equal protection or their sustained separation as a violation of substantive and procedural due process.

Second, Plaintiffs' prohibition on litigating the timing of D.A. and A.A.'s release from ORR custody pertains only to the decision on when to release them *to their father*. ORR was required to ensure D.A. and A.A.'s father could provide for their well-being before granting him

---

[194] *M.D.C.G. v. United States*, 956 F.3d 762, 772 (5th Cir. 2020).

custody. The court assumes, however, that D.A. and A.A. could have been reunited with their mother at a family immigration detention facility following her incarceration. But even if some unidentified law or regulation prohibited ORR from returning D.A. and A.A. back to CBP or ICE custody, such a prohibition would not cure the constitutional violations discussed herein.

### B.    *Failure to State a Claim*

Finally, Defendant argues that, assuming Plaintiffs can establish subject-matter jurisdiction, they nevertheless fail to state a claim under Texas law for IIED, abuse of process, and medical negligence.[195]

### a.    IIED

In order to state a claim for IIED, a plaintiff must show "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe."[196] Defendant argues Plaintiffs cannot make out an IIED claim because their separation was predicated on Padilla-Gonzales' incarceration, and "the prosecution of crime and enforcement of federal immigration law is neither extreme nor outrageous."[197]

But Plaintiffs do not assert an IIED claim based merely on the fact that immigration law was enforced against Padilla-Gonzales. Instead, they assert Defendant's prosecution of Padilla-Gonzales and her six-day detention (from May 23 to May 29, 2018) was a pretextual means of cruelly separating her from her children and keeping them separated to "deter them from pursuing legitimate immigration claims."[198] Indeed, far beyond simply prosecuting Padilla-

---

[195] Mot. at 33–38.

[196] *Twyman v. Twyman*, 855 S.W.2d 619, 620 (Tex. 1993).

[197] Mot. at 2, 34.

[198] Am. Compl. at 25 ¶ 90.

Gonzales, federal agents took her children away on short notice without giving her an opportunity to say goodbye, did not tell her where her children had been taken, and did not allow Plaintiffs to communicate for several weeks.[199] Further, most of the forced separation occurred after Padilla-Gonzales' brief incarceration. Plaintiffs suffer greatly from the trauma of these events.[200] As such, these allegations state a plausible claim for IIED.[201]

> b.    Abuse of Process

"Abuse of process is the malicious use or misapplication of process in order to accomplish an ulterior purpose."[202] To show abuse of process, a plaintiff must establish "(1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process, (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act."[203]

Defendant asserts Plaintiffs have not pled facts establishing the first and second elements.[204] The court is unpersuaded. Texas law recognizes a cause of action for abuse of process where "the original issuance of a legal process is justified, but the process itself is subsequently used for a purpose for which it was not intended."[205] Although federal agents were

---

[199] *Id.* at 6 ¶ 23, 10 ¶ 37, 14–15 ¶ 54.

[200] *Id.* at 17–18 ¶¶ 61–64.

[201] *See, e.g., D.J.C.V.*, 605 F.Supp.3d at 600–01; *A.I.I.L. v. Sessions*, No. CV-19-00481-TUC-JCH, 2022 WL 992543, at *7 (D. Ariz. Mar. 31, 2022); *C.M. v. United States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020).

[202] *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001).

[203] *Moore v. Bushman*, 559 S.W.3d 645, 653 (Tex. App. 2018).

[204] Mot. at 37.

[205] *Hunt*, 68 S.W.3d at 130.

empowered to prosecute Padilla-Gonzales, prosecuting a first-time offender for the lesser offense identified in 8 U.S.C. § 1325(a)(1)—which allows individuals who enter the United States improperly to be subjected merely to civil fines—was not warranted since that decision, as discussed above, plausibly violated Plaintiffs' constitutional rights to equal protection. Indeed, 8 U.S.C. § 1325(a) establishes three categories of increasingly culpable behavior for which a nonresident can be fined or imprisoned: entering or attempting to enter the United States at an undesignated place, eluding examination or inspection by immigration officers, or entering or attempting to enter the United States through willfully false or misleading means.[206] Here, prosecutors charged Padilla-Gonzales with merely improper entry; they did not allege that she attempted to elude inspection or enter the United States through willfully false or misleading means.

Additionally, Plaintiffs adequately allege that the decision to incarcerate Padilla-Gonzales and take her children from her was 1) a pretext to coerce them into giving up their legitimate immigration claims and 2) driven by discriminatory animus toward Central Americans immigrants.[207] As such, 8 U.S.C. § 1325 was plausibly utilized for an unintended purpose.

Finally, Defendant argues Plaintiffs "fail to adequately allege damages as a result of" any abuse of process.[208] This is not true. They assert they have been traumatized by the lengthy and comprehensive family separation that Defendant forced upon them, which was only made possible by Padilla-Gonzales' initial incarceration.

Accordingly, Plaintiffs have plausibly alleged an abuse of process claim.

---

[206] 8 U.S.C. § 1325(a).

[207] Am. Compl. at 25 ¶ 90.

[208] Mot. at 38.

c.     Medical Negligence

"To prevail on a claim for medical negligence, a plaintiff is required to prove (1) a duty by the healthcare provider to act according to a certain standard, (2) a breach of the applicable standard of care, (3) an injury, and (4) a sufficient causal connection between the breach of care and the injury."[209]

Defendant points out that "Plaintiffs do not allege any medical negligence on behalf of any government medical providers."[210] In response, Plaintiffs assert that "non-medical providers may be liable for medical negligence" when "they fail to provide individuals in their control access to medical care."[211] Nevertheless, a non-medical provider, to be liable for medical negligence, must still be a *healthcare* provider.[212] None of Plaintiffs' cited caselaw, moreover, challenge that proposition.[213] Nor is the court aware of any Texas caselaw finding medical negligence against an entity that is not a healthcare provider.[214]

Accordingly, Plaintiffs fail to state a claim for medical negligence because they do not allege that any government healthcare providers were negligent.

---

[209] *Dunnick v. Marsillo*, 654 S.W.3d 224, 228 (Tex. App. 2022) (citation and internal quotation marks omitted).

[210] Mot. at 38.

[211] Resp. at 31.

[212] Medical care is a subset of healthcare.

[213] *See id.* (citing *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30 (Tex. 2002) and *St. Paul Med. Ctr. v. Cecil*, 842 S.W.2d 808 (Tex. App. 1992)). The plaintiffs in *Peavy* asserted an ordinary negligence claim against a mental health management company that ran a care facility for the developmentally disabled. 89 S.W.3d at 32. In *Cecil*, the plaintiffs asserted a negligence action against physicians, a nurse, and a hospital. 842 S.W.2d at 811. Neither case dealt with a formal medical negligence claim, and in both cases the defendant was a healthcare provider.

[214] The Texas Medical Liability Act, which governs medical liability claims, restricts those claims to causes of action against physicians, registered nurses, dentists, podiatrists, pharmacists, chiropractors, optometrists, or healthcare institutions or collaboratives. TEX. CIV. PRAC. & REM. § 74.001(12)–(13).

IV.    **CONCLUSION**

For the foregoing reasons, the court lacks subject-matter jurisdiction over Plaintiffs' conversion and negligent supervision claims. The court retains subject-matter jurisdiction over Plaintiffs' negligence, breach of fiduciary duty, IIED, abuse of process, assault and battery, and loss of consortium claims to the extent those causes of action are not based on conduct protected by the FTCA. Plaintiffs' medical negligence claim is dismissed for failure to state a claim.

Accordingly, it is **HEREBY ORDERED** that "Second Amended Renewed Motion to Dismiss" [ECF No. 105] is **GRANTED IN PART** and **DENIED IN PART**.

**SIGNED AND ENTERED** this 23 day of **March 2023.**

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**